# EXHIBIT C

**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

NOVO NORDISK PHARMACEUTICALS,      :   CIVIL ACTION
INC., and NOVO NORDISK A/S,        :
                                   :
            Plaintiffs             :
                                   :
        vs                         :
                                   :
BIO-TECHNOLOGY GENERAL CORP.,      :
and TEVA PHARMACEUTICALS USA,      :
INC,                               :
                                   :
            Defendants             :   NO 02-232 (SLR)

                      Wilmington, Delaware
                      Thursday, November 21, 2002
                      4:30 o'clock, p.m.

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

APPEARANCES:

        RICHARDS, LAYTON & FINGER
        BY: FREDERICK L. COTTRELL, II, ESQ

            -and-



                              Valerie J. Gunning
                              Official Court Reporter
```

**Page 2**

```
APPEARANCES (Continued):

     GREENBERG TRAURIG, LLP
     BY: ALBERT L. JACOBS, JR., ESQ.,
         DANIEL A. LADOW, ESQ.,
         JERRY DIEBNER, ESQ and
         LIZ LAPADULA, ESQ
         (New York, New York)

         Counsel for Plaintiffs


     YOUNG, CONAWAY, STARGATT & TAYLOR
     BY: RICHARD MORSE, ESQ

           -and-

     KENYON & KENYON
     BY: THOMAS J MELORO, ESQ
         (New York, New York)

           -and-

     KENYON & KENYON
     BY: JOHN W. BATEMAN, ESQ
         (Washington, D.C)

