**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AVID TECHNOLOGY, INC., | |
|     **Plaintiff,** | C.A. No. 11-01040-GMS |
| v. | **JURY TRIAL DEMANDED** |
| HARMONIC INC., | |
|     **Defendant.** | |

**DECLARATION OF DARRELL D.E. LONG, PH.D. IN SUPPORT OF**
**DEFENDANT HARMONIC INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

I, Dr. Darrell D.E. Long, declare as follows:

1.     I have knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

2.     I am a Professor of Computer Science and have served as Associate Dean for Research and Graduate Studies in the Jack Baskin School of Engineering at the University of California at Santa Cruz.   I hold the Kumar Malavalli Endowed Chair of Storage Systems Research and I am the Director of the Storage Systems Research Center, an internationally recognized center of excellence in data storage.   I am also the Director of the Working-group on Applied Security and Privacy (WASP), the laboratory at the University of California at Santa Cruz that studies computer security.  I teach the graduate and undergraduate courses in computer security, operating systems, and have taught courses in networking and distributed systems.

3.     I received my B.S. degree in Computer Science from San Diego State University, and my M.S. and Ph.D. from the University of California, San Diego. I am a Fellow of the Institute of Electrical and Electronics Engineers and of the American Association for the Advancement of Science.

1

4.     My research interests include data storage systems, operating systems, computer security, distributed systems and networking.   My qualifications are further described in my Curriculum Vitae attached as Exhibit A.

5.     I have published numerous papers including in the ACM Transactions on Storage, and various IEEE journals, and I am the co-author of two books.  These publications are listed in Exhibit A.  I am the founder of the premier conference in the data storage field known as the Symposium on File Storage Technologies ("FAST").  I have participated in organizing numerous academic conferences including:

2012:

> Steering Committee:  Petascale Data Storage Workshop (PDSW), Symposium on Modeling, Analysis and Simulation of Computer and Telecommunication Systems (MASCOTS), Symposium on File and Storage Systems Technology (FAST).

> Program Committee:  Symposium on File and Storage Systems Technology (FAST).

2011:

> Steering Committee:  Petascale Data Storage Workshop (PDSW), Symposium on Modeling, Analysis and Simulation of Computer and Telecommunication Systems (MASCOTS), Symposium on File and Storage Systems Technology (FAST).

> Program Committee:  Symposium on Modeling, Analysis and Simulation of Computer and Telecommunication Systems (MASCOTS).

2010:

> Program Chair:  Symposium on Modeling, Analysis and Simulation of Computer and Telecommunication Systems (MASCOTS).

> Steering Committee:  Petascale Data Storage Workshop (PDSW), Symposium on Modeling, Analysis and Simulation of Computer and Telecommunication Systems (MASCOTS), Symposium on File and Storage Systems Technology (FAST).

2

2009:

> Program Committee:  International Workshop on Software Support for
> Portable Storage (IWSSPS), Inaugural International Conference on
> Virtualization and Cloud Computing, Symposium on Modeling, Analysis
> and Simulation of Computer and Telecommunication Systems
> (MASCOTS), Petascale Data Storage Workshop (PDSW).
>
> Program Chair:  Web Information Systems Engineering (WISE).
>
> General Chair:  Symposium on Applications and the Internet (SAINT).
>
> Steering Committee:  Symposium on Modeling, Analysis and Simulation
> of Computer and Telecommunication Systems (MASCOTS), Symposium
> on File and Storage Systems Technology (FAST).

6.     I have also consulted for industry in the area of storage systems including for Hewlett-Packard Laboratories and IBM.

## I.     Review of Background Materials

7.     I have reviewed the following material to determine the proper and correct scope of certain disputed terms of claims 1, 2, 4-8, 10, 12, 14, 16-20, 22, and 23 of U.S. Patent No. 6,760,808 ("the '808 patent") and asserted claims 1-5, 10-14, 16-20, 25-29, and 31-39 of U.S. Patent No. 7,487,309 ("the '309 patent"):

(1)     the '808 patent;

(2)     the '309 patent;

(3)     U.S. Patent No. 5,644,720 ("Boll"), cited as a reference during the prosecution of the '808 patent, a true and correct copy of which is attached as Exhibit B;

(4)     the parties' Joint Claim Construction Statement and exhibits, including the prosecution histories for the '808 and '309 patents.

8.     After my review of the above-reference materials, I reached my opinion as how a person of ordinary skill in the field of the '808 and '309 patents reading the patents would understand the disputed terms to mean.  This understanding is set forth below.

## II.    Person of Ordinary Skill in the Art

9.    The field of the invention relates to "computer systems for capture, authoring, and playback of multimedia programs and to distributed computing systems." ('808 patent at 1:20-22.)

10.    In the 1997 time period corresponding to the filing of the application that led to the specification and claims of the '808 and '309 patents, a hypothetical person of ordinary skill in the art to whom this patent is addressed would have the knowledge and/or training of a person holding a Bachelor degree in computer science or electrical engineering, or 2-3 years of relevant experience, and 3-5 years experience in computer networks, storage systems, and video applications or systems.

11.    In reaching this opinion as to the qualifications of the hypothetical person of ordinary skill in the art, I have considered the types of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field.

## III.    Background on the Technology

12.    The asserted claims relate to a distributed data storage system for media files. Distributed data storage systems support "distributed use of data over computer networks." ('808 Patent at 1:25-26.) As a result, multiple users connected to the network can access files stored on system. ('808 Patent at 1:34-36.)

13.    Traditional client/server systems use a centralized file system in which the client makes a request to the server and the server identifies the location of the data, retrieves the data, and passes it on to client.

14.    In a more distributed system, the server contains the metadata system identifying the location of data, but does not store or retrieve the data directly. Instead, the server identifies the location of the segment and provides that information to the client. The client then connects directly with the storage unit. In this type of system, the server can provide either the exact disk

location or an identifier to the storage unit where the requested segment is located, in which case the storage unit includes a mapping between the segment and disk location.

15.     Media files, typically video or audio files, are significantly larger than most other file types.  Due to their size, media files are frequently divided into segments and the segments stored on different storage units in the network, also known as striping.  ('808 Patent at 1:36-39.) A unique identifier is used to track the segment.  ('808 Patent at 7:47-51.)

16.     An initial method of striping stores the segments in a sequential order using a round-robin pattern.  ('808 Patent at 1:39-41.)  The problem created by this storage method is any latency in the storage or retrieval of segments due to long queues at the storage unit propagates throughout the system, creating a convoy effect.  ('808 Patent at 1:55-63.)  It was well-known to a person of ordinary skill in the art at the time of the invention that random striping of the data addressed the convoy effect, but did not necessarily prevent hotspots in which a storage unit may randomly experience extreme loads.  ('808 Patent at 1:64-2:5.)

