IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AVID TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11-1040-GMS-SRF |
| | ) | |
| HARMONIC INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF AVID TECHNOLOGY'S OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:
Robert A. Schwinger
Tod M. Melgar
Michael S. Davi
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 408-5100

David H. Evans
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC 20036
(202) 974-5600

Dated: January 16, 2013

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys For Plaintiff Avid Technology,*
*Inc.*

## TABLE OF CONTENTS

Table of Authorities ........................................................................**Error! Bookmark not defined.**

STATEMENT OF RELEVANT FACTS ....................................................................................1

    I.      The Patents-In-Suit Share a Common Specification ...................................................1

    II.     Summary of the Distributed Data Storage Systems of the Patents-in-Suit..............1

ARGUMENT .............................................................................................................................3

    I.      General Legal Principles of Claim Construction ......................................................3

         A.     The Role of the Claims ..................................................................................3

         B.     The Role of Intrinsic and Extrinsic Evidence ...............................................3

         C.     Interpreting Means Plus Function Limitations .............................................4

    II.     Construction of Disputed Claim Terms ....................................................................5

         A.     The Proper Construction of "Independent Storage Units" ..........................5

         B.     Proper Construction of "Identifier" .............................................................7

         C.     Proper Construction of "Redundancy Information" ....................................9

         D.     Proper Construction of "Nonsequentially" ...............................................11

         E.     Proper Construction of the Means-Plus-Function Terms ..........................13

               1.     means, operative in response to a request from one of the client systems, for retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit. ..............13

               2.     means for sending the requested segment to the client system......14

               3.     means for sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored.........................................................15

               4.     means for selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced ...............................16

5.      means for scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data............17

6.      means for distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment ..........................18

CONCLUSION.......................................................................................................................18

# <u>TABLE OF AUTHORITIES</u>

CASES                                                                                                                    PAGE(S)

*ACTV, Inc. v. Walt Disney Co.*,
   346 F.3d 1082 (Fed. Cir. 2003)............................................................................................12

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
   632 F.3d 1246 (Fed. Cir. 2011)..........................................................................................3

*B. Braun Medical, Inc. v. Abbott Laboratories*,
   124 F.3d 1419 (Fed. Cir. 1998)..........................................................................................4

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002)..........................................................................................4

*Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*,
   412 F.3d 1291 (Fed. Cir. 2005)..........................................................................................5

*Inverness Med. Switz.GmbH v. Warner Lambert & Co.*,
   309 F.3d 1373 (Fed. Cir. 2002)..........................................................................................4

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
   424 F.3d 1324 (Fed. Cir. 2005)..........................................................................................4

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
   545 F.3d 1340 (Fed. Cir. 2008)......................................................................................3, 4

*nCube Corp. v. SeaChange Int'l, Inc.*,
   436 F.3d 1317, 1322  (Fed. Cir. 2006)..............................................................................10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)................................................................................. passim

*SRI Int'l v. Matsushita*,
   775 F.2d 1107 (Fed. Cir. 1985)........................................................................................10

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362, 1366 (Fed. Cir. 2012)..............................................................................12

*V-Formation, Inc. v. Benetton Group SpA*,
   401 F.3d 1307 (Fed. Cir. 2005)........................................................................................10

*Wavetronix, L.L.C. v. E.I.S. Elec. Integrated Sys.*,
   573 F.3d 1343 (Fed. Cir. 2009)..........................................................................................3

*Wenger Mfg. v. Coating Mach. Sys.*,
239 F.3d 1225, 1233 (Fed. Cir. 2..............................................................................14

**OTHER AUTHORITIES**

U.S. Patent No. 6,449,688 .................................................................................................... 10

U.S. Patent No. 6,760,808 B2 ........................................................................................... passim

U.S. Patent No. 7,487,309 B2 ........................................................................................... passim

