# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AVID TECHNOLOGY, INC., ) | |
| ) | |
| Plaintiff, ) | C.A. No. 11-1040-GMS-SRF |
| ) | |
| v. ) | **JURY TRIAL DEMANDED** |
| ) | |
| HARMONIC INC., ) | **PUBLIC VERSION** |
| ) | |
| Defendant. ) | |

## DEFENDANT'S OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

James C. Yoon
Jason M. Garr
Matthew K. Sumida
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California  94304-1050
Tel:  (650) 565-3645

Stefani E. Shanberg
Robin L. Brewer
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California  94105
Tel:  (415) 947-2000

David E. Moore (#3983)
Jonathan A. Choa (#5319)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
jchoa@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Defendant Harmonic Inc.*

Dated:  January 16, 2013
Public Version Dated: January 30, 2013
1090455 / 38568

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ON THE TECHNOLOGY ..................................................... 1

        A.      Prior Art Systems ..................................................................................... 1

        B.      The Claimed Invention ............................................................................. 4

III.    DISPUTED CLAIM TERMS FOR CONSTRUCTION ................................... 5

        A.      "Independent Storage Units" (Claims 1, 6, and 18 of the '808 Patent;
                Claims 1, 16, 31, and 39 of the '309 Patent) ........................................... 5

                1.      Harmonic's Proposed Construction Uses Patentee's Words For
                        Defining "Independent Storage Units" ......................................... 6

                2.      Avid Disclaimed A Central Controller During The Prosecution Of
                        The Asserted Patents ..................................................................... 7

        B.      "Redundancy Information" (Claims 1, 2, 6, 7, 14, 18, and 19 of the '808
                Patent; Claims 31, 32, and 39 of the '309 Patent) ................................... 9

        C.      "Nonsequentially" (Claims 1, 16, 33, and 36 of the '309 Patent) ....... 11

        D.      "Identifier" (Claims 1, 6, and 18 of the '808 Patent; Claims 1, 16, 31, 34,
                35, and 37-39 of the '309 Patent) ......................................................... 12

IV.     DISPUTED MEANS-PLUS-FUNCTION TERMS ......................................... 13

        A.      Case Law Governing Means-Plus-Function Elements ........................... 13

        B.      Harmonic's Proposed Constructions ...................................................... 14

                1.      "Means, operative in response to a request from one of the client
                        systems, for retrieving the requested segment of the file from the
                        storage unit using the information associating the identifier of each
                        segment stored on the storage unit with the location of each
                        segment on the storage unit" (Claim 1 of the '808 Patent) ....... 15

                2.      "Means for sending the requested segment to the client system"
                        (Claim 1 of the '808 Patent) ....................................................... 16

                3.      "Means for sending a request, for each segment of the data
                        requested by the application, to the storage unit on which the
                        segment is stored" (Claim 6 of the '808 Patent) ....................... 17

i

4.    "Means for selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced" (Claim 7 of the '808 Patent)...................18

5.    "Means for scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data" (Claims 10 & 12 of the '808 Patent) ...........................................................................19

6.    "Means for distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment" ....................................................................19

V.    CONCLUSION .......................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Alloc v. Int'l Trade Comm'n*,
    342 F.3d 1361 (Fed. Cir. 2003) ..........................................................................8

*Aristocrat Techs. Australia Pty Ltd v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008) ........................................................................14

*Biomedino, LLC v. Waters Techs. Corp.*,
    490 F.3d 946 (Fed. Cir. 2007) ..........................................................................16

*Blackboard, Inc. v. Desire2Learn Inc.*,
    574 F.3d 1371 (Fed. Cir. 2009) ........................................................................14

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008) ..........................................................................8

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005) ........................................................................14

*Ergo Licensing, LLC v. Carefusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012) ........................................................................14

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ..........................................................14, 17, 18, 19

*Honeywell Int'l, Inc., et al. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006) ................................................................6, 9, 12

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
    493 F.3d 1358 (Fed. Cir. 2007) ........................................................................13

*In re Aoyama*,
    656 F.3d 1293 (Fed. Cir. 2011)..........................................................................14

*Jonsson v. Stanley Works*,
    903 F.2d 812 (Fed. Cir. 1990) ............................................................................5

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003) ..........................................................13, 15, 17

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) ..........................................................................6

*O.I. Corp. v. Tekmar Co.*,
    115 F.3d 1576 (Fed. Cir. 1997)..........................................................13, 15

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ..........................................................6, 7, 8

*Purdue Pharma L.P. v. Endo Pharms., Inc.,*
    438 F.3d 1123 (Fed. Cir. 2006)...................................................................................8

*Tech. Licensing Corp. v. Videotek, Inc.,*
    545 F.3d 1316 (Fed. Cir. 2008) ................................................................................14

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ....................................................................................7

