IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

AVID TECHNOLOGY, INC.,

         Plaintiff,

    v.

HARMONIC INC.,

         Defendant.

C.A. No. 11-1040-GMS-SRF

**DECLARATION OF SHAHRAM GHANDEHARIZADEH, PH.D.
IN SUPPORT OF PLAINTIFF AVID TECHNOLOGY, INC.'S
<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

I, Dr. Shahram Ghandeharizadeh, declare as follows:

1.      I have knowledge of the matters stated in this declaration and would testify truthfully to

them if called upon to do so.

2.      I am an Associate Professor of Computer Science at the University of Southern

California. I received my Bachelors, Masters and Ph.D. degrees from the Computer Sciences

department at the University of Wisconsin-Madison in 1985, 1987, and 1990, respectively.  My

research interests include design and implementation of scalable, elastic, and highly available

data stores.  I have served as a general co-chair of the ACM Multimedia 2000 conference and a

technical program co-chair of the IEEE International Conference on Data Engineering 2010.  I

have published numerous papers in prestigious forums such as SIGMOD, VLDB, and CIDR.

My billing rate for this case is $400/hr.  My compensation in no way depends on the outcome of

this case.

3.      I have reviewed the following materials in forming my opinions about the scope and

meaning, as I believe they would appear to a person of ordinary skill in the art, of certain

disputed claim terms appearing in asserted U.S. Patent Nos. 6,760,808 (the "'808 Patent") and

7,487,309 ("the '309 Patent").:

     a.  the '808 Patent;

     b.  the '309 Patent;

     c.  the parties' Joint Claim Construction Statement and exhibits, including the

        prosecution histories of the '808 and '309 Patents;

     d.  the parties' Opening Claim Construction briefs;

     e.  the Declaration of Harmonic's expert, Dr. Darrell D.E. Long, in support of

        Harmonic's opening claim construction brief.

## MEANS-PLUS-FUNCTION CLAIM ELEMENTS

4.     I understand that certain claims of the '808 Patent include claim terms written in a

specialized form called "means-plus-function," which recite a means for performing some

recited function.

5.     I understand that construing means-plus-function claim elements is a two-step process:

(1) identifying the recited function, and (2) identifying corresponding structures in the patent

specification which perform the recited function.

6.     I understand that the parties have agreed as to the construction of the function for all

disputed means-plus-function elements, and that those constructions are essentially to the

language actually recited in the claim elements (i.e., the recited functions).

7.     I understand that the parties differ in their identification of "corresponding structure" to

perform the agreed-to functions.

8.     I understand that, in order to be considered "corresponding structure," within the meaning

of the law, structures must be clearly linked or associated in the specification with the recited

function.

9.      I understand that, in order to be considered "corresponding structure," within the meaning of the law, structures must be necessary to perform the recited function, as understood by a person of ordinary skill in the art.

10.     I understand that, while "corresponding structure" includes all structures that are necessary to actually perform the recited function, it does not include all structures necessary to make the claimed invention work.

11.     I understand that any structure described in the patent specification that is unnecessary to perform the recited function cannot be considered corresponding structure.

12.     I understand that, for many computer and software-related inventions that use means-plus-function claim elements, the corresponding structure for those elements may include both hardware and software algorithms that work in conjunction with the identified hardware to perform the recited function.

13.     I understand that corresponding structure in the specification must include sufficient detail to allow a person of ordinary skill in the art to understand the bounds of what is covered by the claim.

14.     I have been advised that, in forming an opinion about the level of ordinary skill pertinent to the patents and understanding of the claim terms, a variety of factors may be considered, including the types of problems encountered in the art, prior art solutions to those problems, the rapidity of innovations in the field, the sophistication of the pertinent technology, and the educational level of active workers in the field.

15.     The opinions herein are based on my understanding that a person of ordinary skill in the art at the time the invention was made would have at least a Bachelor's of Science degree in

computer science or electrical engineering and at least 2-4 years of experience in the storage

system industry.

**means, operative in response to a request from one of the client systems, for retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit**

16.     I understand that the parties have agreed that the function associated with this element

should be construed as: "retrieving the requested segment of the file from the storage unit using

the information associating the identifier of each segment stored on the storage unit with the

location of each segment on the storage unit."

17.     Claim 1 of the '808 Patent states that "each storage unit comprises" the claim element

above.  In my opinion, a person of ordinary skill in the art would understand this to mean that the

recited "means … for retrieving the requested segment" is part of each storage unit.

