# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AVID TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11-1040-GMS-SRF |
| | ) | |
| HARMONIC INC., | ) | ▮▮▮▮▮▮▮▮▮ |
| | ) | |
| Defendant. | ) | REDACTED - PUBLIC VERSION |

## PLAINTIFF AVID TECHNOLOGY'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

OF COUNSEL:
Robert A. Schwinger
Tod M. Melgar
Michael S. Davi
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 408-5100

David H. Evans
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC 20036
(202) 974-5600

Dated: February 4, 2013

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com

*Attorneys For Plaintiff Avid Technology,*
  *Inc.*

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... iii

Argument ............................................................................................................................1

      A.      The Proper Construction of "Independent Storage Units" ..........................1

              1.      Avoiding Central Control .................................................................2

              2.      Avoiding Global Allocation..............................................................3

              3.      "Independent Storage Unit" Does Not Exclude Storage of Segment
                      Tables On a Central Server ...............................................................5

      B.      Proper Construction of "Identifier" ...........................................................6

      C.      Proper Construction of "Redundancy Information" ...................................7

      D.      Proper Construction of "Nonsequentially" .................................................8

      E.      Proper Construction of the Means-Plus-Function Terms ............................9

              1.      means, operative in response to a request from one of the client
                      systems, for retrieving the requested segment of the file from the
                      storage unit using the information associating the identifier of each
                      segment stored on the storage unit with the location of each
                      segment on the storage unit. ('808 Patent, claim 1)......................10

              2.      means for sending the requested segment to the client system ('808
                      Patent, claim 1) ...........................................................................12

              3.      means for sending a request, for each segment of the data
                      requested by the application, to the storage unit on which the
                      segment is stored ('808 Patent, claim 6).......................................13

               4.      means for selecting one of the storage units on which the segment
                      is stored such that a load of requests on the plurality of storage
                      units is substantially balanced ('808 Patent, claim 7)....................15

              5.      means for scheduling the transfer of the data from the storage unit
                      such that the storage unit efficiently transfers data ('808 Patent,
                      claims 10, 12).............................................................................16

              6.      means for distributing each segment, and the redundancy
                      information for each segment, among the plurality of storage units
                      by sending to the storage unit the segment of the data and the
                      identifier of the segment ('808 Patent, claim 18) ..........................18

Conclusion ........................................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

CASES

*AllVoice Computing PLC v. Nuance Comms., Inc.*,
    504 F.3d 1236 (Fed. Cir. 2007).................................................................................16

*Aro Mfg. v. Convertible Replacement Co.*,
    365 U.S. 336 (1961)....................................................................................................12

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002)...................................................................................8

*Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005)...................................................................................14

*E-Pass Techs., Inc. v. 3Com Corp.*,
    343 F.3d 1364 (Fed. Cir. 2003)................................................................................6, 8

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 ...............................................................................................................8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008)...................................................................................6

*SciMed Life Systems, Inc. v. Advanced Cardiovascular, Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)............................................................................ 9, 20

*SRI Int'l v. Matsushita*,
    775 F.2d 1107 (Fed. Cir. 1985)...............................................................................7, 20

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)...................................................................................6

*Wenger Mfg. v. Coating Mach. Sys.*,
    239 F.3d 1225 (Fed. Cir. 2001)........................................................................ passim

As Avid Technology, Inc. ("Avid") demonstrated in its opening brief, Avid's proposed construction for the ten disputed claim terms of the patents-in-suit should prevail. Avid's constructions are supported by the claims themselves, the specification and the prosecution history. The brief submitted by Defendant falls far short of presenting convincing evidence supporting Defendant's proposed constructions.

Unlike Avid's proposed constructions, which conform with the claim language and intrinsic evidence, Defendant's constructions repeatedly read limitations into the claims, including reading unrelated functions and unnecessary structures into means plus function claims. For example, Defendant seeks to read complex prioritization and bandwidth optimization schemes into "sending" functions, contrary to the agreed function. In another example, Defendant seeks to limit the term "identifier" to a single exemplary embodiment, contrary to the plain and ordinary meaning, and to the exclusion of other disclosed embodiments.

Additionally, in the one instance where the prosecution history sought to narrow the scope of a term via an exclusion (i.e., "independent storage units" avoids global allocation of storage unit memory, and avoids using a central controller to access data), Defendant's construction improperly attempts to expand the scope of the exclusion to exclude specific disclosed and claimed embodiments.  For the reasons discussed in its briefs Avid's proposed constructions should be adopted and Defendant's proposed constructions should be rejected.

