IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AVID TECHNOLOGY, INC.,                    )
                                          )
            Plaintiff,                    )
                                          )
        v.                                )        Civil Action No. 11-cv-1040 (GMS)
                                          )
HARMONIC, INC.,                           )
                                          )
            Defendant.                    )
                                          )

## ORDER CONSTRUING THE TERMS OF U.S. PATENT NOs. 6,760,808 and 7,487,309

After having considered the submissions of the parties and hearing oral argument on the

matter, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that, as used in the asserted

claims of U.S. Patent Nos. 6,760,808 (the "'808 Patent") and 7,487,309 (the "'309 Patent"):

1.  The term "independent storage units" is construed to mean "storage units which

    are not centrally controlled and whose memory addresses are not globally

    allocated."[1]

---

[1] While the parties agree that the meaning of the term "independent storage units" is limited by disclaiming statements made by the patentee during prosecution, they dispute the scope of that disavowal. (D.I. 90 at 7–8; D.I. 92 at 5.) Specifically, the parties contest the import of the following prosecution statements:

> The claimed system, by virtue of its "independent" storage units, avoids global allocation of the available storage. In particular, the storage units are independent because clients are aware of "identifiers" of segments and storage units on which segments are stored. The "location of each segment on [each] storage unit" is maintained at the storage unit on which the segment is stored. Further, the claimed system, by virtue of the "independent" storage units, avoids using a central controller to access data. In particular, storage units "receiv[e] . . . request[s] from one of the client systems for a segment of a file." Clients do not issue requests to a central controller that in turn identifies storage units that store the data and issues requests to storage units.

'808 Feb. 6, 2004 Reply to Office Action at 10.

The court agrees with the defendant, Harmonic, Inc. ("Harmonic"), that, with regard to the "central controller" issue, the patentee and plaintiff, Avid Technology, Inc. ("Avid"), set forth a broad disclaimer. The above prosecution statement is unambiguous on that point—systems with "independent storage units" cannot use a central controller to access data, and, in particular, cannot use a central controller that identifies the storage unit on which

2.    The term "redundancy information" is construed to mean "at least a copy of a segment" but may also include "information sufficient to recreate a segment."[2]

---

data is stored in response to client requests. Indeed, Avid makes the scope of this disclaimer even more clear in discussing the Boll prior art:

> In Boll, a client asks a centralized interface 24 to provide access to a server and receives from this interface an identity or connection data for a server to which the client is assigned. The client then performs its transactions with the assigned server. In contrast, the present invention relates to a distributed storage system in which data for a file is distributed among multiple independent storage units. Boll's assignment of a client to a server through a centralized interface for its transaction in [sic] contrary to the claim limitations noted above.

*Id.* at 11.

The court, however, believes Avid is correct on the "global allocation" point. While it did state that "[t]he claimed system, by virtue of its 'independent' storage units, avoids global allocation of the available storage," Avid went on to note that, "the storage units are independent because clients are aware of 'identifiers' of segments and storage units on which segments are stored" and "[t]he 'location of each segment on [each] storage unit' is maintained at the storage unit on which the segment is stored." *Id.* at 10. The latter part of Avid's prosecution statement can be read as clarifying that its reference was only to the localized allocation of memory addresses within storage units rather than the allocation of all storage. While the statement is certainly not clear, it is reasonably susceptible to such an interpretation, and that fact is fatal to Harmonic's disavowal position. The Federal Circuit has made clear that the doctrine of prosecution disclaimer applies only where the allegedly disavowing statements are clear and unambiguous. *See Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1344 (Fed. Cir. 2005); *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1327–28 (Fed. Cir. 2003).

[2] Certain prosecution statements by Avid make clear that "redundancy information" must include at least a copy of a segment. In attempting to overcome the Styczinski prior art, Avid noted:

> The Office Action first asserts that the 'redundancy information' is the parity information mentioned in columns 4 and 5 of Styczinski. The Office Action also refers to the redundant disks. The Office Action then asserts that this limitation is met by Fig. 6 of Styczinski, which merely shows the record format used on the write assist disk 104 of Styczinski. None of these structures in Styczinski is a *copy of the segment* as recited in the claims. To the extent that the write assist disk contains copies of segments, these copies are not permanent and are not *distributed among the plurality of storage units*. The parity information referred to by Styczinski, while distributed among its service units, are not copies of the data segments.