         Counsel for Defendants
```

**Page 3**

PROCEEDINGS

(Proceedings commenced in the courtroom, beginning at 4:30 p.m.)

THE COURT: Good afternoon, counsel.

MR. COTTRELL: Good afternoon, your Honor.

(Counsel respond "Good afternoon, your Honor.")

MR. COTTRELL: Good afternoon, your Honor. Fred Cottrell, for Novo Nordisk.

With me at counsel table is Albert Jacobs, Jr., Dan Ladow, Jerry Diebner and Liz Lapadula, from the Greenberg Traurig firm in New York

THE COURT: All right. Thank you.

MR. COTTRELL: Thank you your Honor.

MR. MORSE: Good afternoon, your Honor.

THE COURT: Good afternoon.

MR. MORSE: Richard Morse, for the defendants. I'm here in place of Ms. Ingersoll because she's next-door in trial.

And I'd like to introduce Tom Meloro and John Bateman, from Kenyon & Kenyon

THE COURT: Nice to see you all. I know we have a couple of things on the agenda. I don't know if

**Page 4**

you have an idea of what we should attack first, what makes sense, whether some issues flow from others or whether it really does not matter, but why don't I let plaintiffs' counsel kind of lead me through initially and then we'll get responses from defendants' counsel.

I know there is an outstanding motion for bifurcation of damages, discovery and trial. I don't know whether it makes sense -- when in the proceedings we should address that. Quite frankly, I've gone through the papers and I just need brief presentations on the issue, but I'd certainly like to hear from you all on that issue

So why don't we start with that and then once we make up our minds about that, because I do plan to make a decision right now, we can decide how we're going to conduct discovery and resolve any discovery issues and I believe I recall there being some discussion about slightly modifying the schedule

So why don't we start with the motion.

MR. BATEMAN: Good afternoon, your Honor. Dan Ladow for Greenberg Traurig, the plaintiffs.

We were going to suggest actually that we do what you were just proposing, which is to briefly address the motion and then talk about an issue relating to this discovery from third parties, a judicial estoppel issue relating to that, try to deal with those issues and then

**Page 33**

1 been conduct, then obviously there won't be -- we won't
2 leave it open for damages.
3     I don't know whether that makes any sense. But
4 at some point, there's got to be a cutoff. The case has to
5 be the case.
6     And so we are going to stay -- I think rather
7 than bifurcate, we're going to stay damages for the moment
8 to be readdressed if the situation changes, if the status
9 quo changes.
10    MR. MELORO: Your Honor, would it be the
11 Court's intention that if the case does not proceed to a
12 single trial on liability and damages, for whatever reason,
13 depending on the timing of the Court decisions and party
14 conduct, if we just have a liability trial, but damages
15 somehow stays in this case?
16    THE COURT: Well, as I said, if damages
17 haven't -- haven't accrued by the time we go to trial then,
18 as far as I'm concerned, there are no damages in my case
19 and you all can fight about that in some other litigation
20 before some other judge.
21    MR. MELORO: If damages have accrued, but it's
22 just too late for the parties to try that in July --
23    THE COURT: Well, I might postpone the entire
24 trial. I might bifurcate.
25    MR. MELORO: That's really the crux of what

**Page 34**

1 we're saying to your Honor. That is essentially punishing
2 our client and delaying the entire case.
3     THE COURT: Well, what -- I mean, what I'm
4 trying to say is there are no damages now. There's nothing
5 to discover. And I understand your clients' frustration
6 but, on the other hand, I can't let your client get away
7 with conduct if, in fact, in my case, your clients' conduct
8 would lead to a damages case and it's still within my
9 jurisdiction.
10    So I can't tell you right now exactly what will
11 happen if the status quo changes and, quite frankly, I
12 think it's a little premature, except to say that damages
13 discovery is stayed. As soon as the status quo changes,
14 you all need to let me know and we'll have a more focused
15 discussion, depending on what our situation is
16    And you can remind me that your clients might,
17 in fact, be prejudiced by how we're proceeding. But at
18 this point, I don't think it makes sense to go forward.
19    MR. MELORO: Thank you, your Honor.
20    THE COURT: All right. So to some extent, for
21 purposes of the record, because Washington likes to see
22 that I get my motions decided and my Law Clerk will take
23 note to give notes to my Docketing Clerk, the motion is
24 granted in part and denied in part, because we're giving
25 some relief, but not what was specifically asked for.

**Page 35**

1     MR. MELORO: Your Honor, that now makes I think
2 ripe one discovery issue, and I understand that part of the
3 reason we're here today is to take up discovery issues.
4 That's not directly on the agenda we sent you and that is
5 the license agreements that Novo has entered into with
6 respect to the '352 patent in suit.