17.     Load balancing techniques are used to address hotspots.  A number of load balancing techniques existed and were well-known to a person of ordinary skill in the art at the time of the invention.  Random striping is one of them.  Random distribution of segments was known to a person of ordinary skill in the art at the time of the invention as the an effective means of load balancing and systems were frequently set up to randomly or pseudorandomly distribute data.

18.     In a system storing segments of data, a failed disk impacts a larger number of files compared to a system where the entire file is stored on a single disk.  ('808 Patent at 1:42-45.) To address this issue and increase the reliability of the data, it was well-known to a person of ordinary skill in the art to use different fault tolerance methods.  Examples include mirroring the data or using RAID, which is based on erasure codes (parity data).

19.     Mirroring involves making an exact copy of the segment and storing it on a different storage unit.  ('808 Patent at 1:46-54.)

20.     RAID usually involves the use of parity data.  Parity data is used to create simple erasure codes based on the exclusive-or operation from Boolean logic and takes less disk space than additional copies.  For example, three disks of data may be condensed into one disk of parity data.  Unlike a mirrored system where both copies of the data may be read by the user, only the original copy of the data may be read in a RAID system using parity data.  The parity data cannot be read directly.

21.     In the event of a failed disk, the state of RAID system using parity will become degraded if the rebuilding of the disk occurs while the system is still in operation.  The lost data must be recreated from the parity data and then it may be copied.  The rebuilding of the disk slows down both reads and writes throughout the system.  In comparison, there is less of an impact on the operation of a mirrored system while a disk is being rebuilt during the continued operation of the system.

## IV.     Claim Terms

### A.     Independent Storage Units

22.     It is my understanding that Avid has taken the position that "independent storage units" means "storage units which exchange segments with clients across a network without the segments passing through a central controller, and whose memory addresses are not globally allocated." [1]  This is not what a person of ordinary skill in the field of the '808 and '309 patents reading the patents and patent file histories would understand "independent storage units" to mean.  Such a construction fails to consider the Boll reference cited by the examiner and the arguments made by Avid during the prosecution of the '808 patent.

---

[1] The use of memory addresses in this phrase is illogical.  Memory is usually volatile and data is generally stored in memory temporarily.  I understand memory addresses in Avid's construction to refer to disk location, or the location on a disk where a data block is stored.

23.    Boll was filed on July 31, 1995 and issued on July 1, 1997.  Boll relates to load

balancing client requests in a distributed database architecture.  (Boll at 1:5-2:5.)  In describing

the problem to be solved, Boll explained:

> In contrast to the hub-and-spoke architecture requiring communications between
> one central processing facility and a number of client applications, the distributed
> architecture requires communications between many client servers and each client
> application.  Moreover, the advent of increased levels of data redundancy raises
> new concerns for intelligently distributing requests, i.e., load balancing among
> client servers having identical component databases or other duplicate
> functionality.

(Boll at 1:61-2:2.)  The term "client server" is not generally used in the art.  Generally, client and

server refer to different portions of the system.  Based upon the disclosure in Boll, a person of

ordinary skill in the art would understand client server to refer to server as it is generally

understood in the art.

24.    Figure 1 illustrates the database architecture disclosed in Boll.



*Fig. 1*

25.    In Boll, client applications communicate requests to the communications

interface.  (Boll at 3:26-30.)  The communications interface is also connected to servers so that

the servers can register their respective sets of attributes with the communications interface.  (*Id.*

at 3:59-62.)  The client application sends a transaction request to the communications interface. (*Id.* at 4:20-23.)  The communications interface then searches the sets of attributes to identify servers that have the necessary attributes.  (*Id.* at 4:56-58.)  Any server that is not available, either because it is offline, going to be taken offline, or is overloaded, is removed from the list of servers matching the required attributes. (*Id.* at 4:63-5:12.)

26.     The list of servers is then sorted and grouped. (*Id.* at 5:14-44.)  If only one server is in the highest-ranked group, identifying information is returned to the client application.  (*Id.* 5:47-50.)  If there is more than one server in the highest-ranked group, the communications interface generates a random or pseudorandom work distribution index and applies a work distribution function to select a server from the group of highest-ranking servers.  (*Id.* at 5:50-61.)  The identifying information for the selected server is then returned to the client application. (*Id.* at 6:61-67.)  Once the client application receives the server identification, the client application connects directly with the server to complete the transaction and transfer of data.  (*Id.* at 7:1-4.)

27.     In summary, a person of ordinary skill in the field of the '808 and '309 patents would understand Boll to disclose a client connecting to a central controller and in response to a client request, the central controller responds to the client application "to provide direct data communication path 38 between application 12 and client server 30." (*Id.* at 3:47-50.)  A person of ordinary skill in the art would further understand reading Boll that it is the client application that connects directly to the identified server, at which point data is transferred to and from the client directly without further interaction from the central controller.

28.     In response to the examiner's reliance on Boll, Avid made a number of statements that the invention disclosed in the patent is distinguishable over Boll because the invention does not have a central controller and avoids global allocation of available storage, as follows:

(1)     The claimed system, by virtue of its "independent" storage units, <u>avoids global allocation</u> of the available storage....

(2)     Further, the claimed system, by virtue of the "independent" storage units, <u>avoids using a central controller to access data</u>.  In particular, storage units

"receiv[e]...request[s] from one of the client systems for a segment of a file." Clients <u>do not issue requests to a central controller</u> that in turn identifies storage units that store the data and issues requests to storage units....

(3)     Boll deals with distributing transaction request for multiple clients to multiple servers. In Boll, a client asks a centralized interface 24 to provide access to a server and receives from this interface an identity or connection data for a server to which the client is assigned. The client then performs its transaction with the assigned server. In contrast, the present invention relates to a distributed storage system in which data for a file is distributed among multiple independent storage units. Boll's assignment of a client to a server through a centralized interface for its transaction in [sic] contrary to the claim limitation noted above.

(4)     the limitations of each of claims 6 and 18 are such that storage units are independent, <u>avoiding global allocation of storage and centralized control</u>.

('808 Response to Office Action dated February 6, 2004 at 10-12.)

29.     A person of ordinary skill in the field of the '808 and '309 patents would understand from the arguments Avid made during the prosecution of the '808 patent that by claiming "independent storage units," the claims cannot cover systems where the client issues a request to a centralized controller or database that identifies the storage unit where the data is stored and the client then connects directly to the storage unit to complete the transaction. ('808 Response to Office Action dated February 6, 2004 at 11.)

30.     In addition to the arguments made during the prosecution of the patents, a person of ordinary skill in the field of the '808 and '309 patents reading the patents would understand the specification to correlate independently as being without central control. ('808 Patent at 2:49-50; 8:7-10.) The specification repeatedly states that the storage units operate "independently and without central control." ('808 Patent at 2:49-50.)