Plaintiff Avid Technology, Inc. ("Avid") initiated this patent infringement action against Harmonic Inc. ("Harmonic") for infringement of U.S. Patent Nos. 6,760,808 ("the '808 Patent") and  7,487,309 ("the '309 Patent").  Both patents are entitled, "Computer system and process for transferring multiple high bandwidth streams of data between multiple storage units and multiple applications in a scalable and reliable manner," and relate to high-performance distributed data storage systems typically used in high-end broadcast and post-production facilities. Avid, a forerunner and founder of what is known as nonlinear video editing, brought this suit because Harmonic's MediaGrid product infringes at least claims 1, 2, 4–8, 10, 12, 14, 16–20, 22 and 23 of the '808 Patent, and claims 1–5, 10–14, 16–20, 25–29 and 31–39 of the '309 Patent.

The parties have agreed upon the construction of many terms and have narrowed the disputed claim terms to the ten most relevant.

## STATEMENT OF RELEVANT FACTS

### I.      The Patents-In-Suit Share a Common Specification

The '808 and '309 Patents both claim priority as continuations, under 35 U.S.C § 120, to a common parent application, serial no. 08/997,769 filed on December 24, 1997.  Accordingly, aside from their respective claims, the '309 and '808 Patents share a common specification.

### II.     Summary of the Distributed Data Storage Systems of the Patents-in-Suit

The patents-in-suit are directed to and describe a high-performance distributed data storage system for transferring multiple high-bandwidth streams of data between multiple storage units and multiple clients, or client applications, in a scalable and reliable manner.  The invention can be used to edit, manage and deliver media files, such as for broadcast television, where fast and reliable access to large files is necessary.  An exemplary embodiment includes a plurality of clients (44), a plurality of independent storage units each having its own controller (42), an asset manager (49) and a computer network (46) to connect these components.  (*See*,

1

*e.g.*, '309 Patent, Fig. 1 and 6:30–60).  Clients (44) are typically computers running applications, such as video editors, which can read or write files.  Independent storage units (42) are the devices that clients exchange file data with during read and write operations.  The catalog manager or asset manager (49) is typically a database, accessible by the clients, that maintains information about the data available on the storage units, such as which storage units contain particular file segments.

This system provides high-speed, high-performance storage and retrieval of data, such as high-definition broadcast video, in real time.  When a client seeks to write file data (*e.g.*, a news clip) to the plurality of storage units, the file data to be stored on the storage units is divided into multiple pieces called segments.  In various embodiments of the invention, the system makes a copy of each segment or generates other redundancy information that can be used, for example, to recover a segment that becomes corrupted.  Each segment is then marked with an identifier and then distributed to the storage units for storage and later retrieval.  To balance the load on the system and avoid network congestion effects, the segments are distributed nonsequentially among the plurality of storage units, without reference to any persistent or permanent ordering of the storage units.  The idea is to scatter the segments over the storage units (*e.g.*, segments *1, 2, 3*, and *4* would <u>not</u> be stored to storage units *w, x, y*, and *z* respectively, but instead segment *1* might be stored to storage unit *w*, segment *2* might be stored to storage unit *z*, segment *3* might be stored to storage unit *x*).  (*See* '309 Patent Figs. 1–2).

So that the data can be retrieved when a client requests a file from storage, the system maintains information that can be used to locate the stored segments and reassemble the file. This information may be maintained in tables, including a segment table that maps the identifier of each segment to the storage units on which the segment is stored.  In some embodiments, this

information is present on the clients (44), and in others it is present on the asset manager (49). (*See*, *e.g.*, '309 Patent, Fig. 1; 7:35–39, 19:6–25).  In addition, each storage unit maintains information associating the identifier of each segment to the location (*e.g.*, memory address) in which that segment is stored. ('309 Patent, 7:62–64).  Because the storage units all have their own independent controllers, each storage unit is an intelligent, standalone device that performs its own allocation of segments to memory addresses, and can exchange segments directly with clients without requiring that the segments pass through a central controller.