## I.      INTRODUCTION

Avid does not claim to have invented video servers, nor does it claim to have invented distributed data storage systems.   What Avid does claim to have invented is a specific implementation of a distributed data storage system that has no centralized control.   The inventors of the '808 and '309 Patents repeatedly distinguished their invention from prior art systems using centralized control by emphasizing the independent nature of their storage units. Notwithstanding these assertions, Avid now seeks to improperly broaden the scope of the claims to cover the exact subject matter that it disclaimed during prosecution of the patents, and undisputedly cover systems in existence well before December 24, 1997, the priority date of the asserted patents. Avid's attempts should be rejected, and as Harmonic proposes, the claim terms should be construed consistent with the patent disclosures and the patentee's prior statements

## II.     BACKGROUND ON THE TECHNOLOGY

The technology at issue relates to distributed data storage systems that allow multiple users connected to computer networks to access files stored on such systems. '808 Patent at 1:25-26, 34-36.[1]  The asserted '808 and '309 Patents are directed to the efficient storage and retrieval of media files on a network in a distributed data storage system. '808 Patent at 2:6-17.

### A.      Prior Art Systems

Traditional client/server systems used a centralized file system in which the client makes a request to the server and the server identifies the location of the data, retrieves the data, and passes it on to client.  Long Decl. at ¶ 3.  In a more distributed system, the server contains the file system identifying the location of data, but does not retrieve the data directly.  *Id.* at ¶ 14. Instead, the server identifies the location of the segment and provides that information to the client.  *Id.*  The client then connects directly with the storage unit.  *Id.*  In this type of system, the

---

[1] The specifications for the '808 and '309 Patents are identical.  Therefore, cites to the specification are made to the '808 Patent rather than both.

server can provide either the exact disk location or the storage unit where the requested segment is located, in which case the storage unit includes a mapping between the segment and disk location. *Id.*

Due to their size, media files are frequently divided into segments and the segments stored on different storage units in the network, also known as striping. '808 Patent at 1:36-39. A unique identifier is used to track each segment. *Id.* at 7:47-51. The traditional method of striping stores segments in a sequential order using a round-robin pattern. *Id.* at 1:39-41. This storage method, however, can result in latency in the storage or retrieval of segments due to long queues at the storage unit that propagate throughout the system, thereby creating a convoy effect. *Id.* at 1:55-63. At the time of the claimed invention, it was well-known that random striping of the data addressed the convoy effect, but did not necessarily prevent hotspots in which a storage unit may randomly experience extreme loads. *Id.* at 1:64-2:5.

Load balancing techniques are used to address hotspots. For example, the use of two copies of data could help distribute the load since the client could get a copy from a second storage unit if the first storage unit is overloaded. '808 Patent at 1:51-52. In addition to random distribution of segments (discussed above), a number of other load balancing techniques were also available. *Id.* at 21:51-23:32. For example, in the preferred embodiment, a client may contact a storage unit asking whether data may be transferred within a time limit. *Id.* at 21:55-58. If the storage unit is not able to transfer the data in the allowable time, then the client can go to the second storage unit. *Id.* at 22:7-15. If neither storage unit is able to perform the data retrieval in the requested times, then the client can go back to the first storage unit. *Id.* at 22:21-23. ███████████████████████████████████████████

███████████████████████████████████████████████

████████ Peters Tr. at 80:21-81:6.

In a system storing segments of data, a failed disk impacts a larger number of files compared to a system where the entire file is stored on a single disk. '808 Patent at 1:42-45. To address this issue and increase the reliability of the data, different fault tolerance methods may be

used.  Long Decl. at ¶ 18.  Examples include mirroring the data or using RAID.  *Id.*  Mirroring involves making an exact copy of the segment and storing it on a different storage unit.  '808 Patent at 1:46-54.  RAID usually involves the use of parity data.  Long Decl. at ¶ 20.  Parity data is used to create simple erasure codes based on the exclusive-or operation from Boolean logic and takes less disk space than the original copy.  *Id.*  For example, three disks of data may be condensed into one disk of parity data.  *Id.*  Unlike a mirrored system where both copies of the data may be read by the user, only the original copy of the data may be read in a RAID system using parity data.  *Id.*  The parity data cannot be read directly.  *Id.*  This also impacts performance in the system when rebuilding a failed disk.  *Id.* at ¶ 21.  A failed disk in a mirrored system is rebuilt without a significant impact on the performance of the system because there is a copy of the segment for read requests.  *Id.*  In a RAID system using parity data, the lost data must be recreated from the parity data and then it may be copied.  *Id.*  The rebuilding of the disk slows down both reads and writes throughout the system, resulting in degraded performance. *Id.*

████████████████████████████████████████████████

The patentee readily admitted that distributed data storage systems, distributed database management techniques, striping, dividing files into segments and the use of unique identifiers, load balancing, random distribution of segments, and mirroring were all well-known in the art at the time of the invention.  '808 Patent at 1:25-5, 19:20-22; Peters Tr. at 28:15-31:25; 35:16-19; 37:8-38:1; 112:2-113:18 (primary inventor testifying as to what was known in the art).