18.     In my opinion, the following are the structures described in the specification that are

necessary to perform the agreed-to function: (1) a memory system on the storage unit (e.g., col.

12, lines 37-61); (2) a table stored in the memory system, the table mapping a unique segment

identifier for each segment to the location of that segment on the storage unit (e.g., col. 10, lines

46-50); (3) a processor or independent controller on the storage unit (e.g., col. 11, lines 54-67),

issuing (4) program instructions to cause, for each request, the storage unit to transfer data

between the disk and the buffer indicated by the request. (e.g., col. 24, lines 22-29).

19.     I understand that Hamonic's construction for this element includes the prioritization and

queuing structures illustrated in Fig. 19 of the patents.

20.     Fig. 19 "illustrates one embodiment of queue 48" ('808 Patent, 23:49, emphasis added),

the queue being a queue of file segment client application requests that functions "to manage the

requests from multiple applications to ensure that the most critical requests are handled first."

('808 Patent, 23:33-35).  The specification notes that queue 48 optionally "may be maintained in several parts, depending on the complexity of the system" such as "[i]n particular, … different queues for disk access [disk queue] and for network transfers [network queue]." ('808 Patent, 23:36-39).  Figure 19 exhibits this optional embodiment, "illustrat[ing] disk queues, for prioritizing requests for disk access to data, and network queues, for prioritizing requests for network transfers of data[.]"  ('808 Patent, 5:24-26).

21.    In my opinion, a person of ordinary skill in the art would understand from the specification, including the characterization of the queue in Fig. 19 as "one embodiment" and further discussions of queues in the patent specification, that Fig. 19 is not the exclusive embodiment of queue discussed by, enabled by, or within the possession of the inventors at the time of the invention.

22.    Fig. 19 includes other particularized structures: subqueues (302, 304, 306, 308, 322, 324, 326, 328) within each of the disk and network queues that enforce a specialized prioritization scheme between four video file applications.  Each subqueue corresponds to requests for segments received from one of four types of specific video applications: playback (302, 322), capture (304, 324), authoring (306, 326) and service (308, 328).  Requests in one subqueue (e.g., playback application requests) are all processed before the system moves to the requests in the next subqueue (e.g., capture application requests) ('808 Patent, Fig. 19, 24:22-26)

23.    Prioritization performed by structures in Fig. 19 may occur before a storage unit performs the recited function of retrieving a requested segment from its storage, such as in prioritization of read requests in a disk queue (300), or may occur after the recited function has already been performed, such as in prioritization of read requests in a network queue (320).

24.    Each of the subqueues (302, 304, 306, 308, 322, 324, 326, 328) in Fig. 19 may contain a

request field (312) that indicates the requesting client and requested operation for each request, and a priority field (314) that indicates the priority of each request. The information in these fields ("the Indicated Information") is relevant to the task of the subqueues, which is to prioritize client requests based on the requested operation and the request priorities.

25.     In my opinion, a person of ordinary skill in the art would not think that the Indicated Information is necessary to perform the recited function, which involves a storage unit retrieving a requested segment from its own storage or memory, because the Indicated Information pertains to client's required functionality, which is unneccessary, and thus not corresponding structure, to the recited function on the storage unit.

26.     In my opinion, a person of ordinary skill in the art would not think that the subqueuing scheme in Fig. 19 is necessary to perform the recited function. The subqueuing scheme in Fig. 19 implements a particular prioritization of video application requests, with requests received from video playback applications being processed first, requests from capturing applications processed second, requests from authoring applications processed third, and requests from service applications being processed fourth. This very specific and highly tailored scheme, designed to optimize segment requests from clients across a network in a video file implementation, is separate from the recited function, which involves a storage unit retrieving data from its own memory. Similarly, other structures in Fig. 19, such as the network queue which prioritizes requests for data transfer across a network, are also unnecessary to performance of the recited function.

27.     Dr. Long's declaration states at ¶ 55, among other places, that, "the disclosed invention relates to the playback of video files, among other things." I understand that the invention is defined by the claim and, in my opinion, there are no words in the claim that would indicate to a

person of ordinary skill in the art that the invention is in any way limited to video files, let alone playback of video files.

**means for sending the requested segment to the client system**

28.     I understand that the parties have agreed that the function associated with this element should be construed as: "sending the requested segment to the client system."