## ARGUMENT

### A.    The Proper Construction of "Independent Storage Units"

| Avid's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "storage units which exchange segments with clients across a network without the segments passing through a central controller, and whose memory addresses are not globally allocated" | "storage units which are not centrally controlled and not part of a global allocation of available storage" |

Avid's construction succinctly captures the meaning and context of the arguments made

in the prosecution history.  Defendant's does not.  Both parties recognize that during prosecution

the patentees argued "independent storage units" are independent because they (1) avoid global

allocation of available storage, and (2) avoid using a central controller to access data.  As

discussed in detail below, the prosecution history clearly elaborated on what was meant by

"avoids global allocation" and "avoids using a central controller to access data."  Defendant

dodges this context in its construction.

### 1.  Avoiding Central Control

When patentees said "independent storage units" "avoid using a central controller to

access data," they were referring to the storage units' ability to exchange data directly with

clients over a network without passing the segments through a central controller.  This is

distinguished from systems where all transmissions of data segments between storage units and

clients were mediated by and funneled through a central controller.  While Defendant's proposed

construction lacks clarity on "avoids central control," the specification and prosecution history

are clear.  For example, during prosecution, patentees stated that avoiding central control meant

storage units pass data to clients without sending the data through a central controller:

> [T]he claimed system, by virtue of the "independent" storage units, *avoids a*
> *central controller* to access data.  In particular, storage units "receiv[e] . . .
> request[s] from one of the client systems for a segment of a file."  *Clients do not*
> *issue requests to a central controller that in turn identifies storage units that*
> *store the data and issues requests to storage units*.

'808 Reply (dated February 6, 2004) at 10–11 (emphasis added).  Consistent with the

prosecution history, the specification clearly states that storage units are independent because

each one has its own controller that communicates directly with clients.  *See*, *e.g.*, U.S. Patent

No. 6,760,808 (the "'808 Patent"), 2:49–50 ("[t]he storage units … may operate independently

and without central control"); *id.*, 6:30–33 ("[e]ach storage unit also has its own independent

controller which responds to requests for access, including but not limited to [client] read and

write access, to data stored on the medium").

Defendant's attempt to rebut this direct support falls short because it mischaracterizes the specification or cites uses of the words "independent" and "central" having nothing to do with storage units.  For example, Defendant cites to statements regarding "applications" being independent, not storage units - "[a]pplications may make such requests independently of each other or any centralized control," Def. Opening Br. at 8, citing '808 Patent at 6:21–23 (emphasis added). Defendant also cites to a portion of the specification describing one embodiment wherein the catalog (e.g., segment tables) is stored on the storage units, (Def. Opening Br. 6–7, citing '808 Patent at 19:27–31), while conveniently ignoring embodiments wherein the catalog is stored on a central server - "catalogs may be stored on the catalog manager 49, at individual clients, at a central data database, or …" '808 Patent at 18:65–66 (emphasis added).  Defendant also contends that, during prosecution, Avid distinguished Boll on "independent storage units." (Def. Opening Br. 7–8).  To the contrary, Boll was distinguished because it is not a distributed storage system - "In contrast [to Boll], the present invention relates to distributed storage system in which data for a file is distributed among multiple independent storage units." '808 Reply (dated February 6, 2004) at 11.

In view of the specification and prosecution history, the correct perspective is accurately reflected in Avid's construction, "storage units which exchange segments with clients across a network without the segments passing through a central controller," and lost in Defendant's, "storage units which are not centrally controlled."

## 2.    Avoiding Global Allocation

When patentees said "independent storage units" "avoid global allocation of storage" during prosecution, they were referring to allocation of segments of data to memory addresses (e.g., blocks) on each independent storage unit, not assignment of segments to one of the

plurality of independent storage units.  While Defendant's proposed construction seeks to muddy

these two concepts, the specification and prosecution history are clear.

Patentees explicitly discussed these distinct concepts during prosecution - "[t]he claims

… require[] two sets of information to be maintained: one that associates an identifier of a

segment with the storage unit on which the segment is stored [(e.g., Segment Table)]; another,

stored by each storage unit that associates the identifier of each segment stored on the storage

unit with the location on that storage unit in which the segment is stored.[(e.g. Data Allocation

Table)]." '309 Reply (dated April 18, 2008) at 3–4.  In the context of avoiding global allocation,

patentees further stated, "[t]he claimed system, by virtue of its 'independent' storage units,

<u>avoids global allocation of available storage</u>.  <u>In particular</u>, the storage units are independent

because clients are aware of 'identifiers' of segments and storage units on which segments are

stored.  <u>The 'location of each segment on [each] storage unit' [e.g., Data Allocation Table] is

maintained at the storage unit on which the segment … is stored</u>." '808 Reply (dated February 6,

2004) at 10 (emphasis added).  The avoidance of global allocation of storage unit memory is part

and parcel with not having central control of the storage units, as disclosed in the specification.