'309 Apr. 18, 2008 Reply to Office Action at 3. While the parties offer contrasting views as to the scope of the disclaimer, they correctly agree that this prosecution statement requires "redundancy information" to include copies. (D.I. 105 at 4; D.I. 107 at 7.)

The true dispute is whether "redundancy information" may also include, as Avid urges, "information sufficient to recreate a segment." As an initial matter, the court notes that Avid's Reply contains no obvious disavowal on this point. Again, prosecution disclaimer requires an unambiguous statement disavowing claim scope. *See Salazar*, 414 F.3d at 1344. Here, the court can draw only two firm conclusions from Avid's Reply position: (1) "[t]he parity information referred to by Styczinski . . . are not copies of the data segments" and, (2) by inference, such copies are required by the claim language of the patents-in-suit. Noticeably absent from Avid's prosecution statements, however, is any clear demand that the redundancy information be limited to copies of the data segments.

On the other hand, the specification and claim language do assist the court in resolving this dispute, as they suggest that "redundancy information" can include "information sufficient to recreate a segment." The specification refers to lost data being both "restored" and "recreated," and the court agrees with Avid that the latter process suggests something more than simply accessing a copy. '808 Patent at 15:49–52. The court also views Harmonic's references to the specification as an attempt to improperly import limitations into the claim language. *See Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("When consulting the specification to

2

3.     The term "nonsequentially" is construed to have its plain and ordinary meaning.[3]

---

clarify the meaning of claim terms, courts must take care not to import limitations into the claims from the specification."). While the specification does discuss storing separate copies of segments, *see, e.g.*, '808 Patent at 6:55–63, the "court will not limit broader claim language to that single application 'unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction,'" *Abbott Labs.*, 566 F.3d at 1288 (*quoting Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

     The claim language itself also supports Avid's position. Both patents-in-suit have dependent claims limiting the term "redundancy information" with substantially the following clause: "wherein the redundancy information for a segment is a copy of the segment." *See, e.g.*, '808 Patent at 28:28–30. If the court were to construe "redundancy information" as simply "a copy of each segment," as Harmonic proposes, it would render this limiting language superfluous. Such a construction would be "contrary to the well-established rule that 'claims are interpreted with an eye toward giving effect to all terms in the claim.'" *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)); *see also Phillips v. AWH Corp.*, 451 F.3d 1303, 1315 (Fed. Cir. 2005) ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

[3] The court agrees with Avid that this term should be given its plain and ordinary meaning. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (internal citations omitted).

     Harmonic contests this construction on two principal grounds, arguing that the term should be defined as "randomly or pseudorandomly independent of prior or subsequent selection." First, Harmonic notes that the specification only discloses the random or pseudorandom distribution of segments among the storage units. (D.I. 90 at 11–12.) Citing *Honeywell International, Inc. v. ITT Industries, Inc.*, 452 F.3d 1312 (Fed. Cir. 2006), Harmonic argues that "if the specification clearly indicates that the described embodiment is the only embodiment the claims cover, the claims are properly limited to that embodiment even if the claim language, removed from the context of the specification, could be read more broadly." (D.I. 105 at 8–9.)

     While the Federal Circuit did endorse such an approach in *Honeywell*, the court does not believe the specification statements at issue here are analogous or warrant a similar conclusion. *See* 452 F.3d at 1318–19. Unlike the patent at issue in *Honeywell*, the present specification does not explicitly define a system employing random or pseudorandom distribution as the invention itself. *See id.* at 1318 ("We agree with the district court that the claim term 'fuel injection system component' is limited to a fuel filter . . . On at least four occasions, the written description refers to the fuel filter as 'this invention' or 'the present invention' . . . ."). As the Federal Circuit has recognized, "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). Harmonic's proposed use of the specification statements here strikes the court as an example of the latter. *See Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("[T]his court looks to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment.")