7     The issue of obviousness is in this liability
8 case. I presume that Novo is going to rely on secondary
9 considerations in response to that.
10    Novo has licensed the entire industry here,
11 including Genentech, and Genentech cross-licensed its patent
12 with Novo, as far as we understand it.
13    That Genentech prior-art patent is something
14 that we are relying on as invalidating prior art in this
15 lawsuit. We relied on it in the Federal Circuit in the
16 appeal that's pending.
17    And we think that those license agreements
18 will bear poignantly on Novo's real view of that Genentech
19 '980 patent and how Novo treated Genentech, which had
20 that '980 patent in its hand, versus the rest of the;
21 industry that it chose to license.
22    And the terms of Novo's deal with Genentech
23 versus the terms of Novo's deal with these other parties
24 is highly relevant to our proceeding in the liability case
25 here irrespective of whether Novo wants to rely on those

**Page 36**

1 license agreements themselves in the liability case in
2 defense to anything we might say.
3     It has been Novo's position thus far that if
4 we're not going to have damages discovery now, there we're
5 not entitled to see those license agreements. And I think
6 we're reaching the point where depositions are going to be
7 starting very soon, document production. A wave of
8 documents have been produced on each side and this issue
9 is now ripe before the Court, I believe, and we would ask
10 the Court to take this up, because we view this as a very
11 pertinent issue, given the ruling that was just made.
12    THE COURT: All right. Thank you very much.
13    Let's hear from plaintiffs' counsel on that
14 point.
15    And while I'm thinking of it, because I'm
16 getting senile, I see that for some unknown reason, we have
17 scheduled a bench trial and I've given you the opportunity
18 to file case and issue dispositive motions before the bench
19 trial and I generally don't let you do that. If you want
20 to have -- I mean, we grant motions for summary judgment
21 very rarely and the reason we don't is because I can get
22 an affidavit from 15 different experts and I can't test
23 their credibility in their affidavits.
24    I want them here on the stand and that's no
25 different with a bench trial. I'm still going to want to

### Page 37

1 see these people, see if they look me in the eye, see if
2 they make sense, see whether they tell a story better than
3 the other experts.
4          So to me, summary judgment motions, when I'm
5 going to be the finder of fact, make absolutely no sense,
6 unless it truly is an issue of law.
7          So I -- we're going to talk about scheduling,
8 but I just want to tell you that unless there are issues of
9 law that you want to address by motion, I mean, I'm not
10 sure at this point, because I didn't, for some reason, I
11 was very generous that day, if you give me affidavits, I'm
12 just going to deny them, because I want to see these people.
13 I want to see them tested through the trial process.
14          But back to licensing agreements and whether
15 they should be produced in connection with the liability
16 phase.
17          MR. LADOW: Your Honor, I did have something to
18 say. If you want me to defer it, I certainly will, on the
19 summary judgment issues.
20          THE COURT: Well, it depends how schizophrenic
21 you are. If you can get back to the licensing agreements,
22 I will let you go ahead with the summary judgment issue.
23          MR. LADOW: Okay. I can do that.
24          Last time we were before your Honor for the
25 scheduling conference, I think maybe back in June, it was

### Page 38

1 not that long after we had had the oral argument on the
2 preliminary injunction motions and I think everything
3 would have been fresh in your Honor's mind in terms of all
4 the varied arguments that the parties put forth.
5          One of the arguments that we put forth that
6 led to your Honor's finding of a likelihood of infringement
7 in the case -- a finding, by the way, that was not appealed
8 by the defendants to the Federal Circuit -- was that the
9 product in issue earlier, when we were talking about the
10 other motion, I mentioned that the four or five companies
11 that sell the product, they all sell this 191 amino acid
12 HGH. That's the product. And the patent covers right bio
13 synthetic HGH.
14          THE COURT: You've got to move along because it's
15 5:20.
16          MR. LADOW: I will, your Honor.
17          So we think that the patent clearly covers this
18 191 amino acid HGH. We have information from the defendants
19 that clearly indicates, without any controversy, that that
20 is exactly what they are planning to sell, and we think we
21 do have a matter of law motion, which we referenced at
22 that June conference on infringement. And, in fact, we
23 were planning to make shortly a summary judgment motion on
24 infringement.
25          The other thing is that, and this relates to

### Page 39

1 the other -- the Genentech discovery issue. There's another
2 motion involved with that. Maybe I will just leave that
3 and come back to the license issue.