31.     Based upon my review of the specification, the prosecution histories, and the Boll references, it is my opinion that a person of ordinary skill in the art would understand that metadata servers would not be covered by the claims and "independent storage units," therefore, means "storage units which are not centrally controlled and not part of a global allocation of available storage."

**B.      Redundancy Information**

32.      It is my understanding that Avid has taken the position that "redundancy information" means "a copy of a segment or information sufficient to recreate the segment." This is not what a person of ordinary skill in the field of the '808 and '309 patents reading the patents and patent file histories would understand "redundancy information" to mean.   Under Avid's construction, "information sufficient to recreate the segment" would include RAID functionality using parity data.   Such a construction fails to consider the specification, the objective of the inventions disclosed in the patents, or arguments made during the prosecution of the '309 patent.

33.      Redundancy information is not used in the specification and only appears in the claims.   The specification, however, repeatedly refers to copies of the segment.   Examples include:

(1)      At least one additional copy of each segment also is distributed randomly over the storage units, such that each segment is stored on at least two storage units. ('808 patent, Abstract.)

(2)      Each segment is copied, and each copy is stored on a different one of the storage units. ('808 patent at 2:22-24 and 6:4-5.)

(3)      This random distribution of multiple copies of segments of data improves both scalability and reliability.   For example, when an application requests a selected segment of data, the request may be processed by the storage unit with the shortest queue of requests so that random fluctuations in the load applied by multiple applications on multiple storage units are balanced statistically and more equally over all of the storage units. ('808 patent at 2:29-36.)

(4)      Each copy of each segment may be stored on a different one of the storage units. ('808 patent at 2:63-65.)

(5)      Copies of segments of the data are randomly distributed among the plurality of storage units. ('808 patent at 3:14-15.)

(6)      To recover the data, segments of which copies were stored on the failed storage unit are identified.   The storage units on which another copy of the identified segments are stored are identified.   A copy of the identified copies is then randomly distributed among the plurality of the storage units.   Such data recovery may be used in combination with the read and

write functionality of a file system or distributed storage system described herein. ('808 Patent at 4:22-29.)

(7)     In the present invention, data to be stored on the storage units 42 is divided into segments. Each segment is <u>copied</u>. Each <u>copy</u> is stored on a different one of the storage units 42. ('808 patent at 6:55-57.)

(8)     In the present invention, the data of a file or source is stored in segments, of which <u>copies</u> are randomly distributed among multiple storage units. ('808 patent at 13:20-22.)

(9)     The success of this process depends on the number of <u>copies</u> of each segment within the system. ('808 patent at 15:45-49.)

34.     A person of ordinary skill in the art would know that storing copies of segments provides advantages with respect to load balancing and data recovery that don't exist if a different fault tolerance method is used, such as RAID with parity data. As discussed above, parity data from a RAID system may not be read directly as a segment, but must be used to recreate a lost or damages segment. This has important implications with respect to both load balancing and data recovery following a disk failure.

35.     By storing more than one copy on the system, a client has the ability to go to a second server if the first storage unit is overloaded or has a long queue of requests. The specification describes the invention as selecting the storage unit with the shortest queue. ('808 patent at 2:29-36, 21:14-15.) The method described by the specification is to send a request to a storage unit with a threshold time for providing the requested data. (*Id.* at 21:55-58.) The storage unit can either accept the request or reject it. (*Id.* at 21:63-22:10.) If the request is accepted, the storage unit adds it to its queue and sends an estimate of when the data will be available in the buffer. (*Id.* at 21:67-22:2.) If the request is rejected, the storage unit will respond with an estimate of the amount of time it would take. (*Id.* at 22:7-10.) This estimate is used to derive a second threshold time, which is included in the request to the second storage unit. (*Id.* at 22:11-15.) If the request is rejected, then the client sends an unconditional request to the first storage unit. (*Id.* at 22:17-23.) A person of ordinary skill in the field of the '808 and '309 patents reading the patents would understand this to describe a type of greedy algorithm.

By choosing the shortest queue, it spreads out the load on the storage units so they all have roughly the same load. A person of ordinary skill in the art would understand that in order for this to work, however, there must be at least two copies of each segments stored on different storage units. If there is only the original segment and parity information, then this algorithm will not work for load-balancing because the client has no option to go to a second storage unit.

36.    The patent also discloses a number of alternative methods of selecting a storage unit for a read request, all of which require at least two copies of the segment. ('808 patent at 22:52-23:32.) The alternatives include randomly selecting a storage unit from the two choices available, the client reviewing all of its outstanding requests and pick the storage unit with the fewest outstanding requests, the client reviewing its request history and pick the storage unit that has been used less historically, receiving the measure of length of the disk queue for each storage unit and selecting the one with the shortest queue, and sending the request to both storage units, receiving the data from one, and cancelling the unused request. (*Id.*) A person of ordinary skill in the art would understand that none of these alternatives would work with RAID.

37.    A person of skill in the art would also understand that storing a copy of each segment also improves the efficiency and reliability of the system in the event of a disk failure. If a disk fails, the copy of the segment can be used to rebuild the failed disk or redistribute the lost data throughout the system. During a disk rebuild, at least one copy exists in the system that can be used for read requests the entire time. In comparison, in a RAID system, the lost data must be rebuilt from the parity data. If the system is in operation during the rebuilding of the disk, reads and writes throughout the system are impacted and the overall performance of the system is degraded. In addition, there may be certain segments that are unavailable because only the parity data exists while the segment is being recreated.

38.    A person of ordinary skill in the field of the '808 and '309 patents reading the patents would understand the inventors to be concerned with the amount of time it takes to repair or replace a failed disk as it impacts the amount of time to a double fault failure. In the event of a double fault failure (i.e., the failure of two disks at the same time), data will be lost

permanently.  The specification describes the mean time to repair as one hour, for a system with 100 storage units, each with a capacity of 50 gigabytes, and describes the time to a double fault failure in this system as likely 115 years. ('808 patent at 9:60-65.)  The specification compares this with a mean time to repair in the same system of 24 hours, at which point the specification describes the time to a double fault failure as likely 4.8 years.  (*Id.*)  As a result, a person of ordinary skill in the art would understand the inventors to be concerned about the amount of time it takes to rebuild a disk as it significantly increases the risk of a double fault failure.

39.   A person of ordinary skill in the art would understand the specification to repeatedly refer to distributing the segments and copies of the segments. ('808 patent, Abstract, 2:29-36, 3:14-15, 4:22-29, 13:20-22.)  The claims for both the '808 and '309 patents state "segments and redundancy information for each segment are distributed among the plurality of storage units." ('808 Patent at 28:10-12 (claim 1), 28:57-59 (claim 6), 30:35-37 (claim 18); see also '309 Patent at 30:20-22 ("wherein each segment and redundancy information for each segment are distributed among the plurality of storage units") (Claim 31).)  As the claim language requires "redundancy information" to be distributed, a person of ordinary skill in the field of the '808 and '309 patents reading the patents would understand "redundancy information" to refer to a copy of the segment as that is what is discussed in the patent as being distributed.