## ARGUMENT

### I.   General Legal Principles of Claim Construction

#### A.   The Role of the Claims

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1253 (Fed. Cir. 2011) (*citing Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)).  Absent a clear, express disclaimer of scope by the patentee, a term should be "construed according to its ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the invention."  *Wavetronix, LLC. v. E.I.S. Elec. Integrated Sys.*, 573 F.3d 1343, 1355 (Fed. Cir. 2009) (*citing Phillips*, 415 F.3d at 1312–13).

#### B.   The Role of Intrinsic and Extrinsic Evidence

While claims are the central focus of the construction analysis, determination of a claim term's ordinary meaning is not made in a vacuum.  *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008); *Phillips,* 415 F.3d at 1313.

First, there is the context provided by the language of the claims themselves, which "[q]uite apart from the written description and the prosecution history . . . provide substantial guidance as to the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314.  In addition,

other claims, both asserted and unasserted, will be informative of a claim term's usage, because claim terms are normally used consistently throughout. *Phillips*, 415 F.3d at 1314.

Second, "[t]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." *Id.* at 1315. But the Federal Circuit has cautioned against "one of the cardinal sins of patent law – reading a limitation from the written description into the claims." *Id.* at 1320. The "heavy presumption" that a claim term "carries its ordinary and customary meaning" cannot be overcome "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

Third, the prosecution history is "the complete record of the [patentee's] proceedings before the PTO," and "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips,* 415 F.3d at 1317 (internal citations omitted). But the prosecution history does not limit claim scope "unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter." *Inverness Med. Switz.GmbH v. Warner Lambert & Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002).

### C.    Interpreting Means Plus Function Limitations

Construing a means-plus-function term includes two steps: identifying the function, and identifying structures (and equivalents) in the specification corresponding to the identified function. *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).

To qualify as corresponding structure, the "specification or prosecution history [must] clearly link[] or associate[] that structure to the function recited in the claim." *B. Braun Medical, Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1998). Furthermore, the corresponding

structure "must include all structure that actually performs the recited function," *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) however, "a court may not import … structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger Mfg. v. Coating Mach. Sys.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

## II.     Construction of Disputed Claim Terms

### A.     The Proper Construction of "Independent Storage Units"

The term "independent storage unit" should be construed to mean:  **a *storage unit which exchanges segments with clients across a network without the segments passing through a central controller, and whose memory addresses are not globally allocated.***

The parties seem to agree that an "independent storage unit" is a storage unit that avoids both "central control" and "global allocation."  The parties depart in that Harmonic's proposed construction does not give context and meaning to the phrases "not centrally controlled" and "not part of a global allocation."  Harmonic's construction is defective because it conflates distinct concepts pointed out in the specification and prosecution histories of the patents-in-suit.

First, the phrase "storage units which are not centrally controlled" in Harmonic's construction is vague because it conflates two related but distinct concepts in distributed storage systems: (1) the client-side controller that maintains a map of segments to storage units; and (2) the storage unit-side central controller which controls the assignment of segments to storage unit memory locations.  The patent specification and prosecution history support the latter concept, and discuss "not centrally controlled" only as excluding storage unit-side central control of the storage of segments on storage units.  For example, in addressing the lack of "central control" over an independent storage unit during prosecution, patentees argued that,

> by virtue of the "independent" storage units, [the claimed system] avoids using a central controller to access data. In particular, storage units 'receiv[e] … request[s] from one of the client systems for a segment of a file.' <u>Clients do not issue requests to a central controller that in turn identifies storage units that store the data and issues request to storage units. Each storage unit thus operates independently of the other storage units.</u>

'808 Reply (dated February 6, 2004) at 10 (emphasis added).  This aspect of Avid's proposed construction ("a storage unit which exchanges segments with clients across a network without the segments passing through a central controller") captures the correct perspective reflected in the intrinsic record, e.g., that the storage units do not communicate with clients only through a central controller.