**B.      The Claimed Invention**

The inventions disclosed in the '808 and '309 Patents relate to a very specific implementation of a distributed data storage system—one that does not have a centralized file system or centralized control. *See, e.g.*, '808 Patent at 2:49-55. The scope of the invention is described in the specification and reinforced by disclaimers during the prosecution of the patents and the testimony of two of the inventors, Eric C. Peters and Herbert R. Jacobs.

4



## III.   DISPUTED CLAIM TERMS FOR CONSTRUCTION

### A.   "Independent Storage Units" (Claims 1, 6, and 18 of the '808 Patent; Claims 1, 16, 31, and 39 of the '309 Patent)[2]

| HARMONIC'S PROPOSED CONSTRUCTION | AVID'S PROPOSED CONSTRUCTION |
|---|---|
| storage units which are not centrally controlled and not part of a global allocation of available storage | storage units which exchange segments with clients across a network without the segments passing through a central controller, and whose memory addresses are not globally allocated |

---

[2] The claim term "independent storage units" is recited in both patents and the construction should be the same for both. Avid relied upon "independent" to distinguish over the prior art during the prosecution of both patents. Further, arguments made in the prosecution of a parent patent are relevant to understand the meaning of that same term in related patents. *See Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990). Therefore, all of the arguments made in the prosecution of the '808 Patent apply equally to the '309 Patent, which claims priority from the same applications and is a continuation of the '808 patent application.

Notwithstanding the fact that central servers were admittedly known in the art and that the patentee disavowed any centralized system for controlling the storage units during prosecution of the '808 Patent, Avid nevertheless proposes a construction that would cover a distributed data storage system that *includes* a central server. Avid's construction is directly at odds with the intrinsic evidence and its own prior descriptions of "independent storage units."

### 1. Harmonic's Proposed Construction Uses Patentee's Words For Defining "Independent Storage Units"

The Federal Circuit has repeatedly declared, "[c]laims must be read in view of the specification, of which they are a part." *Honeywell Int'l, Inc., et al. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (*quoting Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005)). Where the specification clearly indicates that the described embodiment is the only embodiment the claims cover, the claims are properly limited to that embodiment even if the claim language, removed from the context of the specification, could be read more broadly. *See Honeywell*, 452 F.3d at 1316 (construing "fuel injection system component" to mean "fuel filter" where "the entire specification of the '879 patent, as well as the sole drawing, describe the elements and operation of a fuel filter with electrically conductive fibers."); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348-49 (Fed. Cir. 2004) (construing "sending," "transmitting," and "receiving" to require communications "over a telephone line and not a packet-switched network" where the specification "repeatedly and consistently describes" communications over a telephone line).

Harmonic's proposed construction is taken directly from the patent specifications. The specification repeatedly define "independent" as not centrally controlled. '808 Patent at 2:49-50 ("The storage units and applications may operate independently and *without central control*."); *id.* at 8:3-10 ("when an application 44 requests access to a selected segment of data on one of the storage units 42, the storage unit places the request on a queue 48 that is maintained for the storage unit. Applications may make such requests *independently of each other or any centralized control*, which makes the system more readily scalable."); *id.* at 6:21-23 ("***Central***

*control points may be eliminated* by having each client use local information to schedule communication with a storage unit"); *id.* at 19:17-36 (explaining how a catalog manager that monitors how data is distributed on various storage units for catalogs maintained locally on the client "is not a central point of failure") (emphases added).

Indeed, the patents explain that the absence of a central server is vital to the claimed invention:

> Using the procedures, outlined above, storage units and clients operate using local information and without central configuration management or control. A storage unit may be added to the system during operation without requiring the system to be shut down. . . This expandability complements the capability and reliability of the system. '808 Patent at 27:51-59.

The claims of the '309 Patent further confirm that "independent" means without any centralized control. Claims 3 and 28 of the '309 Patent recite "wherein applications may request data from the plurality of storage units independently of each other and any centralized control." '309 Patent at 28:23-24; 30:4-7. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.").

### 2. Avid Disclaimed A Central Controller During The Prosecution Of The Asserted Patents

Harmonic's proposed construction also adopts the words used by the patentee during prosecution of the '808 Patent. *See Vitronics*, 90 F.3d at 1580 (Fed. Cir. 1996). During prosecution of the '808 Patent, Avid sought to avoid the Boll prior art reference (U.S. Patent No. 5,644,720) by amending the claims to add "independent." Boll disclosed a system in which the client sends a request to a centralized interface and the centralized interface returns data identifying the server to which the client may connect. Long Decl. at ¶ 27.[3] The client then connects directly to the server. *Id.*

---

[3] The Federal Circuit has recognized that under certain circumstances extrinsic evidence in the form of expert testimony can be useful, such as to establish the meaning of a particular term

(continued...)