29.     In my opinion, the following are the structures described in the specification that are necessary to perform the agreed-to function: (1) a network interface at the storage unit (e.g., col. 11, lines 33-36); (2) a processor or independent controller on the storage unit (e.g., col. 11, lines 54-67), issuing (3) program instructions to transfer data from the (4) disk queue to the (5) network queue (e.g., col. 24, lines 27-29)

30.     Claim 1 of the '808 Patent states that "each storage unit comprises" the claim element above.  In my opinion, a person of ordinary skill in the art would understand this to mean that the recited "means … for sending the requested segment" is part of each storage unit.

31.     Dr. Long's declaration states at ¶ 63, among other places, that, "the disclosed invention relates to the playback of video files, among other things."  I understand that the invention is defined by the claim and, in my opinion, there are no words in the claim that would indicate to a person of ordinary skill in the art that the invention is in any way limited to video files, let alone playback of video files.

32.     In my opinion, a person of ordinary skill in the art would understand that scheduling the transfer of data is a separate function from the recited function, "sending the requested segment to the client system," and is neither implicitly contained in it nor necessary to perform it.

**means for sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored**

33.     I understand that the parties have agreed that the function associated with this element should be construed as: "sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored."

34.     In my opinion, the following are the structures described in the specification that are necessary to perform the agreed-to function: (1) a network interface at the client system (e.g., col. 11, lines 33-36); (2) a processor or independent controller on the client system (e.g., col. 11, lines 54-67), configured to issue (3) program instructions to cause the network interface to send the (4) read request to the storage unit (e.g., Fig. 16 (274) and col. 21, lines 17-20).

35.     In my opinion, a person of ordinary skill in the art would understand that selecting a storage unit to send data to is a separate function from the recited function, "sending a request, for each segment …, to the storage unit on which the segment is stored," and is not implicitly contained in it.  It is possible, with a device configured according to the disclosure in the specification, to send a request for a segment without first selecting the storage unit (*e.g.*, where only one copy of a segment is stored), and to select a storage unit without sending a request to it.

36.     The specification states, "[t]here are several ways to initiate the pre-read requests, including selection of a storage unit." ('808 Patent, 21:34-35).  In my opinion, a person of ordinary skill in the art would understand from this disclosure that selection of a storage unit is not the only way to initiate a pre-read request, and is not necessary "corresponding structure" to the recited function.

37.     I understand that claim 7 of the '808 Patent is a dependent claim which refers to and further modifies or limits the scope of independent claim 6.  Claim 7 states, "wherein the means for determining … includes means for selecting one of the storage units on which the segment is stored."  That claim 7 associates "means for selecting one of the storage units on which the

segment is stored" with the "means for determining" recited in claim 6, and not with the "means for sending a request," would indicate to a person of ordinary skill in the art that selecting the storage unit is not necessary to the performance of the recited function, "sending a request…"

**means for selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced**

38.    I understand that the parties have agreed that the function associated with this element should be construed as: "selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced."

39.    In my opinion, the following are the structures described in the specification that are necessary to perform the agreed-to function: (1) a processor or independent controller on the client system (e.g., col. 11, lines 54-67), issuing (2) program instructions to identify a storage unit from (3) the segment table listing the segment identifiers and the storage units on which the segments are stored (e.g., col. 3, lines 15-27, col. 7, lines 55-col. 8, line 2) according to (4) load balancing criteria (e.g., col. 8, lines 9-17, col. 22, line 52-col. 23, line 48).

40.    In my opinion, a person of ordinary skill in the art would understand, in view of the patent specification, that the load balancing criteria relevant to the recited function are fully adjustable and extensible, and are not limited to a specific load balancing configuration.  For example, the specification states that, "Threshold E1 and value K may be user-definable."  These parameters characterize how load is balanced in the system.  A person of ordinary skill in the art would understand that the load balancing criteria pointed to in Harmonic's construction, (i.e., Fig. 17, 21:51-22:26, 22:52-23:5, 23:6-32) do not encompass all load balancing criteria disclosed in the patents.

41.    In my opinion, a person of ordinary skill in the art would not think that any particular criterion for load balancing disclosed in the patent specification (e.g., "fewest outstanding

requests," 23:13-14, "measure of the length of the disk queue," 23:24-25, etc.) is necessary to perform the recited function, "selecting one of the storage units … such that a load of requests … is substantially balanced," only that *some* load balancing criteria is necessary.

42.      In my opinion, a person of ordinary skill in the art would understand the bounds of the claim from Avid's construction.  In particular, a person of ordinary skill in the art would understand the phrase "load balancing criteria" and would know if an accused product was performing the recited function "according to load balancing criteria."

**means for scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data**

43.      I understand that the parties have agreed that the function associated with this element should be construed as: "scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data."