Namely, "each storage unit … has its own independent controller" ('808 Patent at 6:30–31), and

in turn "[e]ach storage unit also may have a separate file system which contains a directory of the

segment identifiers and the location on that storage unit where they are stored." '808 Patent at

7:59–61.

In other words, a storage unit is independent because it is responsible for allocating each

segment of data to a memory location on its disk, independent of a central controller.  ██████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

### 3. "Independent Storage Unit" Does Not Exclude Storage of Segment Tables On a Central Server

"Independent storage units" do not exclude a system wherein clients access a central server (asset or catalog manager) prior to directly accessing the storage units. Defendant's construction, with its broad and vague use of the negative limitations "not part of a global allocation," and "not centrally controlled," would exclude claimed embodiments, conflict with dependent claims, and fail to respect the intrinsic evidence. Contrary to Defendant's construction, the specification and claims are replete with embodiments where information associating segments to storage units (segment table) is maintained on a central server that a client accesses before communicating with storage units. For example, the '808 patent shows "Asset Manager (49)" (Fig.1), and states, "[t]he catalog manager and asset manager also may be combined" ('808 Patent at 18:65–66); "[t]he catalog manager may specify the location where the segment should be stored" ('808 Patent at 10:43–45); and, "[e]ach segment table, or file map, can be stored separately from other segment tables. Segment tables may be stored together, as a catalog. Catalogs may be stored on a catalog manager 49, at individual clients, at a central database, or may be distributed among several databases or clients." '808 Patent at 7:30–35 (emphasis added).

Additionally, there are dependent claims directed to embodiments Defendant tries to exclude with its vague construction. For example, in U.S. Patent No. 7,487,309 (the "'309 Patent"), claims 2–4 recite "wherein the data for a file is stored in a segment table (claim 2) … wherein the segment tables for a plurality of files is stored in a catalog (claim 3)… wherein the

catalog is stored in <u>a central database accessible by all clients.</u> (claim 4)" (emphasis added)).

Accordingly, it is clear patentees did not exclude a system where segment tables, accessible by

clients, are stored in a central database.

### B.    Proper Construction of "Identifier"

| Avid's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, or "information sufficient to distinguish" | "a unique identifier for the segment that is a combination of a unique identifier for the source, such as a file, and a segment number" |

The term "identifier" should be given its plain and ordinary.  Defendant, however,

continues with an erroneous contention that the patentees restricted the term to one exemplary

embodiment in the specification. Def. Opening Br. at 13.  Claim construction "is not an

obligatory exercise in redundancy," *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568

(Fed. Cir. 1997), and district courts are not required to construe every limitation present in

asserted claims. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351,

1362 (Fed. Cir. 2008).

Contrary to Defendant's contention, the patentees never restricted the term "identifier" to

a particular meaning or disavowed the ordinary meaning using "words or expressions of manifest

exclusion or restriction." *See E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir.

2003).  Indeed, Defendant's only cite is to a statement in the specification that says a "<u>unique</u>

identifier for a segment is a combination of a unique identifier for the source, such as a file, and a

segment number." Def. Opening Br. at 13, citing '808 Patent at 7:49–55 (emphasis added).

As argued in Avid's opening brief (Pl. Opening Br. at 8–9), Defendant plainly fails to

support its argument because (1) Defendant neglects to realize that this statement relates to the

phrase "unique identifier," not "identifier," (2) Defendant omits that even this embodiment of

"unique identifier" is clearly described as exemplary, and (3) Defendant neglects other uses of identifier consistent with the ordinary meaning. (Pl. Opening Br. at 9).

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

### C.   Proper Construction of "Redundancy Information"

| Avid's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, or "a copy of a segment or information sufficient to recreate the segment" | "a copy of each segment" |

The term "redundancy information" should be given its ordinary meaning, including a copy of a segment or other information sufficient to recreate the segment. Defendant's attempt to limit the meaning to just a copy of a segment ignores the doctrine of claim differentiation, seeks to read a single embodiment into the claims, and mischaracterizes the intrinsic evidence.