     Harmonic also contests the plain and ordinary meaning by referencing what it claims is an indirect definition of "nonsequentially" contained in the written description. (D.I. 105 at 7.) Specifically, the patentee stated that "[i]n order to overcome the convoy effect, data may be striped in a random fashion, i.e., segments of a data file is stored in a random order among the disks rather than sequentially." '808 Patent at 1:64-67. In Harmonic's view, this statement "defines the opposite of sequentially (i.e., nonsequentially) as random." (D.I. 105 at 7.)

     The court, however, cannot agree with this conclusion. A careful reading of the specification statement indicates only that segments stored in "random" order are necessarily stored "nonsequentially"—it does not require

3

4.      The terms "identifier," "identifier of each segment," "identifier of the segment,"
        "identifier of a segment," and "identifier of the requested segment" are construed
        to have their plain and ordinary meanings.[4]

5.      The term "means, operative in response to a request from one of the client
        systems, for retrieving the requested segment of the file from the storage unit
        using the information associating the identifier of each segment stored on the
        storage unit with the location of each segment on the storage unit" is construed
        pursuant to 35 U.S.C. § 112, ¶ 6. The claimed function is "retrieving the
        requested segment of the file from the storage unit using the information
        associating the identifier of each segment stored on the storage unit with the
        location of each segment on the storage unit." The corresponding structure is a
        memory system on the storage unit (col. 12, lines 37–61); a table stored in the
        memory system, the table mapping a unique segment identifier for each segment

---

that the concept of "nonsequentially" be limited to "random" distribution. The plain and ordinary meaning of the
term captures the idea of "random" distribution and is not inconsistent with the specification.

[4] As noted above, "[i]n some cases, the ordinary meaning of claim language as understood by a person of
skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more
than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314
(internal citations omitted). The court believes that is the case here.

    Harmonic's arguments in favor of a more limited construction are unpersuasive. The defendant relies on
the following specification statement in contending that the term has been assigned a narrow definition:

    In order to access the segments of data, each segment should have a unique identifier. The copies
    of the segments may have the same unique identifier. The unique identifier for a segment is a
    combination of a unique identifier for the source, such as a file, and a segment number.

'808 Patent at 7:47–51. As an initial matter, the court notes that this supposed definitional language relates to a
"unique identifier" rather than an "identifier," the actual disputed claim term. Moreover, while a patentee is entitled
to act as his own lexicographer and divorce a claim term from its plain and ordinary meaning by providing a special
definition, in order to do so he "must 'clearly set forth a definition of the disputed claim term' other than its plain
and ordinary meaning . . . It is not enough for a patentee to simply disclose a single embodiment or use a word in the
same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term." *Thorner v.
Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal citations omitted). Here, Avid's
specification language does not rise to that level of clarity, and, as a result, the court understands the referenced
statement to be permissive rather than definitional.

to the location of that segment on the storage unit (col. 10, lines 46–50); a

processor or independent controller on the storage unit (col. 11, lines 54–67),

issuing program instructions to cause, for each request, the storage unit to transfer

data between the disk and the buffer indicated by the request. (col. 24, lines 22–

29).[5]

---

[5] The parties recognize that this term presents a means-plus-function limitation under § 112, ¶ 6 and correctly agree as to the claimed function. (D.I. 90 at 15; D.I. 92 at 13.) They are also largely in agreement with regard to corresponding structure. (D.I. 90 at 15; D.I. 92 at 13.) Harmonic, however, includes in its proposed structure the use of disk queue 300 from Figure 19. (D.I. 90 at 15.) Thus, Harmonic's proposed construction reads:

> a memory system on the storage unit (col. 12, lines 37-61); a table stored in the memory system, the table mapping a unique segment identifier for each segment to the location of that segment on the storage unit (col. 10, lines 46-50); a processor or independent controller on the storage unit (col. 11, lines 54-67), issuing program instructions to cause, in response to a request from a client system, the storage unit to transfer data between the disk to the buffer through use of disk queue 300 from Fig. 19, which has four subqueues 302, 304, 306 and 308, one for each of the playback, capture, authoring and service and maintenance client programs, respectively; subqueues 302, 304, 306, and 308 comprise a request field 312 indicating the client making the request and the requested operation, a priority field 314 indicating the priority of the request, and a buffer field 316 indicating the buffer associated with the request; priority field 314 may be a deadline, a time stamp, an indication of an amount of memory available at the client, or an indication of an amount of memory currently available at the client.