4          THE COURT: Well, let me just explain something
5 to you, and maybe we can work something out here.
6          I know you all think that when you present
7 issues to the Court, they are clear. I've got 50 or 60
8 patent cases on my docket.
9          I generally don't allow case- and issue-
10 dispositive motions until the end of the case, because
11 it's too hard for me to slip in and out of the technology.
12 It takes me, depending on the technology, a day, a week,
13 to really understand what's going on. And that's when I
14 want to address it, because, you know, if you just do the
15 numbers with 60 patent cases and 60 different technologies,
16 I don't have that much time to go in and out and relearn
17 things multiple times.
18          So I know I had a grasp of the technology in
19 June. You ask me today what this case is about and I will
20 remember only glimmers, because I've had 15 other cases
21 since then that I've had to try to learn and become an
22 expert in.
23          So let's get back to the discovery issues.
24 Then we can talk about scheduling and about whether it
25 makes any sense at all in this case to deviate from what my

### Page 40

1 normal practice is, because my normal practice is you give
2 me everything at once so that I can use my accumulated
3 knowledge and apply it one time, not 15 different times
4 over the course of several months.
5          So let's go back to discovery issues. Then
6 we'll end up with scheduling issues.
7          MR. LADOW: Yes, your Honor. On the license
8 issue, Novo Nordisk sued the other, I think it was four
9 companies in the industry. All of those lawsuits were
10 settled. Licenses were entered into. In some of those
11 instances, there were other cases going on between the
12 parties, including relating to other subject matter.
13 Insulin products, for example.
14          The various companies involved names like Eli
15 Lily. Genentech had significant patent portfolios
16 relating either to the subject matter at issue or to
17 other things.
18          The settlement agreements did resolve those
19 cases. They also resolved other things. We're not
20 relying, we don't intend to rely, we don't think we need
21 to rely on those license agreements for secondary indicia
22 of nonobviousness in the validity side of the case.
23          I mean, remember that this is the same set of
24 defendants that tried to get the very claim, that copied
25 our claim in the interference and tried to get it for

### Page 41

1 themselves.
2     THE COURT: Well, the question is: If these
3 sorts of documents are routinely exchanged in connection
4 with obviousness defenses, that's the first question. And
5 if that's the case, why should this case be any different?
6     MR. LADOW: The answer to that is that the non
7 sequitur, your Honor, I believe is their counsel saying
8 that these licenses somehow give them a leg up on validity
9 on let's say a piece of prior art.
10     Whatever -- regardless of whatever these
11 licenses say, in order for them to prove that a particular
12 piece of prior art is good, you know, in value invalidates
13 our patent, they're going to have to direct themselves to
14 that prior art and all we were saying with respect to
15 these licenses is two things: One, if they were to be
16 produced, it would really be relevant, if anything, to
17 damages, and even then, we would want their access to
18 them restricted because it wasn't settlement because it
19 was in settlement of litigation, just the type of
20 litigation we have with them.
21     And the second thing is that we weren't
22 planning to rely on them in any event.
23     I would also say that we just got a letter two
24 days ago about this issue and we have not really had a
25 chance to respond to the other side. I'm simply

### Page 42

1 addressing it now because your Honor wished us to do so.
2     THE COURT: Okay. So let me make sure I
3 understand your position. Your position is that you're
4 not going to be relying on these documents in your direct
5 case and that whatever relevance they have, it's minimal
6 and outweighed by the fact that they're very confidential.
7     Is that basically what you said?
8     MR. LADOW: Yes.
9     One other thing. If your Honor did believe
10 that we should produce them or if they became producible,
11 even in a damages phase, we would ask that we be able to
12 redact at least the economic terms of the agreement, at
13 least, you know, dollar amounts, that kind of thing.
14     THE COURT: Okay. Let's hear from defendants'
15 counsel on that issue and then we'll go on to any other
16 discovery issues that plaintiffs have and the defendants
17 have.
18     MR. MELORO: Thank you, your Honor.
19     We are here talking about discoverability.
20 Obviously, not admissibility. And the standards for
21 discoverability are far different from some of the
22 arguments that I think were being made, which sounded
23 more like a Rule 403, Federal Rules of Evidence.
24     The Novo argument is based on them having seen
25 the documents and telling all of us, don't worry about it.

### Page 43

1 They're not relevant.