40.   Finally, during the prosecution of the '309 patent, Avid distinguished RAID and parity data from redundant information.  In response to a rejection by the examiner based upon Styczinski, Avid stated:

> The Office Action first asserts that the "redundancy information" is the parity information mentioned in columns 4 and 5 of Styczinski.  The Office Action also refers to the redundant disks.  The Office Action then asserts that this limitation is met by Fig. 6 of Styczinski, which merely shows the record format used on the write assist disk 104 of Styczinski.  None of these structures in Styczinski is a *copy of the segment* as recited in the claims.  To the extent that the write assist disk contains copies of segment, these copies are not permanent and are not *distributed among the plurality of storage units*.  The parity information referred to by Styczinski, while distributed among its service units, are not copies of the data segments.

Based upon this argument, a person of ordinary skill in the art would understand Avid to make a distinction between parity data and copies and that the redundancy information used in the claims refers only to copies of the segments.

41.     Based upon my review of the specification, the prosecution histories, and the claims, it is my opinion that a person of ordinary skill in the art reading the patents would understand that "redundancy information" means "copy of each segment."

### C.     Identifier/Identifier of Each Segment/Identifier of the Segment/Identifier of a Segment/Identifier of the Requested Segment

42.     In a database without a central control or global allocation of storage space, a person of ordinary skill in the art would know it is critical that each segment has a unique means of identification.   The specification describes the segment identifier as used to identify the segment.  In order to access the segment, the segment identifier must be unique.  ('808 patent at 7:47-48.)  The specification defines the unique identifier as "a combination of a unique identifier for the source, such as a file, and a segment number." (*Id.* at 7:49-51.)

43.     In the distributed system described in the patents, a person of ordinary skill in the art would understand that a segment number is not sufficient to uniquely identify a segment.  As many clients may store segments to the storage units, in the absence of a central controller or global allocation of available space, each client may end up using the same segment numbers since there is no method discussed in the specification for the clients to reserve segment numbers.  Since multiple segments may have the same segment number assigned by different clients, a person of ordinary skill in the art would understand the specification to require a unique identifier from the source be used to ensure the uniqueness of the segment identifier.  Using a unique identifier from the source combined with a segment number reduces the likelihood that two different segments will have the same segment number to zero.  This explains why the inventors defined this term; to ensure that anyone using the patents would use unique segment identifiers.

44.     Based upon my review of the specification and claims, it is my opinion that a person of ordinary skill in the field of the '808 and '309 patents reading the patents would understand that "identifier" means "unique identifier for the segment that is a combination of a unique identifier for the source, such as a file, and a segment number."

## V.     Means-plus-function Terms

### A.     Understanding of Means-plus-function Elements

45.     I understand that in certain claims of the '808 patent, some elements are written in a particular format using functional language, which are referred to as means-plus-function limitations. I am informed that these limitations shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

46.     I understand that construing a means-plus-function limitation involves two steps: (1) identify the function of the limitation, and (2) identify the corresponding structure for that function as described in the specification.  The structure disclosed in the specification is deemed to be corresponding structure if the specification clearly links or associates that structure to the function recited in the claim.  The corresponding structure does not need to include everything necessary to enable the claimed invention to work, but it must include all of the structure that performs the recited function.  I am informed that the question is not whether one of skill in the art would be capable of implementing a structure to perform the function, but whether that person would understand the written description itself to disclose such a structure.

47.     I understand that for computer-implemented inventions with means-plus-function claiming, the applicant must disclose an algorithm.  I am informed that the patentee may express that algorithm in any understandable way: a mathematical formula, in prose, as a flow chart, or in any other manner that provides sufficient structure.

**B.    Means, operative in response to a request from one of the client systems, for retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit**

48.     It is my understanding that the parties agree that function for this means-plus-function element is "retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit."

49.     In my opinion, a person of ordinary skill in the field of the '808 and '309 patents would understand that the specification clearly links the following structures to this mean-plus-function element: (1) memory system on the storage unit (col. 12, lines 37-61); (2) table stored in the memory system, (3) table mapping a unique segment identifier for each segment to the location of that segment on the storage unit (col. 10, lines 46-50); (4) processor or independent controller (col. 11, lines 54-67), issuing program instructions to cause, in response to a request from a client system, and (5) storage unit to transfer data between the disk to the buffer through use of disk queue 300 (including subqueues 302, 304, 306 and 308 and fields 312, 314 and 316) (Fig. 19).

50.     According to the specification, the storage unit "keep[s] track of segments by using a unique identifier for each segment and by storing a table mapping the segment identifier to its location on the storage unit, in step 145." ('808 patent at 10:46-50.) The specification describes this table as stored in a memory system on the storage unit. ('808 patent at 12:12-15, 12:37-61.) The specification also states that "[e]ach storage unit also has its own independent controller which responds to requests for access, including but not limited to read and write access, to data stored on the medium." ('808 patent at 6:30-33.)

51.     When a client makes a request to a storage unit, "the storage unit places the request on a queue 48 that is maintained for the storage unit." ('808 patent at 8:3-6.) Further, "[i]n order to manage the requests, a queue 48 of request is maintained by each of the storage units." (*Id.* at 10:66-67.) The patent describes the queue 48 as maintaining two queues, one for

requests for disk access and one for network transfers, which is described in Figure 19. (*Id.* at 11:1-6.)

52.    Figure 19 illustrates the use of a disk queue 300 and network queue 320 as disclosed in the patent. ('808 patent at 23:49-50.) Since the function relates to retrieving the segment stored on the storage unit, the segment is transferred from its location in storage to a data buffer, which implicates the disk queue 300. (*Id.* at 24:26-27.) The request is then transferred from the disk queue 300 to the network queue 320 for the transfer of data from the storage unit to the client. (*Id.* at 24:27-29.) The network queue relates to the means for sending the requested segment to the client system, discussed below, and is not clearly linked to this function.

53.    The patent describes disk queue 300 as being divided into four subqueues: (1) 302 for playback, (2) 304 for capture, (3) 306 for authoring, and (4) 308 for service and maintenance. ('808 patent at 23:50-53.) Disk queue 300 uses the subqueues in order to prioritize requests. (*Id.* at 24:22-26.) Playback is the highest priority as the requests relate to time-sensitive applications that are using data with specific due times. (*Id.* 23:39-44.) Capture or storage requests on subqueue 304 are handled next, followed by authoring tools on subqueue 306 with service and maintenance programs on subqueue 308 having the lowest priority. (*Id.* at 23:44-48.)