Second, the phrase "no global allocation of available storage" is vague because it conflates two related but distinct concepts in distributed storage systems: (1) the client-side allocation of segments to storage units; and (2) the storage unit-side allocation of segments to memory locations in the storage unit.  The intrinsic record is clear in supporting the latter concept, that when the patentees said "independent storage units" have no "global allocation," they were referring to the fact that each storage unit has its own controller that allocates segments to memory addresses on the storage unit.  For example, the patentees specifically addressed the issue of "global allocation" in relation to the independence of the storage units:

> The claimed system, by virtue of the "independent" storage units, avoids global allocation of the available storage. In particular, the clients are aware of 'identifiers' of segments and storage units on which segments are stored.  <u>The 'location of each segment on [each] storage unit' is maintained at the storage unit on which the segment … is stored</u>.

'808 Reply (dated February 6, 2004) at 10 (emphasis added).  Similarly, during prosecution of the '309 patent, patentees argued that storage units were independent because each storage unit maintained its own information associating an identifier for data stored on the storage unit with the memory address at which the data was stored:

> [t]he information described in Col. 10 only appears in the write assist disk of Styczinski, and not on "each storage unit" as claimed. . . . The locations of all data blocks of the storage devices in Styczinski are maintained in the array controller 103, not in each storage unit, because storage is globally allocated [in Styczinski].

'309 Reply (dated April 18, 2008) at 4-5; '309 Reply (dated November 24, 2008) at 4.

Consistent with the prosecution history, the specification also discloses that "[e]ach storage unit . . . has its own independent controller which responds to requests for access, including but not limited to read and write access, to data stored on the medium" ('309 patent, 6:36–39) and "storage units . . . may operate independently and without central control." ('808 Patent, 2:64–65). The specification further discloses that "[e]ach storage unit . . . contains a directory of the segment identifiers and the location on that storage unit where they are stored." ('309 patent, 7:62–64).

Thus, "independent storage units" should be construed consistent with the specification and the clarifying prosecution history arguments as "storage units which exchange segments with clients across a network without the segments passing through a central controller, and whose memory addresses are not globally allocated."

### B.     Proper Construction of "Identifier"

The term "identifier," proposed for construction by Harmonic, should be given its plain and ordinary meaning in view of the patent specification and, in particular, the claims themselves. To the extent a construction is necessary, Avid asserts that consistent with the ordinary meaning, "identifier" should be construed as: ***information sufficient to distinguish***.

Harmonic's proposed construction seeks to limit "identifier" to "a unique identifier for the segment that is a combination of a unique identifier for the source, such as a file, and a segment number." Harmonic's proposed construction should be rejected.

First, Harmonic's proposed construction would exclude disclosed embodiments. For

example, the specification states that "distribution of segments may be represented in and tracked by a segment table 90, or catalog, such as shown in Fig. 2," ('309, 7:19–20) and that "the segment table … lists the segment identifiers and the storage units on which the copies of the segments are stored." ('309 Patent, 7:59–61). Figure 2 shows segment table (90) with rows (92) depicting where each segment is stored, with columns (94) depicting the segment identifier (first column), and which storage units the first copy (A, second column) and second copy (B, third column) of the segment are stored on. ('309 Patent, 7:19–25). The segment identifiers shown in Fig. 2 are simply the unique numbers *1, 2, 3, 4,* and so on. Similarly, the segments are again represented by identifiers *1, 2, 3, 4* and so on in Fig. 1, as depicted in the two side-by-side boxes in the top portion of each storage unit (42).

Second, Harmonic's proposed construction conflates the phrase "unique identifier" in the specification with the broader term "identifier" used in the claims. The claims use "identifier," not "unique identifier," and the patent specification uses these terms differently, with a "unique identifier" discussed as an example of an "identifier." In discussing multimedia clips, the specification notes that the "data structure ultimately refers to clips of source material, such as digitized video or audio, <u>using an identifier</u> of the source material, <u>such as a unique identifier</u> or a file name, and possibly a temporal range within the source material defining the clip." ('309 Patent, 19:40–44 (emphasis added)). This demonstrates that the term "identifier," as used in the specification, is a superset of, and hence broader than, the term "unique identifier."