In distinguishing the claimed invention over the prior art, Avid described the "independent" storage units as avoiding global allocation or a central controller:

> The claimed system, by virtue of its "independent" storage units, ***avoids global allocation*** of the available storage....

> Further, the claimed system, by virtue of the "independent" storage units, ***avoids using a central controller to access data.*** In particular, storage units "receiv[e]...request[s] from one of the client systems for a segment of a file." Clients ***do not issue requests to a central controller*** that in turn identifies storage units that store the data and issues requests to storage units....

> Boll deals with distributing transaction request for multiple clients to multiple servers. In Boll, a client asks a centralized interface 24 to provide access to a server and receives from this interface an identity or connection data for a server to which the client is assigned. The client then performs its transaction with the assigned server. In contrast, the present invention relates to a distributed storage system in which data for a file is distributed among multiple independent storage units. Boll's assignment of a client to a server through a centralized interface for its transaction in [sic] contrary to the claim limitation noted above.

'808 Response to Office Action dated February 6, 2004 at 10-11 (emphases added). Avid clearly disclaimed use of a central controller and global allocation of available space by amending its claims to include "independent" and explaining that "the limitations of each of claims 6 and 18 are such that storage units are independent, ***avoiding global allocation of storage and centralized control.***" *Id.* at 12 (emphasis added).

Having clearly and unmistakably disavowed a centralized control or global allocation of available storage, Avid's proposed construction should be rejected. *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1372-74 (Fed. Cir. 2008); *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006); *Alloc v. Int'l Trade Comm'n*, 342 F.3d 1361, 1372 (Fed. Cir. 2003). To construe this term otherwise would allow Avid to reclaim

---

(...continued from previous page)

in the prior art. *See Phillips*, 415 F.3d at 1318. The declaration of Dr. Long is being offered to explain the meaning of central controller and global allocation of available space in light of the Boll reference cited by the Patent Office.

scope that it gave up during prosecution.

**B.** **"Redundancy Information" (Claims 1, 2, 6, 7, 14, 18, and 19 of the '808 Patent; Claims 31, 32, and 39 of the '309 Patent)**

| HARMONIC'S PROPOSED CONSTRUCTION | AVID'S PROPOSED CONSTRUCTION |
| --- | --- |
| a copy of each segment | a copy of a segment or information sufficient to recreate the segment |

Harmonic's proposed construction of "redundancy information" to mean "a copy of each segment" is consistent with the intrinsic evidence. The term "redundancy information," which is part of the claimed phrase "redundancy information *for each segment*," refers to "a copy of each segment" stored by the distributed data system of the patents. This construction is confirmed by the specification, prosecution history, and claims of the '808 and '309 Patents.

Avid does not dispute that the proper construction of "redundancy information" includes "a copy of each segment." The parties, however, dispute whether the proper construction also includes "information sufficient to recreate the segment." This dispute focuses on whether the proper construction of "redundancy information" also includes RAID. Avid, during the prosecution of the '309 Patent, specifically disclaimed RAID. Further, the specification and claims of the '808 and '309 Patents further support that "redundancy information" is only "a copy of each segment."

A person of ordinary skill reading the specification of the '808 and '309 Patents would understand that "redundancy information" refers to the "copy of a segment" stored in the claimed distributed data system to enhance system reliability. The specification uniformly teaches that the claimed system divides data into segments and stores *at least two* copies of each individual segment in different storage units of the system. '808 Patent at 6:55-63; *Honeywell*, 452 F.3d at 1316. The patent requires the invention to store a redundant copy of each individual segment in a different storage unit from the original copy to perform the data recovery and load balancing functions of the patents. Specifically, with respect to data recovery, the specification declares:

> To recover the data, segments of which copies were stored on the failed storage unit are identified. The storage units on which another copy of the identified

segments are stored are identified. *A copy of the identified copies is then randomly distributed among the plurality of the storage units.* Such data recovery may be used in combination with the read and write functionality of a file system or distributed storage system described herein. '808 Patent at 4:22-29 (emphasis added).

The specification makes clear that the redundant copy is necessary for the patented inventions to perform their load balancing function. As explained in the specification, when data is requested by a client, the distributed data system selects one of the at least two storage units that store a copy of the segment using different load balancing techniques, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ '808 Patent at 11:7-23, 21:51-23:32; *see also* Peters Tr. at 80:21-81:6. The system cannot perform the choice between two or more storage units unless the system stores at least one redundant copy of each segment. Long Decl. at ¶¶ 35-36.