44.      In my opinion, the following are the structures described in the specification that are necessary to perform the agreed-to function: (1) a processor or independent controller on the client system (e.g., col. 11, lines 54-67), issuing (2) program instructions to submit a request to a storage unit to cause it to transfer requested data from (3) a disk buffer into (4) a network queue (e.g., col. 8, lines 15-24).

45.      The patent specification links "efficient transfers of data" with scheduling (e.g., "Data transfers between the storage units and clients over the network may be scheduled to improve efficiency," '808 Patent, 24:48-50).  In my opinion, a person of ordinary skill would understand from the specification that efficient transfer of data means that the transfer is scheduled.

46.      The specification states, "the storage unit uses the network queue to prioritize network transfers in the process of scheduling those transfers," and, "[i]f a storage unit receives two … [client] requests at about the same time, the storage unit processes the request that has a higher

priority in its queue." A person of ordinary skill in the art would understand from at least these disclosures that the network queue is "corresponding structure" for the recited function of "scheduling the transfer of data," inasmuch as it allows for time-ordering of request processing.

47.     In addition to the network queue, Harmonic's construction includes the subqueuing scheme of Fig. 19. Although the subqueues in Fig. 19, like the network queue, can perform the function of time-ordering client requests, the former do so in a very specialized way that is applicable to four media-specific applications: playback (i.e., reading/playback of media files), capture (i.e.,writing/capture of media files), authoring (i.e., reformatting of media files), and service (i.e., service/repair/replacement of media files). (*See* '808 Patent, 12:12-36 for discussion of these media applications). In the subqueuing scheme of Fig. 19, playback application requests are all processed first in their priority order, then all of the video capture application requests are processed, followed by all of the media authoring application requests, and finally the file service requests. ('808 Patent, Fig. 19 and 24:22-31). Although this particular subqueuing scheme may be useful in particular media implementations of the claimed invention, they are highly specific and would be superfluous, for example, in a non-media implementation, in an implementation with no disk failures or servicing requirements, and in myriad other implementations covered by the claims as worded. In my opinion, a person of ordinary skill in the art would recognize that these specialized structures are unnecessary to perform the function as it is recited in the claim, "scheduling the transfer of data … such that the storage unit efficiently transfers data."

48.     In addition to the network queue and video-application-specific subqueues, Harmonic's construction also includes a specific tokening scheme ('808 Patent, 24:64-25:5) and a client-server request processing scheme based on clients providing acceptable wait times to storage

units which determine if they can service the requests within those times ('808 Patent, 25:6-26:10).  These schemes are not essential to the operation of the claimed invention, but rather represent optional aspects which may be employed to "improve[] bandwidth utilization of the computer network." ('808 Patent, 24:50-51).  In my opinion, a person of ordinary skill in the art would understand, from the patent specification, that these specialized schemes are not necessary to perform the recited function.

**means for distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment**

49.     I understand that the parties have agreed that the function associated with this element should be construed as: "distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment."

50.     In my opinion, the following are the structures described in the specification that are necessary to perform the agreed-to function: (1) a network interface at the client system (e.g., col. 11, lines 33-36); (2) a processor or independent controller on the client system (e.g., col. 11, lines 54-67), issuing (3) program instructions to cause the network interface to send (4) one or more write requests to the storage units for the segment and its copy (e.g., Fig. 3 (124), Fig. 6(214))

51.     The specification states that "write requests may be asynchronous rather than sequential," ('808 Patent, 10:1-2) and that, "[t]hese operations may be synchronous or asynchronous." ('808 Patent, 13:18-19).  A person of ordinary skill in the art would understand from these disclosures that asynchronous transmission is unnecessary to perform the recited function of "distributing each segment."

52.     In my opinion, a person of ordinary skill in the art would understand that selecting a storage unit to which to send data is a separate function from the recited function, "distributing each segment … by sending," and is not implicitly contained in it.  It is possible, with a device configured according to the disclosure in the specification, to distribute segments without first selecting the storage units (such as where storage unit selection is performed by another device), and to select storage units without distributing segments to them.

53.     The patent discusses random or pseudorandom distribution as one way that segments may be distributed to storage units.  However, in my opinion, a person of ordinary skill in the art would recognize that distribution of segments is not restricted to random or pseudorandom embodiments in the specification, and that there is nothing in the recited function above that would indicate that the corresponding structures should be limited in this way.


Executed on this day, the 4th of February, 2013 in Los Angeles, CA.


_____

Shahram Ghandeharizadeh, Ph.D.