First, claim differentiation indicates that "redundancy information" is more than a copy of the segment. *SRI Int'l v. Matsushita*, 775 F.2d 1107, 1122 (Fed. Cir. 1985).  Both the '808 and '309 Patents have dependent claims further limiting the term "redundancy information" with the following clause: "wherein the redundancy information for each segment is a copy of the segment."  *See, e.g.,* claim 2 of the '808 Patent and claim 32 of the '309 Patent. Defendant's construction would render these dependent claims superfluous.

Second, a copy of a segment is only one example of "redundancy information," and there is no manifest exclusion scope covering information to recreate a segment.  Although, the term "redundancy information" only appears in the claims, the specification clearly envisions "redundancy information" being used to both "restore" and "recreate" lost segments - after a

storage unit fails, "a new storage unit may be installed in its place, <u>with lost data restored [e.g.,</u> <u>using a copy], or the lost data may be recreated [e.g., using other information]</u>."  '808 Patent at 15:49–52 (emphasis added).  Even if a copy of a segment were the only disclosed embodiment, which it is not, the Federal Circuit "has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

Third, Defendant mischaracterizes the prosecution history as limiting "redundancy information."  Specifically, during prosecution of the '309 Patent, the Examiner stated that Fig. 6 of Styczinski disclosed the claim 2 limitation, "wherein the redundancy information for each segment includes <u>at least one copy of the segment</u>." '309 Reply (dated April 18, 2008) at 3 (emphasis added).  In response, patentee argued that the parity information disclosed in Styczinski was not "a copy of the segment," not that "redundancy information" could not include parity information. *Id.*

### D.    Proper Construction of "Nonsequentially"

| Avid's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, or "not following a permanent sequence" | "randomly or pseudorandomly independent of prior or subsequent selection" |

Avid's proposed construction of "nonsequentially" is consistent with the plain and ordinary meaning, whereas Defendant seeks to limit the term to random or pseudorandom distribution.  There is a "heavy presumption" that a claim term "carries its ordinary and customary meaning." *E-Pass Techs., Inc. v. 3Com Corp.* 343 F.3d 1364, 1368 (Fed. Cir. 2003). This heavy presumption cannot be overcome "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

Defendant cites to *Honeywell v. ITT Industries* in support of excepting the general law. *See* 452 F.3d 1313 (Fed. Cir. 2006), but this reliance is misplaced. In *Honeywell* the court limited "fuel injection system component" to mean only a "fuel filter" because on "at least four occasions, the written description refers to the fuel filter as 'this invention' or 'the present invention.'" *Id.* *Honeywell* does not apply here. The specification here never states that distributing data segments randomly or pseudorandomly is the invention. Moreover, the specification explicitly describes this as exemplary - "[i]n one embodiment of the invention, the write operation randomly distributes copies of segments of the file among the storage units," ('309 Patent at 13:42–45); "[the disclosures are] illustrative and not limiting, having been presented by way of example only." ('309 Patent at 27:42–43; *see also,* 6:8–15; 10:65; 11:2–3; 11:20–21).

In addition, although "nonsequential" is not mentioned outside of the claims, "sequential" is discussed in describing the claimed inventions' avoidance of the problems caused by such sequential distribution. '808 Patent at 1:36–2:5. Further, the claims of the '808 Patent recite "randomly or pseudorandomly," (e.g., claims 3, 15 and 21) and the drafters of the '309 claims used the different phrase "nonsequentially." Defendant's construction ignores the specification, is inconsistent with the law, and fails to respect the choices made in claim drafting.

## E.    Proper Construction of the Means-Plus-Function Terms

The parties agree on the functions for the six means-plus-function terms at issue but dispute the corresponding structures and the necessity of certain structures to perform the agreed functions. Defendant's constructions commit "[o]ne of the cardinal sins of patent law—reading a limitation from the written description into the claims." *SciMed Life Systems, Inc. v. Advanced Cardiovascular, Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). In means-plus-function claims, "a

court may not import functional limitations that are <u>not recited</u> in the claim, or structural

limitations from the written description that are <u>unnecessary</u> to perform the claimed function."

*Wenger Mfg. v. Coating Mach. Sys.,* 239 F.3d 1225, 1233 (Fed. Cir. 2001) (internal citation

omitted, emphasis added).  Defendant's constructions seek to do both.

> **1.   means, operative in response to a request from one of the client systems, for retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit. ('808 Patent, claim 1)**

<u>Agreed Function:</u>  retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit.

<u>Avid's Corresponding Structure:</u>  a memory system on the storage unit; a table stored in the memory system, the table mapping a unique segment to the location of that segment on the storage unit; a processor or independent controller on the storage unit, issuing program instructions to cause, for each request, the storage unit to transfer data between the disk and the buffer indicated by the request.