(D.I. 86, Ex. A at 7.)

The court rejects this attempt to include disk queue 300 and its subqueues. In identifying corresponding structure under § 112, ¶ 6, the Federal Circuit has warned against "import[ing] functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger Mfg., Inc. v. Coating Machinery Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001); *see also Kudlacek v. DBC, Inc.*, 25 F. App'x 837, 843–44 (Fed. Cir. 2001). Harmonic falls into precisely this trap, urging the court to accept certain structure that, while unquestionably disclosed in the specification, is more properly directed toward "prioritizing" the delivery of segments than the claimed "retrieving" function at issue here.

Harmonic's proposed construction rests upon both an abstract and a textual argument. On the abstract side, Harmonic notes that the invention relates to "the retrieval and transfer of data for the specific purpose of providing 'multiple high-bandwidth streams of data between multiple storage units and multiple clients,'" and argues that prioritization of the retrieval of segments is therefore a necessity. (D.I. 105 at 11–12.) While this may be true, there is no evidence that prioritization is required to perform the agreed-upon function here, and there is certainly no clear linkage. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003) ("A disclosed structure is corresponding only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim.'" (internal citation omitted)).

Harmonic's textual argument relies on the "operative in response to a request from one of the client systems" segment of the claim term. Joining this language and the specification statement that "[i]n order to manage the requests, a queue 48 of the requests is maintained by each of the storage units," the defendant concludes that the '808 Patent "clearly links queues as responding to and managing the request for segments in the storage units." (D.I. 115 at 106–107.) Harmonic, however, appears to make the mistake of "import[ing] functional limitations that are not recited in the claim," by merging the concept of the client submitting a request with the actual retrieval function. (D.I. 115 at 106 ("So what we are talking about, Your Honor, is that the client makes a request. And in response to that request, you are pulling the data from the storage unit. That's the function that's being performed

6.  The term "means for sending the requested segment to the client system" is construed pursuant to 35 U.S.C. § 112, ¶ 6. The claimed function is "sending the requested segment to the client system." The corresponding structure is a network interface at the storage unit (col. 11, lines 33–36); a processor or independent controller on the storage unit (col. 11, lines 54–67), issuing program instructions to transfer data from the disk queue to the network queue (col. 24, lines 27–29).[6]

7.  The term "means for sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored" is construed

---

here.")   If the claimed function actually dealt with managing segment requests from clients, Harmonic's prioritization queues might represent corresponding structure. The function at issue, however, is "retrieving the requested segment of the file from the storage unit using the information associating the identifier of each segment stored on the storage unit with the location of each segment on the storage unit," and only involves client requests to the extent they act as a trigger.

[6] As with the previous term, the parties correctly acknowledge that this term should be construed under § 112, ¶ 6 and agree on the claimed function. Again, however, Harmonic urges the court to go beyond the agreed-upon corresponding structure and include references to, *inter alia*, disk queue 300, network queue 320, and various subqueues. (D.I. 90 at 16.) The court declines this invitation. Harmonic contends that these added proposed structures (1) are needed to allow a storage unit to prioritize and schedule the transfer of segments, (D.I. 105 at 13–14), and (2) must be included as corresponding structure because they represent the only disclosed embodiments of the generic "disk queue" and "network queue," which both parties agree correspond to the claimed function (D.I. 115 at 114).

Harmonic's first argument suffers from substantially the same flaws as its position regarding the term discussed in footnote 5. For the reasons explored above, the court is not persuaded that a clear link exists between Harmonic's additional structures and the "sending" function at issue here. While Harmonic cites *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291 (Fed. Cir. 2005) for the proposition that "corresponding structure . . . must include all structure that actually performs the recited function," its proposed additional structures do not, in fact, perform the function of "sending." 412 F.3d at 1298. Rather, they perform related functions—prioritizing and scheduling—that may be helpful to the invention but are not addressed in the claim language itself.