2     We have not even seen the documents to know
3 whether they're admissible or not. I think Novo gave its
4 patent away, essentially, to the industry. That's just
5 my gut belief. And I think those licenses are going to
6 show that because Novo knew it had a weak position. But I
7 don't know that because I haven't seen the documents yet,
8 so I can't even get them under a protective order or an
9 outside-counsel's-eyes-only agreement in litigation.
10     An argument is being made that we shouldn't be
11 allowed to see the economic terms of the license. Why
12 shouldn't we know if they, for one penny, gave somebody a
13 license under patent because they didn't want to have to
14 test it against Eli Lily or somebody else or Serona. We
15 didn't hear anything about Serona and what they might have
16 given in return or Pharmacia and what they might have
17 given in return.
18     This is standard discovery in patent litigation
19 for obviousness, whether or not there was industry
20 acquiescence, a whole host of factors routinely considered
21 by the courts at trial. And certainly to be arguing about
22 the discoverability of the documents seems to be a whole
23 different ball of wax than should they be admissible at a
24 trial or should the Court give them one degree of weight
25 or another in making its decision on the issues.

### Page 44

1     This is just a very threshold issue of Rule 26
2 relevance in discovery, your Honor.
3     THE COURT: Already. Thank you very much.
4     Last word from plaintiffs' counsel and then
5 we'll move on to other issues.
6     MR. MELORO: I don't really have anything else
7 to add on this substantively, your Honor, except to say
8 that one of the other issues that we have not addressed
9 yet is a protective order has been agreed to except for
10 what was mentioned in your agenda letter about letting
11 in-house counsel see all of the outside-counsel-only
12 information and if we -- if your Honor thought that we
13 needed to produce these documents, whether it was now or
14 whether it was in connection with the damages case, we
15 don't think that their in-house counsel should see what we
16 settled these other lawsuits for with these other companies.
17 We don't think that's appropriate.
18     Thank you, your Honor.
19     THE COURT: All right. And I agree with that
20 last point. I am going to have them produced, unredacted,
21 but they're for outside counsel only, regardless of what
22 we decide otherwise on the protective order.
23     All right. Let's get on with the rest of the
24 discovery issues, since we've used up your hour and are
25 running into overtime here, and I'm hoping my children

Page 53

1  just have a the practical concerns that, depending on what
2  the discovery schedule is and how we work that out, there's
3  still going to be deadlines where documents have to be
4  produced because of the volume so that plaintiffs have a
5  fair and equitable opportunity to use them and deal with
6  them during the discovery process.
7       So let's go on with any discovery issues and
8  we'll kind of get back to the Genentech life of its own
9  kind of documents when we talk about scheduling again.
10      MR. MELORO: Okay. Your Honor, I believe the
11 next issue on the agenda is the protective order generally
12 in this case and the issue before the Court is whether
13 in-house attorney representatives can be on the protective
14 order.
15      THE COURT: I forget. Who wants them and who
16 doesn't?
17      MR. MELORO: Defendants, BTG and Teva, wish to
18 have two in-house lawyers on the protective order obviously
19 to see all documents except what license agreements the
20 Court just accepted from that and Novo wants to have
21 essentially a two-tiered order where in-house counsel
22 would be precluded generally from seeing a bigger universe
23 of documents that they have not really defined yet.
24      My partner, Mr. Bateman, would be happy to
25 address that issue with the Court.

Page 54

1       THE COURT: All right. And I am going to
2  leave at 6:00, so we've got a few more minutes.
3       Let me just say before you come up, and I
4  don't know, do you have other in-house people who have
5  access? I mean, I generally allow in every case one
6  person in-house, whether it's a technical person or a legal
7  person, who has access to everything, because I believe
8  that the clients deserve to have one person with access
9  to everything.
10      Now, I don't know whether we're talking apples
11 and oranges here. Not two: One. One person. So I don't
12 know whether that resolves the issue.
13      MR. MELORO: From our perspective, it does,
14 your Honor, because the fight is not one versus two at
15 this point, so if each party could have one in-house
16 person, that would be acceptable from our standpoint.
17      THE COURT: And this is the thing. If you all
18 can't agree on who that one person is, my new procedure is
19 to bring them in. I mean if there are two objections
20 about this person's qualifications, trustworthiness, area
21 of expertise, again, I get all of this garbage in
22 affidavits. I'd rather hear the person because, on