54.    The entry on any subqueue includes "a request field 312 indicating the client making the request and the requested operation, a priority field 314 indicating the priority of the request, and a buffer field 316 indicating the buffer associated with the request." ('808 patent at 23:54-59.) A person of ordinary skill in the art would understand the request field 312 is necessary to know where the data is going to or coming from and whether a read or write is being requested. For this function, request field 312 would indicate the client data needs to be sent to and the segment being requested for a read operation. A person of ordinary skill in the art would understand the priority field 314 is necessary so that the highest priority requests are processed first. While the disk queue is already prioritized based upon the type of operation requested, priority 314 is used to prioritize the requests within each subqueue. This ensures that

the highest priority request is always processed first.  Finally, a person of ordinary skill in the art would understand the buffer field 316 is necessary to know where the data should be transferred. Figure 19, below, shows how each of the queues and subqueues are divided and the order in which requests are processed.



**FIG. 19**

55.     According to the specification, the purpose of queue 48 is to "ensure that the most critical requests are handled first."  ('808 patent at 23:33-36.)  Since the disclosed invention relates to the playback of video files, among other things, a person of ordinary skill in the art would understand the priority in which requests are handled and data transferred is critical to the invention.  Without a means of prioritizing requests and the transfer of data, the system would not be able to ensure the data would be available to the client for playback or real-time editing. The specification describes no other means for prioritizing requests besides the subqueues and associated fields of disk queue 300 described above.  A person of skill in the field of the '808 and

'309 patents reading the patents would understand disk queue 300 and its subqueues (302, 304, 306 and 308 and their associated fields 312, 314 and 316) to be necessary for this function.

56.    It is my understanding that Avid has taken the position that the corresponding structure for this function is "a memory system on the storage unit (e.g., col. 12, lines 37-61); a table stored in the memory system, the table mapping a unique segment identifier for each segment to the location of that segment on the storage unit (e.g., col. 10, lines 46-50); a processor or independent controller on the storage unit (e.g., col. 11, lines 54-67), issuing program instructions to cause, for each request, the storage unit to transfer data between the disk and the buffer indicated by the request. (e.g., col. 24, lines 22-29)." A person of skill in the art would not understand that part of the corresponding structure is for the "storage unit to transfer data between the disk and the buffer indicated by the request. (e.g., col. 24, lines 22-29)."

57.    Avid's construction is a generic way of saying the storage unit transfers the requested data and ignores the structure disclosed in the specification for achieving the function. As discussed in paragraphs V.B.5252-55 above, a person of skill in the art would understand the specification to disclose a disk queue 300 with subqueues and associated fields as the corresponding structure. The structure disclosed is specific so that requests may be prioritized to ensure the highest priority request is handled first, which is critical to the operation of the invention. Under Avid's proposed structure, there is no prioritization that occurs in the transfer of data, e.g., requests may be handled in any order and data may not be returned to the client in a timely manner that allows for playback or real-time editing of videos.

**C.    Means for sending the requested segment to the client system**

58.    It is my understanding that the parties agree that function for this means-plus-function element is "sending the requested segment to the client system."

59.    In my opinion, a person of ordinary skill in the field of the '808 and '309 patents would understand that the specification clearly links the following structures to this mean-plus-function element: (1) network interface at the storage unit (col. 11, lines 33-36); (2) processor or independent controller on the storage unit (col. 11, lines 54-67) that issues program instructions

to transfer data from the disk queue to the network queue 320 (col. 24, lines 27-29); (3) subqueues 322, 324, 326 and 328; and (4) said processor or independent controller uses either a token as described at '808 patent (24:60-25:5) or the algorithm described in Fig. 21 and described at '808 patent (25:46-26:10) to schedule transfer of data across the network.

60.     The specification discloses that the client and the server both have a network interface to connect them to the computer network. ('808 patent at 11:33-36.) Also, as discussed above, each storage unit has an independent controller for handling read and write requests. (*Id.* at 6:30-33.)

61.     As discussed above in paragraph V.B.52, the storage unit uses queue 48 to manage requests from the client. Queue 48 maintains a disk queue 300 and network queue 320. (*Id.* at 11:1-6.) In a read operation, once the disk queue 300 has transferred the data to the buffer, the request is passed to the network queue 320. (*Id.* at 24:27-29.) The network queue 320 is responsible for "prioritizing network transfers in the process of scheduling those transfers." (*Id.* 24:33-35.)

62.     Similar to disk queue 300, network queue 320 is divided into four subqueues: (1) 322 for playback, (2) 324 for capture, (3) 326 for authoring, and (4) 328 for service and maintenance. ('808 patent at 23:53-54.) Network queue 320 uses the subqueues in the same manner as the disk queue to prioritize requests. (*Id.* at 24:22-26; *see also id.* 23:39-48.) The subqueues also have the same associated fields that are used for the same purpose as on the disk queue 300. (*Id.* at 23:54-59.) Figure 19, below, shows how each of the queues and subqueues in the network queue 320 are divided and the order in which requests are processed.



**FIG. 19**

63.     As discussed in the previous section, a person of ordinary skill in the art reading the patent would understand the purpose of queue 48 to be to "ensure that the most critical requests are handled first." ('808 patent at 23:33-36.)  Since the disclosed invention relates to the playback of video files, among other things, a person of ordinary skill in the art would understand that the priority in which requests are handled and data transferred is critical to the invention.  Without a means of prioritizing requests and the transfer of data, the system would not be able to ensure the data would be available to the client for playback or real-time editing. The specification describes no other means for prioritizing requests besides the subqueues and associated fields of network queue 320 described above.  A person of skill in the field of the '808 and '309 patents reading the patents would understand network queue 320 and its subqueues (322, 324, 326 and 328 and their associated fields 312, 314 and 316) to be necessary for this function.

64.     The storage unit must also schedule the transfer of data over the network to send the segment to the client. ('808 patent at 24:32-35.) The specification discloses two methods for scheduling the transfer of data. The first method disclosed in the specification uses a token so that the client receives data from one storage unit and the storage unit is only sending data to that client. (*Id.* at 24:6-25:5.) Once the storage unit is finished sending the data, it returns the token to the client so the client can send it to the next storage unit it needs to transfer data from. (*Id.*)

65.     The second method of scheduling the transfer of data over the network by the storage unit described in the specification relates to establishing a communications channel and the order to process requests. ('808 patent at Figure 21, 25:46-26:10.) Figure 21 describes an algorithm that determines whether data is ready to be transferred and whether the network connection is available. (*Id.* at 25:47-57.) If so, the storage unit establishes a communications channel with the client. (*Id.*) If not, the storage unit determines whether the data can be delivered within the time limit set by the client and whether the client has higher priority than the waiting client. (*Id.* at 25:57-26:5.) If so, the client becomes the waiting client. (*Id.* at 26:3-5.) If not, the storage unit rejects the request. (*Id.* at 26:5-8.)