Third, even if "identifier" and "unique identifier" were synonymous, Harmonic's construction improperly imports limitations from a single exemplary embodiment of a "unique identifier" into the definition of "identifier." *See Phillips*, 415 F.3d at 1323. There is no specialized definition of "identifier" in the specification. Although the specification describes an

embodiment in which the segments should have a unique identifier, it is exemplary, and the claims recite an "identifier," not a "unique identifier."  Moreover, the specification discloses segment identifiers that would be excluded by Harmonic's proposed construction.  As to the exemplary embodiment including a unique identifier, the specification is describing "example embodiments of the invention," ('309 Patent, 5:50–53(emphasis added)) and "[a]n example of this random distribution of copies of segments of data is shown in Fig.1." ('309 Patent, 7:10).  This example describes four storage units storing data "divided into four segments." ('309 Patent, 7:10–13).  The example goes on to describe how each of these segments "should have a unique identifier" and that the "unique identifier for a segment is a combination of a unique identifier for the source, such as a file, and a segment number." ('309 Patent, 7:50–54).  Although the specification describes an exemplary embodiment including a unique identifier and a specific example of a unique identifier, the claims should not be confined to this embodiment.

The term "identifier" does not require construction; it should be given its plain and ordinary meaning.  However, should the Court find that some construction is warranted, Avid proposes that this term be construed as "information sufficient to distinguish."

## C.    Proper Construction of "Redundancy Information"

The term "redundancy information," proposed for construction by Harmonic, should be given its plain and ordinary meaning in view of the patent specification and, in particular, the claims themselves.  To the extent a construction is necessary, Avid asserts that, consistent with the ordinary meaning, "redundancy information" means:  *a copy of a segment or information sufficient to recreate the segment.*

The parties seem to agree that redundancy information encompasses at least a copy of a segment.  The parties disagree, however, over whether redundancy information can include other types of information sufficient to recreate a segment.  Avid submits that its construction is

strongly supported by the ordinary meaning of "redundancy information," as well as by the claims themselves which specifically recite "copy of a segment" in dependent claims to describe a subset of "redundancy information." Thus, when considered in context, the meaning of the term "redundancy information" cannot be limited solely to "a copy of each segment."

For all but one of the independent claims having the limitation "redundancy information for each segment," there is a dependent claim that recites "wherein the redundancy information for a segment [is/includes] a copy of the segment." (*See, e.g.,* '808 Patent, claims 2, 7, 14, 19; '309 Patent, claim 32). The Federal Circuit has made it clear that "when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement." *SRI Int'l v. Matsushita*, 775 F.2d 1107, 1122 (Fed. Cir. 1985); *nCube Corp. v. SeaChange Int'l, Inc.*, 436 F.3d 1317, 1322 (Fed. Cir. 2006). Here, restricting "redundancy information" to only "a copy of each segment" would impermissibly read the "copy of a segment" limitation of the dependant claims into the independent claims, rendering the dependent claims superfluous. *See id.*

Additionally, and consistent with the specification and ordinary meaning, U.S. Patent No. 6,449,688 explains that "redundancy information" can be "created based on one or more segments," "created by the exclusive-or of two or more segments," or "created using many other techniques known in the art of fault tolerance." ('688 Patent, 7:38–44 and 8:37–38). This patent is related to, and shares three common inventors with, the patents-in-suit, and constitutes intrinsic evidence because it was considered during prosecution of the patents-in-suit. *See V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("prior art cited in a patent constitutes intrinsic evidence").

Read in light of the surrounding claims and other intrinsic evidence and in light of the

understanding of one of ordinary skill in the art, the term "redundancy information" should be given its ordinary meaning.  To the extent a construction is necessary, Avid's proposal is consistent with the ordinary meaning of identifier: "a copy of a segment or information sufficient to recreate a segment."