The above understanding of "redundancy information" is confirmed by the claims themselves, which recite "segments and redundancy information for each segment *are distributed among the plurality of storage units.*" '808 Patent at 28:10-12 (claim 1), 28:57-59 (claim 6), 30:35-37 (claim 18); *see also* '309 Patent at 30:20-22 ("wherein each segment and redundancy information for each segment are distributed among the plurality of storage units") (Claim 31). A person of ordinary skill reading this claim language would understand that "redundancy information" for segment refers to a copy of segment since the only thing distributed among the storage units are copies of segments. '808 Patent at Abstract, 2:29-36, 3:14-15, 4:22-29, and 13:20-22; *see also* Long Decl. at ¶¶ 33, 30.

The specification teaches that the storage of these redundant copies of segments achieves important objectives of the invention including (1) no single point of failure, (2) tolerance of storage unit failure without disrupting operation; (3) the capability of recovering lost data and (4) efficient load balancing (to obtain long mean time to failure). '808 Patent at 5:58-67.

In sharp contrast, Avid's construction of "redundancy information" as "a copy of a segment or information sufficient to recreate the segment" is at odds with the specification of the '808 and '309 Patents and the objectives of the invention itself. Nowhere in the specification is

10

there any indication that "redundancy information" refers to information sufficient to recreate the segment, as Avid suggests.   To the contrary, the specification of the '808 and '309 Patents teaches that the "redundancy information" is a complete copy of a segment.  '808 Patent at 6:4-5; 6:55-57; 13:20-22.  Moreover, the invention requires redundancy information to be a complete copy in order to allow the claimed system to provide the desired load balancing and to allow the system to respond to any loss of segment of data without a disruption of operation.  '808 Patent at 2:29-36, 9:60-65, 21:14-15, 21:51-22:26, and 22:52-23:32; *see also* Long Decl. at ¶¶ 34-38.

This fact was a key distinction that Avid relied on to distinguish the '309 patent from the prior art.  During the prosecution of the '309 patent, the patent office rejected the pending claims of the patent on the ground that the Styczinski prior art reference stored "redundancy information" in the form of parity information for each segment.  Parity information is essential to RAID systems.  Avid argued that such parity information (*e.g.*, information from a segment) was not the invention because Styczinski did not store a "*copy of the segment*" and did not distribute such copies "among the plurality of storage units." '309 Response to Office Action (April 18, 2008), at 3.  Avid explained that "[t]o the extent that the write assist disk [of Styczinski] contains copies of segment, these copies are not permanent and are not *distributed among the plurality of storage units*.  The parity information referred to by Styczinski, while distributed among its service units, are not *copies* of the data segments." *Id.* (emphasis added).  As the intrinsic evidence makes clear, "redundancy information" should be construed to mean a copy of the entire segment, not just the information sufficient to recreate the segment.

C.   "Nonsequentially" (Claims 1, 16, 33, and 36 of the '309 Patent)

| HARMONIC'S PROPOSED CONSTRUCTION | AVID'S PROPOSED CONSTRUCTION |
|---|---|
| randomly or pseudorandomly independent of prior or subsequent selection | not following a permanent sequence |

Harmonic's construction is derived from the patent specifications.  The specifications make clear that segments are distributed randomly or pseudorandomly independent of prior or subsequent selection.  *See, e.g.,* '808 patent at 2:20-29 ("Data is *randomly distributed* on

multiple storage units....The selection of each storage unit on which a copy of a segment is stored is *random or pseudorandom* and may be independent of the storage units on which other segments of the data are stored."); *id.* at 6:5-6 ("The selection of each storage unit is *random or pseudorandom*..."); *id.* at 6:58-61 ("The selection of the storage units on which the copies of a segment are stored is *random or pseudorandom* and may be independent of the storage units on which other segments of the data are stored."); *id.* at 7:5-6 ("An example of this *random* distribution of copies of segments of data is shown in FIG. 1."); *id.* at 8:32-35 ("Referring now to FIG. 3, an example process for storing multiple copies of segments of data in a *randomly* distributed manner over the several storage units will now be described in more detail."); *id.* at 9:15-18 (Selection of the storage units for the copies of one segment is *random or pseudorandom*. This selection may be independent of the selection made for a previous or subsequent segment."). The purpose of the random distribution is to avoid the convoy effect and help distribute the load on the system. '808 patent at 1:64-2:5. The randomness of the distribution of the segments is critical to the achieving this objective.

The term "nonsequentially" is not mentioned once in the specification for the '808 and '309 Patents and is used only in the claims. The construction of "nonsequentially" as "randomly or pseudorandomly independent of prior or subsequent selection" is proper as the specification clearly indicates that this is the *only* embodiment the claims cover. *See Honeywell*, 452 F.3d at 1316 (holding that where the specification clearly indicates that the described embodiment is the only embodiment the claims cover, the claims are properly limited to that embodiment even if the claim language, removed from the context of the specification, could be read more broadly.).