Avid's structure is all that is necessary, and Defendant agrees to the structure.  Defendant,

however, seeks to read in additional prioritization functions from Fig. 19 that are unrelated to the

agreed-to retrieving function.[1]  Defendant argues that (1) "the retrieve operation from a storage

---

[1]   Greater discussion of the content of Fig. 19 is provided in the declaration of Prosecution expert Dr. Shahram Ghandeharizadeh, especially at ¶¶ 23, 25-27.  The Federal Circuit has strongly cautioned against the use of expert opinion testimony in construing claims. *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) ("Patents should be interpreted on the basis of their intrinsic record, not on the testimony of such after-the-fact 'experts' that played no part in the creation and prosecution of the patent"); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996) ("[Expert] testimony may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms.  Such instances will rarely, if ever, occur").  However, to the extent the Court is willing to entertain expert testimony for claim construction, Avid has provided the declaration of its expert to rebut the testimony of Defendant's expert and to clarify issues surrounding means-plus-function structures.

unit cannot be performed without subqueues since … they contain information relating to 'the client making the request and the requested operation' and the priority of each request," (Def. Opening Br. at 16) and (2) "the disclosed invention relates to playback of video files," so one ordinary skill would understand these structures to be necessary to "prioritizing requests." Declaration of Dr. Darrell D.E. Long ("Long Decl.") at ¶ 55.  Contrary to Defendant's proposal, the structures in Fig. 19 are not necessary to perform the agreed-to "retrieving" function.

First, prioritization and subqueues are not necessary to perform the retrieving function. *See*, Declaration of Shahram Ghandeharizadeh ("S.G. Decl.") at ¶¶ 18–27.  Although the specification mentions that each entry in the queues of Fig. 19 contains information about the requesting client, the requested operation, and the request priority ('808 Patent at 23:56–58), it does so in the context of "manag[ing] the requests from multiple applications to ensure that the most critical requests are handled first," *i.e.*, prioritization. '808 Patent at 23:34–35.  The information is not necessary to perform the "retrieving" function.  Even the ipse dixit conclusions of Defendant's expert all relate to prioritization, "retrieving" - "know[ing] where the data is going to," "ensur[ing] that the highest priority requests are processed first," and "know[ing] where the data should be transferred" after retrieval.  Long Decl. at ¶ 54. Incorporating Defendant's additional functions and structures is inconsistent with the parties' agreed-to function and violates *Wenger*, which forbids "import[ing] functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." 239 F.3d at 1233.

Second, Defendant ignores the claims themselves; Defendant argues that the prioritization scheme of Fig. 19 is necessary because its expert erroneously restricts the claims based on his impression that "the disclosed invention relates to the playback of video files,

among other things," and that "the priority in which requests are handled and data transferred is

critical to the invention." Long Decl. at ¶ 55).  The claims, however, are clearly not limited to

video playback.  *See*, S.G. Decl. at ¶ 27.  Importing limitations into the claim based on

impressions of what "the disclosed invention relates to" is in striking opposition to the core

principle of claim construction that "the claims made in the patent are the sole measure of the

grant."  *Aro Mfg. v. Convertible Replacement Co.*, 365 U.S. 336, 339 (1961).

Third, Defendant's argument must fail because its conclusion that "the claimed function

of 'retrieving the requested segment …' cannot be performed without the disk queue 300 and its

subqueues" does not follow logically from their expert's ipse dixit opinion that "[a] person of

ordinary skill … would understand disk queue 300 and its subqueues … to be necessary for

[prioritizing requests]."  Long Decl. at ¶ 55

### 2. means for sending the requested segment to the client system ('808 Patent, claim 1)

<u>Agreed Function:</u>  sending the requested segment to the client system.

<u>Avid's Corresponding Structure</u>:  network interface at the storage unit; a processor or
independent controller on the storage unit, issuing program instructions to transfer data
from the disk queue to the network queue.

Avid's structure is all that is necessary, and Defendant agrees to the structure.

Defendant, however, seeks to improperly read in additional structure including subqueues,

priority fields, and time stamps, as well as an additional 37 lines of detailed structure (relating to

tokens) from the patent specification or Fig. 21.  These superfluous structures relate to

prioritization and bandwidth optimization functions, not the recited "sending" function.