The second argument is related and similarly defective. While the additional proposed structures provide examples of the corresponding "disk queue" and "network queue," they are embodiments that perform a specialized form of the "sending" function related to video playback. As noted above, it is improper to import "structural limitations from the written description that are unnecessary to perform the claimed function," and the claimed function here is only "sending the requested segment to the client system." Though Harmonic's video-related structures may send segments, they are directed to a number of unrecited, unrequired functions and go beyond what is necessary. The court confines this portion of the corresponding structure to the queues disclosed at col. 24 lines 27–29.

pursuant to 35 U.S.C. § 112, ¶ 6. The claimed function is "sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored." The corresponding structure is a network interface at the client system (col. 11, lines 33–36); a processor or independent controller on the client system (col. 11, lines 54–67), configured to issue program instructions to cause the network interface to send the read request to the storage unit (Fig. 16 (step 274) and col. 21, lines 17–20).[7]

---

[7] Again the parties agree that this term should be construed pursuant to § 112, ¶6 and accurately identify the claimed function as "sending a request, for each segment of the data requested by the application, to the storage unit on which the segment is stored." Their principal dispute is whether the corresponding structure must include structure allowing the client to select the storage unit to which it sends the segment requests.

Harmonic argues that, in order for a client to send a request, it necessarily first must select the applicable storage unit. (D.I. 105 at 14.) In support of this position, the defendant first notes that "[s]ince each segment is stored in the system twice, the segment table will identify two storage units where the segment is stored . . . The client must then decide which storage unit it wants to get the segment from." (*Id.*) This statement, however, is inaccurate—as the court has already observed, "redundancy information" may include "information sufficient to recreate a segment" and the system therefore need not contain multiple copies of each segment. *See supra* note 2. Additionally, Avid correctly points out that, even if segment copies were distributed, there would be no logical requirement that the client perform a selection—it could simply send multiple requests. (D.I. 115 at 121.)

Harmonic also relies upon the following specification language: "When the client requests a segment of data for a particular data stream, the client selects a storage unit, in step 272, for the segment that is requested." '808 Patent at 21:10–12. In the defendant's view, this statement explicitly incorporates a selecting step into the claimed "sending a request" function. (D.I. 90 at 17.) The court, however, cannot assign it so broad a meaning—the specification goes on to provide that "[t]here are *several* ways to initiate the pre-read requests, including selection of a storage unit." '808 Patent at 21:34–35 (emphasis added). The written description merely indicates that "selecting" may precede the claimed function of "sending."

As with earlier claim terms, Harmonic is conflating the corresponding structure required to perform the recited function with structure necessary to perform "ancillary functions that are not recited by the claim but whose performance may precede performance of the recited function." (D.I. 107 at 14.) Even if the court were convinced that, as a practical matter, a client must select a storage unit to send a segment request, it would still be improper to import a "selecting" function into the claim itself. As Avid notes, "[a] device may need to be powered-up or connected to a network before it may send a request to a storage unit. However, just like 'selecting the storage unit,' these other functions 'are not recited in the claim' and the structures that perform them 'are unnecessary to perform the claimed function . . . .'" (*Id.* (quoting *Wenger*, 239 F.3d at 1233).)

Finally, the court notes that adopting Harmonic's view of corresponding structure would run afoul of the doctrine of claim differentiation, as dependent Claim 7 explicitly recites "[t]he file system of claim 6 . . . wherein the means for determining the storage unit on which the segment is stored includes means for selecting one of the storage units . . . ." *See Phillips*, 451 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

8.    The term "means for selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced" is construed pursuant to 35 U.S.C. § 112, ¶ 6. The claimed function is "selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced." The corresponding structure is a processor or independent controller on the client system (col. 11, lines 54–67), issuing a program instruction to implement the algorithm in Fig. 17 and described in col. 21:51–22:26 and 22:52–23:5 or one of the alternatives discussed in Col. 23:6–32.[8]

9.    The term "means for scheduling the transfer of data from the storage unit such that the storage unit efficiently transfers data" is construed pursuant to 35 U.S.C. § 112, ¶ 6.

---

[8] The parties correctly identify the claimed function of this means-plus-function term as "selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced." They fail, however, to agree on the corresponding structure.