23 occasions, I've heard them and have decided that --
24      MR. MELORO: We'll certainly designate people
25 that ought to be acceptable and try to work it out with

Page 55

1  Novo.
2       THE COURT: All right.
3       MR. MELORO: Thank you, your Honor.
4       MR. LADOW: Your Honor, on the basis of one for
5  one where we can get some information from them and try to
6  work it out, we will do that.
7       THE COURT: ALL right.
8       THE COURT: All right. It's important that we
9  get moving on this. I'm interested in having a mini
10 hearing if we need it. It's actually fun.
11      MR. MELORO: On the defense side of the case,
12 we have two distinct parties, Teva and BTG. They're two
13 unrelated companies. We would request that each of those
14 companies have one representative.
15      THE COURT: Well, you can certainly suggest
16 one from each. And you have to understand that these
17 people, I mean, it's bottom line, in this court I think
18 your local counsel will tell you that they can't be
19 involved in marketing, business decisions, patent
20 prosecutions, that sort of thing. So -- all right?
21      MR. MELORO: Understood, your Honor.
22      THE COURT: All right.
23      THE COURT: All right. Hopefully, you can work
24 that out.
25      Any other discovery issues that we should

Page 56

1  address before we get to how we're going to schedule this
2  case?
3       MR. LADOW: I don't believe so, your Honor.
4       THE COURT: All right.
5       THE COURT: All right. Now, you can give
6  yourself more time by eliminating that case and issue-
7  dispositive motion date, because if, in fact, you follow
8  my advice and the only motions I receive prior to the
9  bench trial are truly legal issues, without affidavits
10 and stacks of documents, you can file those any time.
11      I won't entertain the standard motions for
12 summary judgment that have expert affidavits and you can
13 give yourselves a couple more weeks or months by getting
14 rid of that motion.
15      MR. MELORO: From our standpoint, your Honor,
16 that would be perfectly acceptable, and I think we have
17 enough time in the schedule as already at least agreed by
18 the parties to keep to our trial date, and I think to the
19 extent we wanted to give ourselves even more time and
20 we've already agreed amongst ourselves, we could probably
21 work it out without bothering the Court and just come back
22 if there's some sort of disagreement.
23      THE COURT: I frankly don't care how you use
24 your time up to my trial date unless you -- unless there's
25 a motion.

### Page 57

1    MR. MELORO: Our scheduling has been something
2    that has run relatively smoothly between the parties, so I
3    would be happy to try to keep going down that track.
4        THE COURT: All right.
5        MR. JACOBS: Just a word on the other motion Mr.
6    Ladow mentioned. He mentioned judicial estoppel. We also
7    believe we should respectfully request the Court permit us
8    to file a summary judgment on infringement. There would be
9    no declaration or affidavits attached to that either.
10       MR. LADOW: Except for an affidavit putting in
11    document that we have not an expert.
12       THE COURT: Well, you can certainly -- I mean,
13    generally, I don't allow fact -- I don't know the state of
14    the record. Summary judgment motions that are fact-
15    intensive I generally don't allow until the end of
16    discovery, so that I can't -- I just don't get a response
17    from the defendants or from the non-movant, saying discovery
18    isn't over. The record isn't closed. There's no way you
19    can make a decision on this.
20       So I will leave it to you to exercise your
21    judgment.
22       Now, certainly, if you could get an agreement
23    from the defendant that this is the universe of information
24    that should be used for an infringement analysis and give
25    me undisputed documents anyway, even if they're not

### Page 58

1    undisputed facts, then I will be happy to look at it. But
2    I frankly think it's a waste of my time because I can't
3    make this judgment for you to come with a motion for summary
4    judgment and for the defendants to respond. The record
5    isn't closed and we have not had the opportunity to explore
6    this or that.
7       So I'm not going to preclude you from doing it
8    in this case. If, I trust you will not waste my time by
9    trying to pursue something that even if you think it should
10    happen, it's just going to generate paper and not really
11    lead to a decision on my part.
12       So I don't know what to tell you. I would say
13    at least wait until the end of discovery, unless you get
14    agreement from the defendants that this is an issue that
15    can be resolved on the papers. I don't know.
16       MR. JACOBS: Let us discuss it with the
17    defendants, your Honor.
18       THE COURT: All right.
19       MR. JACOBS: Our intention is not to waste the
20    Court's time. But we think in this particular case, for a
21    variety of factors, including, you know, the fact that
22    they've appealed the interference decision to this very