66.     As previously discussed, the invention relates to the playback of videos and real-time editing. A person of skill in the art would understand that scheduling the transfer of segments over the network ensures the data is available at the client when it is needed. Without a means scheduling the transfer of segments over the network, the system would not be able to ensure the data would be available to the client for playback or real-time editing. The only means of scheduling the transfer of data over the network described in the specification are through the use of tokens described at Col. 24:60-25:5 or the algorithm described in Figure 21 and Col. 25:46-26:10. A person of skill in the field of the '808 and '309 patents reading the patents would understand that these two alternative methods are part of the corresponding structure for this function.

67.     It is my understanding that Avid has taken the position that the corresponding structure for this function is "network interface at the storage unit (e.g., col. 11, lines 33-36); a

processor or independent controller on the storage unit (e.g., col. 11, lines 54-67), issuing program instructions to transfer data from the disk queue to the network queue (e.g., col. 24, lines 27-29)." A person of skill in the art would not understand this to be the structure clearly linked in the specification with the identified function. Avid fails to account for the role of the subqueues and associated fields in the network queue and ignores the disclosed structure for scheduling the transfer of data over the network.

68.     The subqueues 322, 324, 326, and 328, and associated fields 312, 314, and 314 ensure the highest priority request is handled first, which a person of skill in the art reading the patents would understand is critical to the operation of the invention.  Under Avid's proposed structure, there is no prioritization that occurs in the transfer of data; requests may be handled in any order and data may not be returned to the client in a timely manner that allows for playback or real-time editing of videos.

69.     Further, Avid generically identifies network queues, but does not identify the specific network queue 320 disclosed by the specification.  The data must somehow be transferred over the network in order to get to the client.  A person of skill in the art reading the patents would understand the specification to disclose specific methods that can be used to schedule the transfer of data over the network.  This promotes efficiency and ensures the data is available when needed by the client, as required by the specification.

**D.     Means for sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored**

70.     It is my understanding that the parties agree that function of this means-plus-function element refers to "sending a request to the storage unit on which the segment is stored."

71.     In my opinion, a person of ordinary skill in the field of the '808 and '309 patents would understand that the specification clearly links the following structures to this mean-plus-function element: (1) network interface at the client system (col. 11, lines 33-36); (2) a processor or independent controller on the client system (col. 11, lines 54-67); and (3) configured to

implement the algorithm in steps 272 and 274 of Fig. 16 as described in the '808 patent, Col. 21:10-23.

72.     The specification discloses that the client and the server both have a network interface to connect them to the computer network. ('808 patent at 11:33-36.) The specification also discloses various processors that may be used in the client system to run the operating system. (*Id.* at 11:54-67.)

73.     According to the specification, the first step in sending a request to the storage unit is to select a storage unit to send the request to. ('808 patent at 21:10-12.) Since each segment is stored in the system twice, the segment table will identify two storage units where the segment is stored. (*Id.* at 7:14-28.) The client must then decide which storage unit it wants to get the segment from, as set forth in step 272 from Figure 16. (*Id.* at 21:10-12.) A person of skill in the art reading the specification would understand the storage unit must be selected before the client can send a request to the storage unit, which is referred to as singular in the claim. Once the client has selected the storage unit, it issues a pre-read request in step 274 in which the client requests the storage unit read the desired data from the disk into the buffer. (*Id.* at 21:17-20.)

74.     A person of skill in the art reading the specification would understand that the specification correlates the selection of storage as linked with the pre-read request. For example, the specifications states "[t]here are several ways to initiate the pre-read requests, including selection of a storage unit, in step 274." (*Id.* at 21:34-35.) As a further example, information about a look-ahead value "may be used to initiate selection of a storage unit and pre-read requests." (*Id.* at 21:36-44.) A person of skill in the field of the '808 and '309 patents would understand that the specification clearly links the selection of a storage unit in step 272 and sending a pre-read request in step 274 as part of the corresponding structure for the function "sending a request to the storage unit on which the segment is stored."

75.     It is my understanding that Avid has taken the position that the corresponding structure for this function is "network interface at the client system (e.g., col. 11, lines 33-36); a processor or independent controller on the client system (e.g., col. 11, lines 54-67), configured to

issue program instructions to cause the network interface to send the read request to the storage unit (e.g., Fig. 16 (274) and col. 21, lines 17-20)." A person of skill in the art reading the specification would not understand that "causing the network interface to send the read request to the storage unit" is part of the corresponding structure.

76.    Avid's construction restates the function and ignores the structure disclosed in the specification. Avid further gives the example of step 274, but Avid's proposed construction is for a read request, not a pre-read request as required by step 274. It is therefore unclear to a person of skill in the art whether Avid is saying a generic read request is the structure or the pre-read request of step 274 is the structure. Either way, Avid does not account for the selection of a storage unit in step 272 and, therefore, part of the corresponding structure that a person of skill in the art would consider linked to the function is missing from Avid's construction.

**E.    Means for selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced**

77.    It is my understanding that the parties agree that function of this means-plus-function element refers to "selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced."

78.    In my opinion, a person of ordinary skill in the field of the '808 and '309 patents would understand that the specification clearly links the following structures to this mean-plus-function element: (1) a processor or independent controller on the client system (col. 11, lines 54-67), (2) issuing a program instruction to implement the algorithm in Fig. 17 and described in '808 Patent, Col. 21:51-22:26 and 22:52-23:5 or (3) one of the alternatives discussed in Col. 23:6-32.

79.    The specification discloses various processors that may be used in the client system to run the operating system. (*Id.* at 11:54-67.) The operating system issues the instructions for implementing the algorithms for selecting the storage unit. (*Id.* at 12:1-11.)

80.    A person of skill in the art reading the patents would understand that the function relates not just to selecting the storage unit, but doing it in a way so that the load on the system is

balanced.   In the view of a person of skill in the art, the specification equates selecting the storage unit with the shortest queue as the preferred method for load balancing.   Examples include:

(1)     [W]hen an application requests a selected segment of data, the request may be processed by the storage unit with the shortest queue of requests so that random fluctuations in the load applied by multiple applications on multiple storage units are balanced statistically and more equally over all of the storage units. ('808 patent at 2:32-37.)

(2)     By further controlling which storage unit is accessed by a particular application, such as by selecting the storage unit with the shortest queue of requests, random fluctuations in load are distribute approximately evenly over all of the storage units." (*Id.* at 6:12-16.)

(3)     The selection of a storage unit to which a request is sent may be controlled such that random fluctuations in the load applied by multiple applications 44 on multiple storage unites 42 are balanced statistically and more equally overall of the storage units 42.  For example, each request from an application 44 may be processed by the storage unit that has the shortest queue of requests. (*Id.* at 8:10-16.)