### D.  Proper Construction of "Nonsequentially"

The term "nonsequentially," proposed for construction by Harmonic, should be given its plain and ordinary meaning in view of the specification and, in particular, the claims themselves. To the extent construction is necessary, Avid asserts that, consistent with the ordinary meaning of the term, "nonsequentially" means: ***not following a permanent sequence.***

The purpose of distributing the data segments nonsequentially is set forth in the specification, which describes a " convoy effect" as "[a]nother problem with sequentially striping data over several disks" which "occurs because requests for data segments from a file trend to group together at a disk and then cycle from one disk to the next." ('309 Patent, 2:5–9). The solution to the problem, explained in the specification, is for segments from different files to not *always* be distributed to storage units according to the *same* sequence of units.  Accordingly, Avid's proposed alternative construction to the ordinary meaning, "not following a <u>permanent</u> sequence," reflects the fact that the segments are not always distributed to storage units according to the same storage unit sequence.

Harmonic seeks to replace the ordinary meaning of "nonsequentially" with the more limited phrase, "randomly or pseudorandomly independent of prior or subsequent selection." While Avid agrees that segments distributed randomly or pseudo-randomly will be nonsequential, there are other ways to distribute segments "nonsequentially," and neither the specification nor the prosecution history disavows these other ways.  The standard for disavowal of claim scope is exacting.  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366

(Fed. Cir. 2012).  A patentee "may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id*.  Here, there was no such disavowal; Avid is entitled to the full scope of its claim language.

The context of the surrounding words of the claim must be considered in determining the ordinary and customary meaning of claim terms. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).  Here, the term "nonsequentially" forms part of the phrase "wherein the segments of data are distributed nonsequentially among the plurality of storage units" in each of claims 1, 16, 33, and 36 of the '309 Patent.  To the extent it needs construction, the plain meaning of the term "nonsequentially" in this context is, "not following a permanent sequence." That is, the segments of data are distributed to the storage units such that the order of the segments, according to their positions in the original file, does not track any permanent sequencing of the storage units.

The written description of the '309 Patent supports this construction. For example, Fig. 1 shows a series of storage units labeled in order *w, x, y,* and *z*.  The claim language, "wherein the segments of data are distributed nonsequentially among the plurality of storage units," means that rather than storing segments identified *1, 2, 3,* and *4* to storage units *w, x, y,* and *z,* respectively, segments identified *1, 2, 3,* and *4* should be stored nonsequentially.  For example, Fig. 2 shows segments *1, 2, 3,* and *4* being nonsequentially stored to storage units *w, z, x,* and *y,* respectively, and a second copy of the segments going to storage units *y, x, w,* and *z,* respectively.  The plain meaning of the term "nonsequentially" is clear from these examples, and nothing in either the claim language or the intrinsic evidence suggests that the patentee had intended to depart from that plain meaning.

Accordingly, Avid submits that the term " nonsequentially" should carry its plain and ordinary meaning.  To the extent any construction is necessary, Avid proposes that the Court construe the term to mean, "not following a permanent sequence."

### E. Proper Construction of the Means-Plus-Function Terms

The parties have agreed on the functions for the six means-plus-function terms at issue.

1. **means, operative in response to a request from one of the client systems, for retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit.**

<u>Claims:</u>  1 ('808 Patent)

<u>Agreed Function:</u>  retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit.

<u>Avid's Corresponding Structure:</u>  a memory system on the storage unit; a table stored in the memory system, the table mapping a unique segment to the location of that segment on the storage unit; a processor or independent controller on the storage unit, issuing program instructions to cause, for each request, the storage unit to transfer data between the disk and the buffer indicated by the request.

The agreed-to function recited by the claim element involves a storage unit retrieving a segment of data from a memory system on the storage unit in response to a request from a client system.  In connection with this function, the patent specification describes that (1) the storage unit may access "a table mapping the segment identifier to its location on the storage unit," ('808 Patent, 10:49–50) which is stored in a memory system on the storage unit ('808 Patent, 12:37–61), and (2) based on the information in that table, "[f]or each request, the storage unit transfers data between the disk and the buffer indicated by the request," ('808 Patent, 24:26–28) thereby retrieving the requested segment.  This is the structure necessary to perform the recited function.