**D.** **"Identifier" (Claims 1, 6, and 18 of the '808 Patent; Claims 1, 16, 31, 34, 35, and 37-39 of the '309 Patent)**

| HARMONIC'S PROPOSED CONSTRUCTION | AVID'S PROPOSED CONSTRUCTION |
| --- | --- |
| a unique identifier for the segment that is a combination of a unique identifier for the source, such as a file, and a segment number | information sufficient to distinguish |

12

Consistent with the intrinsic evidence, Harmonic proposes that the recited "identifier" of a segment be construed as "a unique identifier for the segment that is a combination of a unique identifier for the source, such as a file, and a segment number." The specification defines an "identifier" for a segment as a "combination of a unique identifier for the source, such as a file, and a segment number." '808 Patent at 7:49-55. The law is clear. Where a patent applicant acts as his or her own lexicographer, the claim term should be given the definition set forth in the specification. *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007).

Avid's construction of "identifier" as "information sufficient to distinguish," on the other hand, is incomplete and unsupported by intrinsic evidence. Avid's construction ignores the central feature of the '808 and '309 Patents, which requires "independent storage units" to "operate independently and without central control." '808 Patent at 2:49-50. "For example, each client may use only local information to schedule communication with a storage unit." '808 Patent at 2:50-52. The "identifiers" used by the invention provide the information necessary for the system to use "only local information" to locate the segment. Specifically, in the absence of a central controller, the system must ensure multiple clients do not assign the same segment identifier to different segments. Avid's construction of "identifier" as "information sufficient to distinguish" does not meet this requirement because it does not include the information necessary to perform the claimed identifier function. At a minimum, such an identifier would include a "combination of a unique identifier for the source, such as a file, and a segment number." '808 Patent at 7:49-51; *see also* Long Decl. at ¶¶ 43-44.

IV.     **DISPUTED MEANS-PLUS-FUNCTION TERMS**

A.     **Case Law Governing Means-Plus-Function Elements**

Means-plus-function claiming allows patentees to use means expressions without reciting all possible structures in the claim language. *Med. Instrumentation*, 344 F.3d at 1211. However, "[t]he price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof." *Id.* (quoting *O.I. Corp. v. Tekmar*

*Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997)).

The structure disclosed in the specification is deemed to be "corresponding" structure if the specification "clearly links or associates that structure to the function recited in the claim." *In re Aoyama*, 656 F.3d 1293, 1297 (Fed. Cir. 2011) (internal quotations omitted). "While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005).

"The question is not whether one of skill in the art would be capable of implementing a structure to perform the function, but whether that person would understand the written description itself to disclose such a structure." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008). Further, the identified structure needs to be more than a "black box." *See Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1382-82 (Fed. Cir. 2009). The structure needs to be described in detail and not abstraction. *See id.*

For software limitations using means-plus-function claiming, the Federal Circuit "has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Australia Pty Ltd v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Rather, the patentee must disclose "enough of an algorithm to provide the necessary structure under § 112, ¶ 6." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). The algorithm may be expressed in any understandable way, but it "is still a step-by-step procedure for accomplishing a given result." *Ergo Licensing, LLC v. Carefusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) (internal citations and quotations omitted).

## B.    Harmonic's Proposed Constructions

The '808 patent claims recite several means-plus-function limitations. The parties have reached agreement on the claimed function and certain means for each of the disputed means-plus-function claim elements. *See* Exhibit A, Am. Jt. Claim Const. Stmt (Doc. No 86). However, Avid's proposed constructions ignore additional corresponding structures that are required to

perform the claimed functions.   Instead of properly identifying the structure for each of the means-plus-function limitations, Avid points to generic and frequently open-ended structure. This defeats the purpose of means-plus-function claiming, where, in exchange for defining an invention in terms of its function, the patent owner is strictly limited to protection for only the structure actually disclosed in the specification and equivalents.  *See O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997); *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("The duty . . . to clearly link or associate structure with the claimed function is the quid pro quo for allowing the patentee to express the claim in terms of function under section 112, paragraph 6.").   By contrast, Harmonic's constructions include the disclosures in the specification that are directly linked to the claimed function.

    1.  **"Means, operative in response to a request from one of the client systems, for retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit" (Claim 1 of the '808 Patent)**

The parties agree that claimed function refers to "retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit."   The parties further agree that the specification of the '808 Patent links the following structures to this mean-plus-function element: (1) memory system on the storage unit (col. 12, lines 37-61); (2) table stored in the memory system, (3) table mapping a unique segment identifier for each segment to the location of that segment on the storage unit (col. 10, lines 46-50); and (4) processor or independent controller (col. 11, lines 54-67), issuing program instructions, in response to a request from a client system.   The remaining dispute is whether, as Harmonic proposes, the '808 Patent also links the storage unit to transfer data between the disk to the buffer through use of disk queue 300 (including subqueues 302, 304, 306 and 308 and fields 312, 314 and 316) (Fig. 19) to this claim element.