First, Defendant's own brief relates subqueues to the prioritization function, not the

"sending" function – "the subqueues <u>include</u> the information [about requesting client, requested

operation, and request priority]"and "[w]ithout such information , the claimed system would not

be able to send the requested segment to the client system or <u>ensure the highest priority request is</u>

<u>processed first."</u> Def. Opening Br. at 16–17 (emphasis added). Defendant's efforts to add an un-

recited prioritization function is contrary to the parties' agreed-to function and contrary to law.

*Wenger*, 239 F.3d at 1233

 Second, Defendant's basis for reading in additional elements is, again, its expert's

improper restriction of the claims to video playback. Defendant's expert reaches his conclusions

based on his impression that "the invention relates to playback of videos" and, in turn, that the

claims must have prioritization and bandwidth optimization functions related to real-time video

delivery.  Specifically, in the context of video playback he states (1) "[w]ithout [information

contained in subqueues], the claimed system would not be able to send the requested segment to

the client system or <u>ensure the highest priority request is processed first,</u>" and (2) "without [the

scheduling schemes] … the claimed invention would not have the capability of performing the

claimed 'sending' function," (Def. Opening Br. at 16–17, citing Long Decl., emphasis added).

Contrary to Long's conclusion, the claims are not restricted to video playback, and prioritization

and bandwidth optimization functions related to real-time video delivery should <u>not</u> be read into

the sending element.  S.G. Decl. at ¶¶ 29–32.  To do so would be contrary to law. *See Wenger*,

239 F.3d at 1233.

 **3.** **means for sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored ('808 Patent, claim 6)**

<u>Agreed Function:</u>  sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored.

<u>Avid's Corresponding Structure:</u>  network interface at the client system; a processor or independent controller on the client system, issuing program instructions to cause the network interface to send the read request to the storage unit.

Avid's structure is all that is necessary, and Defendant agrees to the structure.

Defendant, however, seeks to import the additional un-recited function, "select[ing] a storage unit" (i.e., '808 Patent at Fig. 16, 272).

Where Defendant asserts that "[t]he claimed function of 'sending a request to the storage unit on which the segment is stored' cannot be performed without selecting the storage unit," (Def. Opening Br. at 17), it confuses two concepts: "corresponding structure" necessary to perform the recited function, and ancillary functions that are not recited by the claim but whose performance may precede performance of the recited function.  Defendant seeks to characterize "selecting the storage unit" as the former, but it is in fact the latter.  *See* S.G. Decl. at ¶¶ 34–37.

First, a client may send a request without itself selecting the storage unit (*e.g.*, where only one copy of a segment is stored).  Conversely, a storage unit may be selected without a request being sent to it.  Though these related functions can be performed in conjunction or succession, they do not have to be performed together or at all.  *See* S.G. Decl. at ¶ 35.  Second, even if the functions were inextricably linked, it is still improper to import "selecting" into the claim.  A device may need to be powered-up or connected to a network before it may send a request to a storage unit.  However, just like "selecting the storage unit," these other functions "are not recited in the claim" and the structures that perform them "are unnecessary to perform the claimed function [sending a request … to the storage unit]."  *Wenger*, 239 F.3d at 1233.  While performance of a recited function may require some other functions to be performed, those other functions are not implicit in the specific recited function. *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) ("corresponding structure need not include all things necessary to enable the claimed invention to work").

Second, Defendant's construction would render dependent claim 7 superfluous.  Claim 7 recites a "means for selecting one of the storage units" as part of the "means for determining the

storage unit on which the storage unit is stored" recited in independent claim 6, not as part of the "means for sending a request … to the storage unit on which the segment is stored."  *See* S.G. Decl. at ¶ 37.  The fact that selection of the storage unit is claimed as part of a different means element than the one at issue here further demonstrates that such selection is not a necessary component of the "means for sending a request."

>   **4.  means for selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced ('808 Patent, claim 7)**

>   Agreed Function:  selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced.

>   Avid's Corresponding Structure: a processor or independent controller on the client system, issuing program instructions to identify a storage unit from the segment table, listing the segment identifiers and the storage units on which the segments are stored, according to load balancing criteria.

>   Avid's structure is all that is necessary, and Defendant agrees to the structure.

Defendant, however, seeks to import additional unnecessary structures, including all of Fig. 17 and 26 lines of detailed load balancing criteria in the specification.  Defendant's construction again improperly incorporates detailed structure that is unnecessary to perform the recited function, and would require the jury to interpret technical detail from Fig. 17 and 26 lines of specification.