Avid contends that Harmonic's proposed structure contains "elaborate aspects of particular embodiments . . . which are not necessary to perform the claimed function of selecting." (D.I. 92 at 16–17.) In its view, "[a]n accused infringer would know if an accused product 'select[ed] one of the storage units' according to some 'load balancing criteria,' and this is all that the construction requires." (D.I. 107 at 16.) Harmonic, on the other hand, notes that "a proper construction limits the claim element to the corresponding structure disclosed in the specification and its equivalent," and argues that "[t]he alternative methods are not merely examples, but rather set the 'metes and bounds' of the scope of this means-plus-function limitation." (D.I. 90 at 18.)

The court believes that Avid might well have provided sufficient structure simply by disclosing "a processor or independent controller issuing program instructions to identify a storage unit . . . according to load balancing techniques," the patentee chose to provide more, reciting the algorithm in Fig. 17 and the various methods cited by Harmonic as specific techniques by which the program instructions might accomplish load balancing. The Federal Circuit has held that "corresponding structure . . . must include all structure that actually performs the recited function." *Default Proof Credit Card Sys.*, 412 F.3d at 1298 (Fed. Cir. 2005). Since the embodiments found in col. 21:51–22:26 and 23:6–32 do actually perform the function at issue here, they must be included as corresponding structure. The fact that the specification provides multiple exemplary embodiments presents no problem—they may simply be viewed as alternative corresponding structures. *See Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000).

The fundamental difference between this term and several of the means-plus-function terms disputed above is that the recited function here—"selecting one of the storage units on which the segment is stored such that a load of requests on the plurality of storage units is substantially balanced"—explicitly contemplates the load balancing achieved by Harmonic's proposed structures. This limitation is not directed to merely "selecting one of the storage units." Rather, it demands corresponding structure capable of selecting a storage unit in a particular way.

The claimed function is "scheduling the transfer of data from the storage unit such that the storage unit efficiently transfers data." The corresponding structure is a processor or independent controller on the client system (col. 11, lines 54-67), issuing program instructions to submit a request to a storage unit to cause it to transfer requested data from a disk buffer into a network queue (col. 8, lines 15-24).[9]

10.     The term "means for distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment" is construed pursuant to 35 U.S.C. § 112, ¶ 6. The claimed function is "distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment." The corresponding structure is a network interface at the client system (col. 11, lines 33-36); a processor or independent controller on the client system (col. 11, lines 54-67), issuing program instructions to cause the network interface to send one or more write requests to the storage units for the segment and its copy (Fig. 3 (step 124), Fig. 6 (step 214)).[10]

---

[9] The parties correctly agree as to the claimed function of this means-plus-function term but dispute the scope of the corresponding structure. The court agrees with Avid that it need not import limitations from the specialized embodiment of queue 48 relied upon by Harmonic. (D.I. 92 at 17.) The court's reasoning largely parallels that set forth above regarding the "means for sending the requested segment to the client system" claim term. *See supra* note 6. Put simply, Harmonic's additional proposed structure is most accurately viewed as directed toward a specialized form of the recited function and not the function itself. Including those embodiments within the corresponding structure would risk improperly "import[ing] functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger Mfg.*, 239 F.3d at 1233.

[10] Once again, the parties correctly agree as to the claimed function of this means-plus-function term but disagree regarding the corresponding structure. As with the "means for sending a request . . . to the storage unit on

Dated: April / 5, 2013

CHIEF, UNITED STATES DISTRICT JUDGE

---

which the segment is stored" term discussed above, the principal dispute is whether the corresponding structure must include structure directed toward the selection of storage units. (D.I. 105 at 16–17.) Harmonic contends that "[t]he claimed function of 'distributing each segment, and the redundancy information for each segment, among the plurality of storage units by sending to the storage unit the segment of the data and the identifier of the segment' requires selecting the storage units where the segment and redundancy information should be stored." (D.I. 90 at 20.)

As with the "means for sending" term, however, Harmonic's proposed construction here encounters a claim differentiation problem. The present term appears first in Claim 18. Dependent Claim 19 then recites: "The file system of claim 18 . . . wherein the means for distributing comprises: means for selecting . . . ." '808 Patent 30:53–56. "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *See Phillips*, 451 F.3d at 1315.

10