23    Court, that there can't be a controversy about the claim
24    covering the very product that they sought to launch.
25       THE COURT: All right.

### Page 59

1    MR. JACOBS: This is not a normal patent case.
2    We might be arguing what the terms really mean, does this
3    product fall within the scope of the claim. We will
4    exercise discretion and file a motion only if we believe
5    it will simplify the case and not add to the mound of
6    paper that your Honor has to sift through.
7       THE COURT: All right. Assuming, then, that
8    there won't be -- it seems to me that this case is treated
9    like my other bench trials, that we don't have standard
10    summary judgment motions with mountains of appendices and
11    affidavits, because I'm having a bench trial, that you can
12    use some of the time, if you feel you need to, that would
13    be devoted to filing motions and my deciding motions for
14    your own purposes finishing discovery.
15       Having that said, I do think we need to take a
16    few minutes to talk about these documents from Genentech
17    and make sure that, in the absence of a ruling precluding
18    that discovery, that we have a deadline for making those
19    documents available to plaintiffs, so that the schedule
20    can be kept. And without -- maybe you just need to work
21    that deadline into your revised schedule and you can call
22    me if you can't agree to that. But it seems to me with
23    that volume of documents, that you've got to allow at least
24    60 days, if not 90 days, for followup discovery, depending
25    on what it is and what we're talking about. And you don't

### Page 60

1    really have a whole lot of time, so I --
2       MR. MELORO: I would agree with the Court's
3    suggestion, that perhaps we talk with Novo's counsel, try
4    to agree on some dates, given the guidance that we've had
5    here today, and I am relatively hopeful that we could agree
6    on something that will be acceptable to everybody. And, if
7    not, we can then contact the Court to see if we can get it
8    resolved.
9       THE COURT: I do think it's important that you
10    get a revised schedule in place as soon as possible. If
11    you can't agree on it without spinning a lot of wheels,
12    just give me a call. We'll have a telephone conference.
13       MR. MELORO: Thank you very much, your Honor.
14       MR. LADOW: Your Honor, on the schedule, just
15    to help us do what you just asked us to do.
16       THE COURT: Right.
17       MR. LADOW: We had oral argument on both -- you
18    had a date not only for filing summary judgment motions,
19    but also for an earlier date for identifying claim
20    construction issues and then you had set April 30th for
21    oral argument.
22       THE COURT: I just stuck you in my jury trial
23    schedule because none of it makes a whole lot of sense in
24    a bench trial. And I know lawyers think they need to go
25    into trial knowing what my claim construction is, but

| Court Hearing | CondenseIt™ | Thursday, November 21, 2002 |
|---|---|---|

Page 61

1  there's no law that says you are entitled to it.
2      I'm not confident that makes sense, and I do
3  mean, and I apologize to the patent bar, I do mean to
4  revise my little website procedures so that you all have
5  clear notice of what my expectations are in bench trials
6  versus jury trials, so you can make your decisions about
7  these things with all the information in hand
8      I don't know whether claim construction is going
9  to be an issue. I mean, if you really think it's going to
10 be an issue -- because I have not given you clear notice.
11 If you really think it's going to be an issue that you both
12 require an answer to it before we go to trial, then you
13 have my permission to include that kind of exchange and
14 oral argument and decision-making process into the
15 schedule if you want to. All right? But it won't take --
16 I mean, certainly claim construction does not take as long
17 as summary judgment claim construction, so you can cut
18 down the time to some extent.
19     My only requirement is that you give me enough
20 time to look and hear and review and decide before the
21 pretrial.
22     MR. LADOW: Under what we should work out
23 between ourselves, should we still assume what we have,
24 which is a June 17 pretrial conference?
25     THE COURT: Yes. And that's because I'm hoping

Page 62

1  to be out of the office for part of June and July, so that's
2  why I schedule it early.
3      MR. LADOW: We were going to send you a
4  postcard.
5      THE COURT: Well, I don't know where I'm going
6  yet, but someplace.
7      All right. Anything else that we need to address
8  that I've managed to skip?
9      MR. MELORO: Nothing from our side, your Honor
10     MR. LADOW: No, your Honor.
11     THE COURT: Thank you very much for your patience
12 and your help.
13     Have a good evening.
14     (Counsel respond "Thank you, your Honor.")
15     (Court recessed at 5:53 p.m.)
16         - - -

Novo Nordisk v. Bio-Technology, CA No. 02-232(SLR)          Page 61 - Page 62