81.     Figure 17 discloses a method for selecting the storage unit with the shortest queue from the perspective of a client system.  First, the client sends a request with a threshold time (E1) to the first storage unit.   ('808 patent at 21:55-56.)   The client then receives a reply indicating whether the request was accepted or not.  (*Id.* at 21:63-67.)  If the request is accepted, then the client is given an estimate as to when the data will be available at the first storage unit. (*Id.* 21:67-22:3.)  If the request is rejected, the storage unit estimates the amount of time it is likely to take.  (*Id.* at 22:7-10.)  This estimate is used to set a threshold time (E2) to send to the second storage unit storing the segment.  (*Id.* at 22:11-12.)  If the second storage unit accepts, the client is given an estimate as to when the data will be available at the second storage unit.  (*Id.* at 22:17-21.)  Otherwise, the client issues an unconditional request to the first storage unit.  (*Id.* at 22:21-23.)

82.     A person of skill in the field of the '808 and '309 patents would understand from this description that the client does not need to have global knowledge of the system in order to make a decision.  It looks only at the two options available to it and selects the one with the

shortest queue.  A person of skill in the art would further understand that since all clients in the system are making the same decision, it balances the load in the system.

83.     The specification describes a variation on the algorithm disclosed in Figure 17. Instead of receiving an estimate of time when the data will be available, the client waits for a ready signal from the storage unit to indicate the segment is in the buffer.  ('808 patent at 22:52-23:5.)  The specification also describes a number of other methods that may be used to select the storage unit such that the load is balanced.  They include:

(1)     The client randomly picks a storage unit from the two storage units.  ('808 patent at 23:7-10.)

(2)     The client reviews all of its current outstanding requests and selects the storage unit with the fewest outstanding requests.  (*Id.* at 23:10-17.)

(3)     The client examines the history of its recent requests and selects the storage unit that has been used less historically.  (*Id.* at 23:17-23.)

(4)     The client requests the length of the disk queue from each storage unit and selects the storage unit with the shortest queue.  (*Id.* at 23:23-26.)

(5)     The client sends requests to both storage units, receives the segment from one storage unit, and the request to the second storage unit is canceled.  (*Id.* at 23:26-32.)

84.     A person of skill in the art reading the patents would understand from the specification that it discloses a preferred method of selecting a storage unit to load-balance the system in Figure 17 and a number of alternatives in Col. 23:6-32.  As the function specifically requires that load-balancing be considered in selecting the storage units, the function cannot be performed without one of the methods described in the specification.  As the specification discloses only the algorithm in Fig. 17 and described '808 patent, Col. 21:51-22:26 and 22:52-23:5 or the alternatives discussed in Col. 23:6-32 for selecting storage units to perform load-balancing, a person of skill in the art would understand this to be part of the corresponding structure for this function.

85.     It is my understanding that Avid has taken the position that the corresponding structure for this function is "a processor or independent controller on the client system (e.g., col.

11, lines 54-67), issuing program instructions to identify a storage unit from the segment table listing the segment identifiers and the storage units on which the segments are stored (e.g., col. 3, lines 15-27, col. 7, lines 55-col. 8, line 2) according to load balancing criteria (e.g., col. 8, lines 9-17, col. 22, line 52-col. 23, line 48)." A person of skill in the art reading the specification would not understand this to be the corresponding structure for the identified function.

86.     Avid's construction ignores Figure 17, which a person of skill in the art would understand is the preferred method for selecting a storage unit to perform load-balancing. Avid identifies the disclosure at Col. 8:9-17, which identifies as one method of load balancing the selection of the storage unit with the shortest queue. That method is implemented as Figure 17. In describing Figure 17, the specification states "[o]ne process which enables a client to make an adequate estimate of which storage unit has the shortest queue of requests, without requiring an exhaustive search of all the available storage units, will now be described in connection with FIGS. 17 and 18." ('808 patent at 21:51-54.) Figure 17 relates to the method from the perspective of the client system and Figure 18 relates to the method from the perspective of the storage unit. As Figure 17 is clearly linked to the function, a person of skill in the art would understand that it should be included in the corresponding structure.

**F.     Means for scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data**

87.     It is my understanding that the parties agree that function of this means-plus-function element refers to "scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data."

88.     In my opinion, a person of ordinary skill in the field of the '808 and '309 patents would understand that the specification clearly links the following structures to this mean-plus-function element: (1) network interface at the client and storage unit (col. 11, lines 33-36); (2) processor or independent controller on the client and the storage unit; (3) algorithm for implementing queue 48; (4) network queue 320 from Fig. 19 (including subqueues 322, 324, 326 and 328 and fields 312, 314 and 316); and (5) the algorithm that forces each client to receive data

from only one storage unit, and that forces each storage unit to send data to only on client, at any given time, through the use of a token described in '808 patent, Col. 24:64-25:5 or the algorithm described in Figs. 20 and 21, and described in the '808 patent at 25:6-26:10.

89.     The specification discloses that the client and the server both have a network interface to connect them to the computer network. ('808 patent at 11:33-36.) The specification also discloses various processors that may be used in the client system to run the operating system. (*Id.* at 11:54-67.) Further, each storage unit has an independent controller for handling read and write requests. ( *Id.* at 6:30-33.)

90.     A person of skill in the art would understand that the function requires the client to schedule the transfer of data such that the storage unit efficiently transfers data. A person of skill in the art would further understand that this requires the storage unit to take the affirmative action of efficiently transferring data. As discussed above in Section V.C., the client makes a request to the storage unit, which the storage unit places on queue 48. ('808 patent at 8:3-6.) Queue 48 maintains a disk queue 300 and network queue 320. (*Id.* at 11:1-6.) The network queue 320 is responsible for "prioritizing network transfers in the process of scheduling those transfers." (*Id.* 24:33-35.) This is accomplished through the use of subqueues and associated fields. (*Id.* at 24:22-26; *id.* 23:39-59.) By prioritizing network transfers, a person of skill in the field of the '808 and '309 patents would understand that this structure is clearly linked to the functions as it is necessary for the efficient transfer of data.

91.     In addition the prioritization of network transfers, a person of skill in the art would understand that the client and storage unit also schedule the transfer of data over the network in order to efficiently transfer data. The specification states "[d]ata transfers between the storage units and clients over the computer network may be scheduled to improve efficiency." ('808 patent at 24:48-50.)

92.     As stated in Section V.C., a person of skill in the art would understand that the specification discloses two methods for scheduling the transfer of data. The first uses a token so that the client receives data from one storage unit and the storage unit is only sending data to that

client. (*Id.* at 24:6-25:5.) Once the storage unit is finished sending the data, it returns the token to the client so the client can send it to the next storage unit it needs to transfer data from. (*Id.*)

93. The second method of scheduling the transfer of data over the network by the storage unit relates to establishing a communications channel and the order to process requests. ('808 patent at Figures 20 and 21, 25:6-26:10.) Figures 20 and 21 describes to an algorithm from the client and storage unit perspective respectively for scheduling the transfer of data by establishing a communications channel with the data is ready for transfer. (*Id.*) The algorithm with respect to the storage unit has already been discussed in Section V.C. With respect to the client, the client associates each buffer with a segment during playback time. (*Id.* at 25:19-21.) As the client has performed pre-reads and has an estimate as to when each requested segment will be available, the client can order the buffers by their due time. (*Id.* at 25:21-24.) This ordering is used in Figure 21. (*Id.* at 25: 26-28.)