Harmonic's proposed structure however seeks to read in structural limitations unnecessary to the function of "retrieving the requested segment," in conflict with Federal

Circuit precedent precludes reading in "structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger Mfg. v. Coating Mach. Sys.,* 239 F.3d 1225, 1233 (Fed. Cir. 2001).

First, Harmonic seeks to incorporate a "queue" whose function is to "manage the requests from multiple applications to ensure that the most critical requests are handled first." ('808 Patent, 23:34-35). Request prioritization is unrelated to the agreed function of "retrieving the requested segment" by the storage unit from its own memory. Second, even if it was related to the recited function, the queue proposed by Harmonic is described in the specification as merely "one embodiment of queue **48**." ('808 Patent, 23:49). Third, Harmonic seeks to incorporate specific embodiments of unnecessary structures pertinent to unrelated functions, such as the "four subqueues 302, 304, 306 and 308" which are particular to a request prioritization example where file access is sought by four specific client video applications, "playback, capture, authoring and service and maintenance client programs." ('808 Patent, 23:52-53). Contrary to Harmonic's proposed construction, the agreed function does not encompass either prioritization or the more specific example of prioritization of video file requests.

### 2.    means for sending the requested segment to the client system

<u>Claims:</u> 1 ('808 Patent)

<u>Agreed Function:</u>  sending the requested segment to the client system.

<u>Avid's Corresponding Structure:</u>  network interface at the storage unit; a processor or independent controller on the storage unit, issuing program instructions to transfer data from the disk queue to the network queue.

The agreed-to function recited by the claim element involves a storage unit sending a segment of data to a client system requesting that segment. In connection with this function, the specification describes that, after a requested segment has been placed into a disk buffer, "the request is transferred from the disk queue to the network queue," ('808 Patent, 24:27–29) from

where it may be passed to the network via the storage unit's network interface ('808 Patent, 11:33–36) and sent to the client.  This defines the necessary structure.

Harmonic's proposed structure, however, seeks to read in structural limitations unnecessary to the recited function of "sending the requested segment."  Namely, Harmonic again seeks to read in various prioritization queues.  Sending a segment however requires only that the segment be transferred from a disk queue to a network queue.  Although the specification discloses elaborate queuing techniques that may utilize further prioritization techniques, those aspects are not part of the basic and agreed-to function of sending the segment.  The superfluous structures that Harmonic has put forth, such as a queue for managing file request priorities and subqueues associated with specific client video applications, are "unnecessary to perform the claimed function"  (*Wenger*, 239 F.3d at 1233) and are instead pertinent to other functions (e.g., prioritizing requests).

> ### 3.    means for sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored.
>
> <u>Claims:</u>  6 ('808 Patent)
>
> <u>Agreed Function:</u>  sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored.
>
> <u>Avid's Corresponding Structure:</u>  network interface at the client system; a processor or independent controller on the client system, issuing program instructions to cause the network interface to send the read request to the storage unit.

The agreed-to function recited by the claim element involves a client system sending a request for a segment of data to a storage unit.  In connection with this function, the specification describes how a client system can form a request for a segment of data ('808 Patent, 7:61–65) and engage a client network interface ('808 Patent, 11:33–36) to send that request over the network to a storage unit.  This defines the necessary structure.

Although the parties agreed that the recited function involved sending a request for data to the storage unit, Harmonic's proposed structure again goes beyond the agreed function by including an algorithm for "select[ing] a storage unit for a segment using a segment table." ('808 Patent, step 272 of Fig. 16).  Harmonic's proposed structure, incorporating selecting into the recited function of "sending a request," represents either "functional recitations that are not recited in the claim" and contrary to the parties agreement, or "structural limitations … that are unnecessary to perform the claimed function," both of which cannot be imported into the claim. *Wenger*, 239 F.3d at 1233.