The claimed function of "retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit

with the location of each segment on the storage unit" cannot be performed without disk queue 300 and its subqueues (302, 304, 306 and 308 and their associated fields 312, 314 and 316). Long Decl. at ¶ 55.[4]  For example, the retrieve operation from a storage unit cannot be performed without subqueues since, as the specification explains, they contain the information relating to "the client making the request and the requested operation" and the priority of each request within each subqueue. '808 Patent at 23:54-59; Long Decl. at ¶ 54.  Accordingly, Harmonic's proposed construction includes all structures necessary to perform the claimed function.

### 2.  "Means for sending the requested segment to the client system" (Claim 1 of the '808 Patent)

The parties agree that the claimed function refers to "sending the requested segment to the client system," and that the corresponding structures include: (1) network interface at the storage unit (col. 11, lines 33-36); and (2) processor or independent controller on the storage unit (col. 11, lines 54-67) that issues program instructions to transfer data from the disk queue to the network queue (col. 24, lines 27-29).  Avid disputes that the (3) subqueues 322, 324, 326 and 328 and their associated field 312, 314, 316; and (4) said processor or independent controller uses either a token as described at '808 patent, Col. 24:60-25:5 or the algorithm described in Fig. 21 and described at '808 patent, Col. 25:46-26:10, also comprise corresponding structure.

The intrinsic evidence demonstrates that the subqueues (322, 324, 326 and 328 and fields 312, 314 and 316) are necessary to perform the function of "sending the requested segment to the client system."  The specification explains that the subqueues include the information indicating "the client making the request and the requested operation" and the priority for processing each request. '808 Patent at 23:54-59.  Without such information, the claimed system would not be able to send the requested segment to the client system or ensure the highest priority request is

---

[4] Since the question on corresponding structure is whether a person of skill in the art would understand the specification to disclose the corresponding structure, it is appropriate to consider expert testimony in determining the corresponding structure for the identified function. *See Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949 (Fed. Cir. 2007).

processed first. Long Decl. at ¶¶ 52, 62-63. Similarly, without either the token described at Col. 24:60-25:5 or the algorithm of Figure 21, the process of the claimed invention would not have the capability of performing the claimed "sending" function. Long Decl. at ¶¶ 64-66; *Finisar*, 523 F.3d at 1340.

> 3.   **"Means for sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored" (Claim 6 of the '808 Patent)**

The parties agree that the claimed function refers to "sending a request to the storage unit on which the segment is stored," and that corresponding structures include: (1) network interface at the client system (col. 11, lines 33-36); and (2) a processor or independent controller on the client system (col. 11, lines 54-67). The only dispute is whether (3) configured to implement the algorithm in steps 272 and 274 of Fig. 16 as described in the '808 patent, Col. 21:10-23, should also be included in the construction.

Avid incorrectly omits step 272 from the process and treats step 274 as exemplary, rather than the only means disclosed in the specification. Avid's proposed construction thus ignores the specification, resulting in legal error. The claimed function of "sending a request to the storage unit on which the segment is stored" cannot be performed without selecting the storage unit and then sending a pre-read request to the selected storage unit. Long Decl. at ¶¶ 73-74. For example, the request operation cannot be performed without first selecting the storage unit. '808 Patent at 21:10-12 ("When the client requests a segment of data for a particular data stream, the client selects a storage unit, in step 272, for the segment that is requested."); Long Decl. at ¶ 73.

With respect to step 274, Avid agrees that the corresponding structure for this limitation includes this step. The dispute is whether step 274 is merely exemplary or not. By providing exemplary language, Avid violates the basic tenet of means-plus-function claiming that in exchange for expressing a claim in means language, the claims are limited to the "means specified in the written description and equivalents thereof." *Med. Instrumentation*, 344 F.3d at 1211. Part of the corresponding structure is, therefore, limited to only the structure disclosed in the specification, step 274. Avid's construction should therefore be rejected.

17

    **4.**    **"Means for selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced" (Claim 7 of the '808 Patent)**

The parties agree that the claimed function refers to "selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced," and that the corresponding structure includes (1) a processor or independent controller on the client system (col. 11, lines 54-67). Avid disputes the following portion of Harmonic's proposed construction: (2) issuing a program instruction to implement the algorithm in Fig. 17 and describe in '808 Patent, Col. 21:51-22:26 <u>or</u> (3) one of the alternatives discussed in Col. 23:6-32.

Avid incorrectly omits Figure 17 and treats as exemplary the alternative methods disclosed in the specification. Again, Avid ignores the specification. The claimed function of "selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced" cannot be performed without one of the methods identified in the specification. Long Decl. at ¶¶ 81-84.