Defendant's broad citation to the specification imports extensive detail from at least six exemplary load balancing schemes. The intrinsic evidence, however, repeatedly demonstrates that claimed balancing criteria are not limited to a specific configuration.  *See, e.g.*, '808 Patent at 21:58–60, 22:13–14; *see also* S.G. Decl. at ¶¶ 39–41.  Rather than clarify the scope of the claim, Defendant's broad citations to technical detail from the specification obfuscate the meaning of claim terms, open the door to new construction issues, and render claim construction pointless.

Avid's construction "render[s] the bounds of the claim understandable to one of ordinary skill in the art."  *See AllVoice Computing PLC v. Nuance Comms., Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007).  Just as recited "storage units" do not require detailed elaboration to adequately define the bounds of the claim (e.g., size, type, whether "a magnetic disk, optical disk, a flash memory … [or] tape" is used, etc., '808 Patent at 12:39–40), so too the details of specific load balancing criteria examples are not necessary to the recited function; the only requirement is that some load balancing criteria be present.  An accused infringer would know if an accused product "select[ed] one of the storage units" according to some "load balancing criteria," and this is all that the construction requires.  *See AllVoice*, 504 F.3d at 1245; *see also* S.G. Decl. at ¶ 42. Defendant's construction goes far beyond this, imports unnecessary structures, and calls on the jury to perform the technical analyses that claim construction is designed to resolve.

### 5.  means for scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data ('808 Patent, claims 10, 12)

<u>Agreed Function:</u>  scheduling the transfer of the data from the storage unit such that the storage unit efficiently transfers data.

<u>Avid's Corresponding Structure</u>: a processor or independent controller on the client system, issuing program instructions to submit a request to a storage unit to cause it to transfer requested data from a disk buffer into a network queue.

Avid's structure is all that is necessary, and Defendant agrees to the structure.

Defendant, however, seeks to import other unnecessary structures,[2]  including two figures and 80 lines of technical disclosure from the specification detailing embodiments of bandwidth

---

[2]   Defendant incorrectly states that, "Avid disputes that the following structures are necessary to perform the claimed function; … (3) network queue." (Def. Opening Br. at 19).  In fact, Avid's construction includes, "a request to a storage unit to cause it to transfer requested data from a disk buffer into a <u>network queue</u>." (emphasis added).

optimization schemes ('808 Patent at Figs. 20–21, 24:64 – 26:10) and, again for the third time, details of the specialized video application queuing and subqueuing scheme of Fig. 19. The function of "scheduling the transfer" does not require bandwidth optimization.

Efficient transfer of data is linked in the specification with scheduling - "[d]ata transfers … may be scheduled to improve efficiency." '808 Patent at 24:48–50; *see also* S.G. Decl. at ¶ 45). The structure that performs the recited function of scheduling is also indicated in the specification - "the storage unit uses <u>the network queue</u> to prioritize network transfers <u>in the process of scheduling those transfers</u>." '808 Patent at 24:33–35 (emphasis added); *see also* S.G. Decl. at ¶¶ 44, 46. Thus, the network queue organizes and time-orders processing of client requests for data transfers across the network, and is the "corresponding structure" for the recited function. '808 Patent at 24:33–38.

Instead of limiting its construction to the network queue, Defendant again seeks to import a host of additional details regarding optional embodiments to improve bandwidth utilization. The specification states that, "to enforce … [improved bandwidth] utilization of the network, a mechanism may be provided that forces each client to receive data from only one storage unit," and describes the tokening scheme which Defendant seeks to import as one "example" of such a mechanism. '808 Patent at 24:60–64. Defendant has not explained what this "example" has to do with the recited function, "scheduling the transfer of data," let alone why this structure would be <u>necessary</u> to perform that function. Similarly, Figures 20 and 21 show an embodiment of a method, from client and storage unit perspectives respectively, for evaluating and servicing client requests based on a maximum time, E3, that a client is willing to wait. Again, Defendant has failed to explain why they believe the embodiment based on maximum desired waiting times, is

<u>necessary</u> to perform the recited function.  These structures are not necessary and should not be imported into the claim.  *See* S.G. Decl. at ¶ 48.

Again, Defendant seeks to read limitations of the queuing embodiment of Fig. 19 into the claim. Defendant's expert correctly notes that the network queue, also included in Avid's proposed construction, "is responsible for 'prioritizing network transfers in the process of scheduling those transfers'" (Long Decl. at ¶ 90), but his statement that "[t]his is accomplished through the use of subqueues and associated fields" (*id.*) is misleading.  The subqueues schedule transfers, but are described as "illustrat[ing] <u>one embodiment</u> of queue 48" ('808 Patent at 23:49 (emphasis added)) applicable to video playback, and are not <u>necessary</u> to schedule transfers in general. The network operation of the network queue "to prioritize network transfers in the process of scheduling those transfers," does not require dedicated application subqueues. *See* S.G. Decl. at ¶ 47.  Accordingly, Defendant's construction should be rejected.