94. In Figure 21, the client selects the next buffer for which data will be transferred. ('808 patent at 25:27-28.) The client requests a communication channel with the storage unit and specifies a waiting time for the transfer of the segment. (*Id.* at 25:28-35.) The client receives a response from the storage unit either accepting or rejecting the request. (*Id.* at 25:35-36.) If the request is rejected, the revised time is used to update the buffer list. (*Id.* at 25:36-44.) If the request is accepted, the segment is transferred to the client. (*Id.* at 23:44-45.)

95. As previously discussed, the invention relates to the playback of videos and real-time editing. A person of ordinary skill in the art would understand that scheduling the transfer of segments over the network increases the efficiency of data transfer in the network and ensures the data is available at the client when it is needed. A person of skill in the art reading the specification would further understand the specification to clearly link efficient transfer of data with scheduling the transfer of data over the network. ('808 patent at 24:48-50.) The only means of scheduling the transfer of data over the network described in the specification are through the use of tokens or the algorithm described in Figures 20 and 21 and Col. 25:6-26:10.

To a person of skill in the field of the '808 and '309 patents reading the specification, these two alternative methods are part of the corresponding structure for this function.

96.      It is my understanding that Avid has taken the position that the corresponding structure for this function is "a processor or independent controller on the client system (e.g., col. 11, lines 54-67), issuing program instructions to submit a request to a storage unit to cause it to transfer requested data from a disk buffer into a network queue (e.g., col. 8, lines 15-24)." A person of skill in the art reading the specification would not understand this to be the corresponding structure.

97.      Avid's construction appears to simply say the data in the disk queue is transferred to the network queue. This construction fails to give any value to the part of the function that requires "scheduling the transfer of data" or that the "storage unit efficiently transfer data." It does not recognize the active role played by the storage unit in the transfer of data over the network. It also does not address the methods disclosed in the specification for scheduling the transfer of data over the network.

**G.      Means for distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment**

98.      It is my understanding that the parties agree that function for this means-plus-function element is "distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment."

99.      In my opinion, a person of ordinary skill in the field of the '808 and '309 patents would understand that the specification clearly links the following structures to this mean-plus-function element: (1) network interface at the client system (col. 11, lines 33-36); (2) a processor or independent controller on the client system (col. 11, lines 54-67), (3) issuing program instructions to implement the algorithm of selecting the storage units either randomly or pseudorandomly as described in step 122 and (4) sending the segment and redundancy information asynchronously to the selected storage units as described in step 124 in Fig. 3.

100.    The specification discloses that the client and the server both have a network interface to connect them to the computer network. ('808 patent at 11:33-36.) The specification also discloses various processors that may be used in the client system to run the operating system. (*Id.* at 11:54-67.)

101.    After the client has divided the file into segments, a person of skill in the art reading the specification would understand the first step in distributing the segments in the system to be selecting two storage units to receive the segment. ('808 patent at 9:12-17.) The specification describes the selection of the storage units as random or pseudorandom, as follows:

(1)     Data is <u>randomly distributed</u> on multiple storage units....The selection of each storage unit on which a copy of a segment is stored is <u>random or pseudorandom</u> and may be independent of the storage units on which other segments of the data are stored. ('808 patent at 2:20-29.)

(2)     The selection of each storage unit is <u>random or pseudorandom</u>... (*Id.* at 6:5-6.)

(3)     The selection of the storage units on which the copies of a segment are stored is <u>random or pseudorandom</u> and may be independent of the storage units on which other segments of the data are stored. (*Id.* at 6:58-61.)

(4)     An example of this <u>random</u> distribution of copies of segments of data is shown in FIG. 1. (*Id.* at 7:5-6.)

(5)     Referring now to FIG. 3, an example process for storing multiple copies of segments of data in a <u>randomly</u> distributed manner over the several storage units will now be described in more detail. (*Id.* at 8:32-35.)

(6)     Selection of the storage units for the copies of one segment is <u>random or pseudorandom</u>. This selection may be independent of the selection made for a previous or subsequent segment. (*Id.* at 9:15-18.)

The specification, as demonstrated by the above citations, frequently refers to random distribution of the copies and segments. This is accomplished through the random selection of storage units before the segment and redundancy information is sent to the selected storage units. ('808 patent at 8:32-35.) A person of skill in the field of the '808 and '309 patents reading the specification would understand that selecting the storage units where the segment and

redundancy information should be stored is clearly linked to the distributing means and constitutes part of the corresponding structure for this limitation.

102.    Once the storage units are selected, the segments are sent to the selected storage units in step 124. ('808 patent at 9:67-10:2.) A person of skill in the art would understand the specification to clearly link the sending of the segments to the selected storage units as part of the corresponding structure for the function.

103.    It is my understanding that Avid has taken the position that the corresponding structure for this function is "interface at the client system (e.g., col. 11, lines 33-36); a processor or independent controller on the client system (e.g., col. 11, lines 54-67), issuing program instructions to cause the network interface to send one or more write requests to the storage units for the segment and its copy (e.g., Fig. 3 (124), Fig. 6(214))." A person of skill in the field of the '808 and '309 patents reading the specification would not understand this to be the corresponding structure. Avid fails to include the selection of storage units as part of the corresponding structure. As discussed above, before segments can be sent to storage units, two storage units must be randomly or pseudorandomly selected to receive the segment. Distribution of the segments must be random, which is accomplished through randomly or pseudorandomly selecting storage units to receive the segments. The selection of storage units is therefore clearly linked with the distribution of segments.

104.    My billing rate for this case is $575/hr. My compensation does not depend in any way on the outcome of the case.


Executed on this 16th day of January, 2013 at Paris, France.



_____
Darrell D.E. Long, Ph.D.


33

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on January 16, 2013, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on January 16, 2013, the attached document was Electronically

Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Andrew Russell
Shaw Keller LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
SKAvid@shawkeller.com

Robert A. Schwinger
Paul J. Tanck
Michael S. Davi
Tod M. Melgar
Kamran Vakili
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
rschwinger@chadbourne.com
ptanck@chadbourne.com
mdavi@chadbourne.com
tmelgar@chadbourne.com
KVakili@chadbourne.com

David Howard Evans
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036
devans@chadbourne.com

By:   /s/ David E. Moore
      David E. Moore
      Jonathan A. Choa
      Bindu A. Palapura
      POTTER ANDERSON & CORROON LLP
      Tel: (302) 984-6000
      dmoore@potteranderson.com
      jchoa@potteranderson.com
      bpalapura@potteranderson.com

1037642/38568