### 4.     means for selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced

Claims:  7 ('808 Patent)

Agreed Function:  selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced.

Avid's Corresponding Structure: a processor or independent controller on the client system, issuing program instructions to identify a storage unit from the segment table, listing the segment identifiers and the storage units on which the segments are stored, according to load balancing criteria.

The agreed to-function recited by the claim element involves a client system selecting a storage unit on which a desired segment is stored in such a way as to substantially balance the load on the plurality of storage units.  In connection with this function, the specification describes that the client system may access a table, correlating segment identifiers and the storage units on which the segments are stored, and choose a storage unit from that list according to various load balancing criteria ('808 Patent, 23:6–32).  This defines the structure necessary to perform the recited function.

Harmonic's proposed structures reach far past these recitations in the specification, instead suggesting that the function of "selecting" requires elaborate aspects of particular

embodiments, such as clients sending threshold waiting times to storage units (Fig. 17, 330) or

storage units replying to clients with an acknowledgment message (Fig. 17, 350), which are not

necessary to perform the claimed function of "selecting."  Avid submits that the structure Avid

identified above represents all structure necessary to perform the agreed function.

5.      **means for scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data**

Claims:  10, 12 ('808 Patent)

Agreed Function:  scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data.

Avid's Corresponding Structure: a processor or independent controller on the client system, issuing program instructions to submit a request to a storage unit to cause it to transfer requested data from a disk buffer into a network queue.

The agreed-to function recited by the claim element involves a client system scheduling a

transfer of requested data from a storage unit storing that data.  In connection with this function,

the specification states that, "the transfer of data between applications and storage units may be

scheduled to reduce network congestion" by employing "a pre-read request which transfers the

data from disk to a buffer on the storage unit, and a network transfer request which transfers data

over the network from the buffer to the application. . . .[T]he queue 48 may include a disk queue

and a network queue." ('808 Patent, 8:15–23).  This defines the structure necessary to perform

the recited function.

Harmonic's current proposed structure once again seeks to draw limitations into the claim

from "one embodiment of queue **48**," including particular client video applications for

"playback, capture, authoring and service and maintenance," and features relevant to "the

priority of the request" ('808 Patent, 23:49-53) which are unnecessary to perform the claimed

function of "scheduling the transfer," in opposition to controlling precedent.  *See Wenger*, 239

F.3d at 1233.

    **6.**    **means for distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment**

<u>Claims</u>: 18 ('808 Patent)

<u>Agreed Function:</u>  distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment.

<u>Avid's Corresponding Structure:</u>  network interface at the client system; a processor or independent controller on the client system, issuing program instructions to cause the network interface to send one or more write requests to the storage units for the segment and its copy.

The agreed-to function recited by the claim element involves a client system distributing segments to storage units "by sending to the storage unit the segment of the data and the identifier of the segment."  In connection with this function, the patent specification describes a client system generating write requests (*see*, *e.g.*, '808 Patent, 26:28–45) and engaging a network interface ('808 Patent, 11:33–36) over a network to send those requests to one or more storage units.  This defines the structure necessary to perform the recited function.

Harmonic's structure stretches beyond the recited function of this claim term, suggesting that the agreed function of "distributing … by sending" also requires selecting a storage unit and, selecting storage units to which segments are sent on a random or pseudorandom basis.  As discussed above "selecting" is a separate function, for which there are separate "means for selecting" limitations – to include selecting with sending would conflate these two distinct limitations,  Accordingly, Harmonic's proposed construction extends beyond structures *necessary* to perform the agreed function of "distributing … by sending."

<u>**CONCLUSION**</u>

For the foregoing reasons, Avid respectfully requests that this Court adopt its construction for the disputed claim terms of the '808 and '309 Patents.

SHAW KELLER LLP

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5482)
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiff Avid Technology, Inc.*

OF COUNSEL:
Robert A. Schwinger
Tod Melgar
Michael Davi
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 408-5100


David H. Evans
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC 20036
(202) 974-5600

Dated:  January 16, 2012