Avid's construction fails to include Figure 17 and the relevant disclosure from the specification as part of the corresponding structure. Figure 17, however, describes the power of two choice, which ███████████████████████████████████████████ is the preferred embodiment. '808 Patent at 21:12-15 (The selection of storage units "will be described in more detail below in connection with FIGS. 17 and 18. In general, the storage unit with the shortest queue 48 (FIG. 1) is selected."). Instead, Avid identifies Col. 8:9-17, which references selecting the shortest queue for load balancing purposes, but fails to include the algorithm disclosed in the specification for accomplishing this method of load balancing. *Finisair,* 523 F.3d at 1340. Avid also identifies as exemplary the alternative methods included in Harmonic's construction. As discussed above, however, a proper construction limits the claim element to the corresponding structure disclosed in the specification and its equivalent. The alternative methods are not merely examples, but rather set the "metes and bounds" of the scope of this means-plus-function limitation. The corresponding structure should therefore include the

algorithm disclosed in Figure 17 or the alternative methods disclosed at Col. 23:6-32, as Harmonic proposes.

> **5.**   **"Means for scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data" (Claims 10 & 12 of the '808 Patent)**

The parties agree that the claimed function refers to "scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data," and that the corresponding structures include: (1) network interface at the client and storage unit (col. 11, lines 33-36); (2) processor or independent controller on the client and the storage unit. Avid disputes that the following structures are also necessary to perform the claimed function; (2) algorithm for implementing queue 48; (3) network queue 320 from Fig. 19; and (4) the algorithm that forces each client to receive data from only one storage unit, and that forces each storage unit to send data to only on client, at any given time, either through the use of a token described in '808 patent, Col. 24:64-25:5 or the algorithm described in Figs. 20 and 21, and described in the '808 patent at 25:6-26:10.

The claimed function of "scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data," however, cannot be performed without queue 48 and the network queue 320 that prioritizes network transfers. Long Decl. a ¶ 90. The claimed function includes "efficiently transfers data," which the specification discloses as an algorithm to schedule the transfer of data over the network. '808 Patent at 24:48-50 ("Data transfers between the storage units and clients over the computer network may be scheduled to improve efficiency."). The specification only discloses two algorithms for scheduling the transfer of data, which represent the corresponding structure. *Id.* at 24:6-25:5, 25:6-26:10, and Figs. 20-21; *see also* Long Decl. at ¶¶ 91-95. Harmonic's proposed construction should therefore be adopted.

> **6.**   **"Means for distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment"**

19

The parties agree that the claimed function of this means-plus-function element refers to "distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment." The parties also agree that the corresponding structures include: (1) network interface at the client system (col. 11, lines 33-36); (2) a processor or independent controller on the client system (col. 11, lines 54-67); and (4) sending the segment and redundancy information asynchronously to the selected storage units as described in step 124 in Fig. 3. Avid's construction omits: (3) issuing program instructions to implement the algorithm of selecting the storage units either randomly or pseudorandomly as described in step 122.

The claimed function of "distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment" requires selecting the storage units where the segment and redundancy information should be stored. Long Decl. at ¶ 101. Dependent claim 19 confirms that the means for distributing includes selecting storage units. '808 Patent at 30:56-58. Selecting the storage units where the segment and redundancy information should be stored is clearly linked to the distributing means and constitutes part of the corresponding structure for this limitation. Long Decl. at ¶ 101. Harmonic's proposed construction should therefore be adopted.

## V.     CONCLUSION

For the foregoing reasons, Harmonic respectfully request that the Court construe the above terms according to the Harmonic's proposed constructions.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

James C. Yoon
Jason M. Garr
Matthew K. Sumida
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California  94304-1050
Tel:  (650) 565-3645

Stefani E. Shanberg
Robin L. Brewer
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California  94105
Tel:  (415) 947-2000

Dated: January 16, 2013
Public Version Dated: January 30, 2013
1090455 / 38568

By:   */s/ David E. Moore*
        David E. Moore (#3983)
        Jonathan A. Choa (#5319)
        Bindu A. Palapura (#5370)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, DE  19801
        Tel:  (302) 984-6000
        dmoore@potteranderson.com
        jchoa@potteranderson.com
        bpalapura@potteranderson.com

*Attorneys for Defendant Harmonic Inc.*

21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on January 30, 2013, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on January 30, 2013, the attached document was Electronically Mailed to the following person(s):

John W. Shaw
Karen E. Keller
Andrew Russell
Shaw Keller LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
SKAvid@shawkeller.com

Robert A. Schwinger
Paul J. Tanck
Michael S. Davi
Tod M. Melgar
Kamran Vakili
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
rschwinger@chadbourne.com
ptanck@chadbourne.com
mdavi@chadbourne.com
tmelgar@chadbourne.com
KVakili@chadbourne.com

David Howard Evans
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036
devans@chadbourne.com

By:   /s/ David E. Moore
      David E. Moore
      Jonathan A. Choa
      Bindu A. Palapura
      POTTER ANDERSON & CORROON LLP
      Tel: (302) 984-6000
      dmoore@potteranderson.com
      jchoa@potteranderson.com
      bpalapura@potteranderson.com

1037642/38568