> **6.      means for distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment ('808 Patent, claim 18)**

<u>Agreed Function:</u>  distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment.

<u>Avid's Corresponding Structure:</u>  network interface at the client system; a processor or independent controller on the client system, issuing program instructions to cause the network interface to send one or more write requests to the storage units for the segment and its copy.

Defendant agrees that the structures identified by Avid are necessary, but seeks to import other unnecessary structures and functions into the claim, including asynchronous transmission

of segments and redundancy information[3], and "the algorithm of selecting the storage units either randomly or pseudorandomly."

As with the "means for sending a request," Defendant contends that the recited function, "distributing each segment… by sending to the storage unit the segment … and the identifier of the segment," must necessarily include, "selecting the storage unit either randomly or pseudorandomly."  This function, however, is not part of the agreed-to function nor is it recited in the claim.  Defendant again confuses "corresponding structure" necessary to perform the recited function with ancillary functions precedent to the recited function.  The "selecting the storage units" in Defendant's construction is clearly the latter, and "functional limitations that are not recited in the claim" cannot be imported.  *Wenger*, 239 F.3d at 1233.

The intrinsic evidence is contrary to Defendant's position.  Defendant correctly notes that claim 19, which depends from claim 18 and further narrows the "means for distributing," recites, "wherein the means for distributing comprises: means for selecting," but Defendant inexplicably concludes that the "[s]electing … constitutes part of the corresponding structure" because claim 19 "clearly linked" these elements. (Def. Opening Br. at 20).  While structure must be "clearly link[ed] or associate[d] … to the function recited in the claim" in order to qualify as corresponding structure (*See WMS Gaming*, 184 F.3d  at 1349), this condition alone is not sufficient.  The structure must also be <u>necessary</u> to perform the claimed function.  The recitation

---

[3]   Defendant incorrectly states that, "[t]he parties also agree that the corresponding structures include … (4) sending the segment and redundancy information asynchronously to the selected storage units, as described in step 124 in Fig. 3." (Def. Opening Br. at 20).  In fact, Avid's construction does not include the optional asynchronous modifier, which is unnecessary to perform the recited function.  *See*, *e.g.*, '808 Patent, 10:1–2.

of "means for selecting" in dependent claim 19 as an optional further limitation of the "means for distributing" recited in independent claim 18 creates a presumption that the former function is not present in, and certainly not necessary to, the performance of the latter. *SRI Int'l*, 775 F.2d at 1121.

Defendant's proposal to further limit the selection to random or pseudorandom, based on the observation of its expert that "[t]he specification … frequently refers to random distribution," (Long Decl. at ¶ 101) again seeks to deviate from the agreed-to function of "distributing," which did not include "randomly" or "pseudorandomly" in the recited function. Defendant again commits "one of the cardinal sins of patent law—reading a limitation from the written description into the claims." *See SciMed Life Systems*, 242 F.3d at 1340. The claim does not recite anything that would limit it as Defendant suggests (*see* S.G. Decl. at ¶¶ 50–53), and Defendant's construction should be rejected.

## <u>CONCLUSION</u>

For the foregoing reasons, Avid respectfully requests that this Court adopt its construction for the disputed claim terms of the '808 and '309 Patents.

SHAW KELLER LLP

/s/ Andrew E. Russell
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiff Avid Technology, Inc.*

20

OF COUNSEL:
Robert A. Schwinger
Tod Melgar
Michael Davi
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY  10112
(212) 408-5100

David H. Evans
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC  20036
(202) 974-5600

Dated:  February 4, 2013

## CERTIFICATE OF SERVICE

I, Andrew E. Russell, hereby certify that on February 4, 2013, this document was served

on the persons listed below in the manner indicated:

**BY E-MAIL**
David E. Moore
POTTER ANDERSON & CORROON, LLP
1313 N. Market St.,
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
dmoore@potteranderson.com

James C. Yoon
Stefani E. Shanberg
Robin L. Brewer
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
(650) 565-3645
jyoon@wsgr.com
sshanberg@wsgr.com
rbrewer@wsgr.com

/s/ Andrew E. Russell
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
*Attorneys for Plaintiff*
*Avid Technology, Inc.*

# Exhibit A

REDACTED